# EXHIBIT K

NOT FOR PUBLICATION                          [Docket No. 70]

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

```
-----------------------------------
                                   :
MARY LOUISE MASTERSON and          :
RICHARD MASTERSON, her husband,    :
                                   :
               Plaintiffs,         :   Civil No. 03-3202(RMB)
                                   :
        v.                         :
                                   :   OPINION & ORDER
B.J. STORES, INC., T/A HOYS        :
5&10, SUNSPECS, INC., JOHN DOE,    :
MARY DOE, ABC PARTNERSHIPS AND     :
XYZ CORPORATIONS,                  :
                                   :
               Defendants.         :
                                   :
-----------------------------------
```

APPEARANCES:

Paul Richard D'Amato, Esquire
Steven R. Cocci, Esquire
D'Amato Law Firm
401 New Road, Suite 103
Linwood, New Jersey 08221
(609) 926-3300
     Attorneys for Plaintiffs

Richard Hollstein, Esquire
Hollstein Keating Cattell Johnson & Goldstein P.C.
Willow Ridge Executive Office Park
750 Route 73 South, Suite 301
Marlton, New Jersey 08053
(856) 810-8860
     Attorney for Defendant Sunspecs, Inc.

**BUMB**, United States District Judge:

        This matter comes before the Court upon a motion by

Defendant, Sunspecs, Inc., to exclude the testimony of Plaintiff,

1

Mary Louise Masterson's, expert witness. Defendant contends that Plaintiff's expert's qualifications and methodology do not support the opinions he offers. In the event the Court excludes the expert testimony, Defendant renews its motion for summary judgment. For the reasons discussed below, Defendant's motion will be granted in part and denied in part.

I.   STATEMENT OF FACTS

On the eve of trial, the parties and the Court are well versed on the underlying facts. They will be only briefly recounted here. More detailed will be the facts central to the instant motion, the qualifications and report of Plaintiff's expert, William Kitzes.

Plaintiff Mary Louise Masterson is a grandmother in her early seventies who, on June 24, 2002, was vacationing with her children and grandchildren in Cape May, New Jersey. On that date, she rode a bodyboard, also known as a "boogie board," in the Atlantic Ocean and was overcome by a wave that caused her head to strike the ocean floor. The resulting impact injured Plaintiff's neck and spinal cord.

The bodyboard used by Plaintiff had been purchased in the summer of 2000 and brought to the beach by her family. Plaintiff claims that when a wave came, she plopped herself down on the bodyboard and then somersaulted, she hit her head on the sand,

2

and she then heard a crack.  The parties dispute whether or not Plaintiff and the board became separated before she hit the sand.

Prior to entering the water Plaintiff did not ask for any instruction or information concerning how to use bodyboards. Although this was Plaintiff's first time bodyboarding, Plaintiff has testified that she is very comfortable in the ocean – she spent a lot of time around waves growing up near Jones Beach in Long Island, New York.  When she picked up the bodyboard that she used, she looked for the string attached to the board, but did not see any warnings or instructions on the board.  Plaintiff claims that she would have read any warning affixed to the board and heeded the warning had one been provided.  Plaintiff also claims that she should have kept her head behind the nose of the board and that she would not have suffered her injury had she known this since she would have either abided by the warning or may not have gotten on the bodyboard at all.

In July of 2003, Plaintiffs Mary Louise Masterson and her husband, Richard Masterson, brought products liability claims against several defendants who were alleged to have designed, manufactured, or sold the bodyboard.[1]  In the intervening years all defendants, save Sunspecs, have been dismissed for various reasons.  In November of 2006, this Court held that under New

---

[1]     Only Mrs. Masterson is relevant to the issues at hand. Therefore, the Court will use "Plaintiff" in reference only to Mrs. Masterson.

Jersey's Product Liability Act ("NJPLA"), N.J. Stat. Ann. §
2A:58C-1 et seq., Defendant Sunspecs, Inc. ("Sunspecs"), was a
manufacturer or seller of the bodyboard and could be liable for
harm caused by the bodyboard. [Doc. No. 63].

In support of her claims, Plaintiff offers the testimony of
William Kitzes ("Kitzes"), product safety manager at Consumer
Safety Associates. Kitzes claims that the bodyboard used by
Plaintiff should have had a warning on how to use the board.
Namely, Kitzes' report states that riders should be warned to
ride with their head below the nose of the board to reduce the
risk of catastrophic neck injuries. Kitzes further states that
affixing to the product an adequate warning would have
substantially reduced or eliminated the injury to Plaintiff.

Kitzes is an expert of product safety management. He is a
Board Certified Product Safety Manager and Hazard Control
Manager. Kitzes holds a Certificate in Safety Management from
the American Society of Safety Engineers, a Bachelor of Arts
degree from the University of Wisconsin, with a major in history
and minor in Political Science, and a law degree from Washington
College School of Law.

Among Kitzes' 30 years of experience in safety analysis is
seven years at the U.S. Consumer Product Safety Commission. For
three of those years he was Legal Advisor to the Director, Office
of Product Defect Identification, and he was responsible for
identifying product defects, implementing recalls and developing

4

voluntary corrective action plans under Section 15 of the Consumer Product Safety Act. He is currently Principal Safety Analyst at Consumer Safety Associates. Kitzes has been retained as a consultant for a number of major manufacturers on product safety issues. He has testified as to the principles used in performing a safety analysis in over 90 trials in 28 states, Canada and Australia.

Plaintiff submits Kitzes's report that she contends offers opinions: (1) that Sunspecs "failed to adequately warn" bodyboard users about the potential for catastrophic injury caused by failing to keep the nose of the board out in front of the rider's head", and that the warning would have "substantially reduced or eliminated the injury" to Masterson, (Pl.'s Opp. Ex. C at 6, 8); and (2) that Sunspecs failed to warn users of the risk of catastrophic injury. (Id. at 6). Prior to rendering his expert opinion, Kitzes cites to principles of what he calls "product safety management." He lists six "product safety principles" that manufacturers should apply "to ensure that products are reasonably safe." According to Kitzes, "the seminal principles that create the model for product safety management have been well established and widely accepted in business, government, and academic institutions for over 50 years." Id.

Kitzes' basis for concluding that a board without a warning or instruction to "ride with your head behind the nose of the board" is dangerous is based on (1) two other manufacturers that

5

included similar warnings in their materials, and (2) a 1990 study reported by Captain Bill Richardson of Huntington Beach, California, indicating that there were many reports of cervical (neck-related) injury while bodysurfing and bodyboarding in Southern California. (See Def.'s Br. Ex. D). The first warning Kitzes identifies on another manufacturer's bodyboard dates to 2001, a year after the board at issue here was purchased. The second manufacturer's warning is undated. Additional paperwork with the warning is dated February 2000, months prior to when the board at issue here was purchased. That warning states "Always keep the nose of the board out in front of the rider's head."

Kitzes did not reconstruct the accident. (Def.'s Br. Ex. C at 49). He further states that he could not tell "physically specifically" what would have happened to Ms. Masterson had she followed a warning to ride with her head behind the nose of the board. Id. Kitzes does not claim to be able to give an opinion as to whether the position of Ms. Masterson's head on the board had anything to do with her accident.

Defendant now moves to preclude Kitzes' report and testimony. Defendant also asserts that without Kitzes' report and testimony, Plaintiff has insufficient evidence for a reasonable jury to conclude Sunspecs is liable. Thus, Sunspecs argues, it is entitled to summary judgment.

6

II.  <u>SUNSPECS' MOTION TO PRECLUDE EXPERT TESTIMONY</u>

Defendant Sunspecs, Inc. seeks to bar the testimony of
Plaintiffs' expert William F. Kitzes under Fed. R. Evid. 702 and
the principles espoused by <u>Daubert v. Merrell Dow</u>
<u>Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny.
Sunspecs contends that Kitzes' testimony is deficient in many
respects.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based on sufficient facts or data, (2) the testimony is
> the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods
> reliably to the facts of the case.

In <u>Daubert</u> the Supreme Court held that under Rule 702 district
court judges must act as gatekeepers to insure that expert
testimony is reliable, relevant, and helpful to the jury.  509
U.S. at 597.  This gatekeeping responsibility applies to all
expert testimony, whether or not "scientific" in nature.  <u>Kumho</u>
<u>Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999).  <u>See also</u>,
<u>Elcock v. Kmart</u>, 233 F.3d 734, 744 (3d Cir. 2000).  The proponent
of the expert testimony at issue bears the burden of showing that
the testimony satisfies the requirements of Rule 702.  <u>Oddi v.</u>
<u>Ford Motor Co.</u>, 234 F.3d 136 (3d Cir. 2000), <u>cert. denied</u>, 532
U.S. 921 (2001).

7

In order for an expert's opinion to be reliable, the expert must have "good grounds" for his or her belief. The opinion, to be reliable, must be based on the "methods and procedures of science" and not merely on "subjective belief or unsupported speculation." <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 742 (3d Cir. 1994) (<u>quoting</u> <u>Daubert</u>, 509 U.S. at 589), <u>cert. denied</u>, 513 U.S. 1190 (1995).

In assessing the reliability of an expert's methodology under <u>Daubert</u>, the trial court must consider various factors, including: (1) whether a method consists of a testable hypotheses; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. <u>Oddi</u>, 234 F.3d at 145; <u>Elcock</u>, 233 F.3d at 745-46; <u>In re Paoli</u>, 35 F.3d at 742 n.8.

An expert in a products liability case offered to testify regarding inadequate warnings must meet the <u>Daubert</u> criteria. <u>Milanowicz v. Raymond Corp.</u>, 148 F. Supp. 2d 525, 541 (D.N.J. 2001). As applied by the Third Circuit, <u>Daubert</u> requires resolution of three questions. First, whether the expert is

8

qualified.  Second, whether the expert's methodology is sound and supports the opinion rendered.  Third, whether the opinion would inform the trier of fact in resolution of the factual disputes.  <u>Milanowicz</u>, 148 F. Supp. 2d at 530-31 (<u>citing</u> <u>In re Paoli</u>, 35 F.3d at 741-43).  In performing its function as a gatekeeper, this Court must therefore find that Kitzes meets the foregoing criteria.

### A. <u>Kitzes' Qualifications</u>

The first step in the Rule 702 analysis requires that the expert be qualified.  <u>See</u> Fed. R. Evid. 702; <u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 321 (3d Cir. 2003).  And, of course, the expert must be qualified to testify regarding the opinions he intends to give.  <u>Id.</u>  The expert witness must have such "skill, knowledge or experience in the field as to make it appear that his opinion will probably aid the trier of fact in his search for the truth."  <u>Aloe Coal Co. v. Clark Equip. Co.</u>, 816 F.2d 110, 115 (3d Cir.) <u>cert. denied</u>, 484 U.S. 853 (1987).  At a minimum, the expert must possess skill or knowledge greater than the average layman on the subject upon which he proposes to testify.  <u>See id.</u>

Here, Kitzes' qualifications are the following: He has a Bachelor of Arts degree from the University of Wisconsin, with a major in history and minor in Political Science.  He holds a law degree from Washington College School of Law.  Kitzes is not a medical doctor, an engineer, or a biomechanical engineer.  However, Kitzes does have over 30 years of research and

9

experience at the U.S. Consumer Product Safety Commission ("CPSC"), the Institute for Safety Analysis and Consumer Safety Associates, where he is currently Principal Safety Analyst and Product Safety Manager. Kitzes is a Board Certified Product Safety Manager and Hazard Control Manager, and holds a Certificate in Safety Management from the American Society of Safety Engineers.

Kitzes has served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying product defects, implementing recalls and developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act, 15 U.S.C. § 2051 et seq. As the CPSC Program Manager for Sports, Recreation and Power Equipment (1977-1980), Kitzes was certified by the U.S. Government's Safety Management/Engineering Series (GS-018/803). He supervised a team of engineers, epidemiologist, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer products injuries. He directed the application of injury prevention tools, mandatory and voluntary standards, on-product warnings, and safety education campaigns. His work resulted in publication of the Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 C.F.R. § 1205 (1979). Kitzes has also served as the CPSC representative to various industry groups and standards development committees,

including American National Standards Institute (ANSI), American Society for Testing & Materials (ASTM), the Outdoor Power Equipment Institute and the Sporting Goods Manufacturers Association.

Kitzes has been retained as a consultant for a number of major manufacturers on product safety issues. He has testified as an expert on several occasions. Thus, Kitzes is clearly qualified to testify as to the principles used in performing a safety analysis, as Plaintiff seek to introduce.

The question for this Court to decide, however, is whether Kitzes's qualifications and methodology support his expert opinions. Plaintiff seeks to introduce the following opinions to support his claims. (Mar. 6, 2007, Hearing Tr. at 19:2-5). Kitzes offers that,

> "An adequate warning informing users to keep their head behind the nose of the board to avoid catastrophic injury...would have substantially reduced or eliminated the injury to [the Plaintiff], and that such warning "would have the beneficial effect of providing crucial safety information."

(Pl.'s Opp. Ex. C at 8). Kitzes also offers that, "Sunspecs . . . failed to act as a reasonably prudent . . . retailer to adequately protect children and adults from the catastrophic risks of injury associated with the foreseeable use of the . . . bodyboard." (Id. at 6).

**B. Reliability of the Expert Opinion**

The answer to this question involves the second step in the

11

<u>Daubert</u>/Rule 702 analysis - - whether the expert's opinion is reliable.  In order for an expert's opinion to be reliable, the expert must have "good grounds" for his belief.  The opinion must be based on the "methods and procedures of science" and not merely on "subjective belief or unsupported speculation."  <u>In re Paoli</u>, 35 F.3d at 742, (<u>quoting</u> <u>Daubert</u> 509 U.S. at 589).

In assessing the reliability of an expert's methodology under <u>Daubert</u>, the trial court must consider various factors, including: (1) whether a method consists of a testable hypotheses; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  <u>Oddi</u>, 234 F.3d 145; <u>Elcock</u>, 233 F.3d at 745-46 (3d Cir. 2000); <u>In re Paoli</u>, 35 F.3d at 742, n.8.

There are several additional "indicia of reliability" that have particular relevance in a products liability case such as this, including: (1) federal design and performance standards; (2) standards established by independent organizations; (3) relevant literature, (4) evidence of industry practice; (5) product design and accident history, (6) whether the expert uses

illustrative charts and diagrams, (7) data from scientific testing, (8) the feasibility of the suggested modification, and (9) the risk-utility of the suggested modification.  <u>Milanowicz</u>, 148 F. Supp. 2d at 532-536.

In addition to the general reliability criteria of <u>Daubert</u>, in a warnings case, where an expert proposes alternate warnings he should at least either test the effectiveness of those warnings or point to contemporaneous industry practice. Otherwise the reliability of the expert's testimony on the proposed warning is "extremely questionable."  <u>Milanowicz</u>, 148 F. Supp. 2d at 541 (<u>quoting</u> <u>Jaurequi v. Carter Mfg. Co.</u>, 173 F.3d 1076, 1084).

Kitzes begins his expert report by identifying six principles found in a satisfactory product safety management programs.  (Pl.'s Opp. Ex. C at 2-3).  Those six principles are: 1) establish and observe a written safety policy; 2) adequately identify and evaluate product hazards; 3) perform an adequate design review integrating product hazards and foreseeable consumer use; 4) develop adequate warnings; 5) continuously monitor product safety data; and, 6) take corrective action to remedy product defects.  (<u>Id.</u>).  Kitzes' product safety management program is arrived at based on several sources. Kitzes cites to several publications developed over the past century and used in the field of product safety management.  (<u>Id.</u> at 4-5).  Kitzes' report reveals that he has published many

articles and book chapters outlining the principles of safety management and analysis, that he has lectured at the National Safety Council on injury prevention and warnings, and that he has assisted major manufacturers, distributors and retailers on safety management issues. (Pl.'s Opp. Ex. C at 5).

Specific to this case, and quite significantly, Kitzes does not rely on standards established by independent organizations; product design and accident history; illustrative charts and diagrams; data from scientific testing; the feasibility of the suggested modification; or the risk-utility of the suggested modification. See Milanowicz, 148 F. Supp. 2d at 541.

### C. No Relationship Between Kitzes' Opinions and Methodology

As mentioned, Plaintiff seeks to offer Kitzes' opinion that Sunspecs "failed to adequately warn" bodyboard users about the potential for catastrophic injury caused by failing to keep the nose of the board out in front of the rider's head", (Pl.'s Opp. Ex. C at  6), and that the warning would have "substantially reduced or eliminated the injury" to Masterson. (Id. at 8). But, he admits that he failed to test the effectiveness of such a warning or point to industry practice at the time the bodyboard was manufactured. As such, these opinions are "extremely questionable" and therefore are not reliable under Daubert for the following reasons.

The product safety principles, about which Kitzes is clearly qualified to testify, do not provide any methodology to reach the

14

conclusion that the bodyboard at issue inadequately warned users. Kitzes' sole basis for concluding that a board without a warning or instruction to "ride with your head behind the nose of the board" is dangerous is based on (1) two other manufacturers that included similar warnings in their materials, and (2) a 1990 study by a Captain Bill Richardson in Huntington Beach, California, indicating that there were many reports of cervical injury while bodysurfing and bodyboarding in Southern California. The 1990 article, however, simply documents the frequency of cervical injuries by bodysurfers and bodyboarders at particular beaches without discussing or documenting the user's <u>position</u> on the board in relation to the injuries. (<u>See</u> Def.'s Br. Ex. D).

Moreover, Kitzes' reliance on other manufacturers does not go beyond the mere fact that these two manufacturers had similar warnings. On its own, the warning that post-dates the purchases of the bodyboard at issue here cannot be relied upon to demonstrate what Sunspecs knew or should have known the year prior. The instruction on the second bodyboard, which a trier of fact could infer pre-dates the purchases of the board at issue here, is also of little help. For one, the "warning" is really little more than an instruction; it does not refer or even allude to potential injury if not followed.

Moreover, there is no science as to what research, if any, the manufacturer performed, whether the instruction was implemented because of studies/data supporting Kitzes' conclusion

15

- - that is, keeping one's head behind the nose of the board serves to avoid catastrophic injury.  In essence, it appears that Kitzes merely looked at other manufacturers' warnings and decided that since these warnings were on other boards, such warnings should have been used here.  He has not offered <u>any</u> data to support why these warnings were placed, such as the research done, the analysis or studies performed, etc.  Simply put, Kitzes's methodology would seem to only support his conclusions on how Sunspecs should have performed and maintained a product safety management program.

This shortcoming is similar to the flaw in <u>Milanowicz</u>.  148 F. Supp. 2d 525.  In <u>Milanowicz</u>, a design defect case, the court excluded Plaintiff's expert testimony on alternative designs.  As here, the expert in <u>Milanowicz</u> identified a number of standards at the beginning of his report but failed to reference those standards in the body of his report.  <u>Id.</u> at 538.  There was no relationship between the methodology employed and the opinion reached.  <u>Id.</u> at 538-39.  Thus, the opinion is presumptively unreliable.  <u>Id.</u>  Moreover, the expert in <u>Milanowicz</u> offered untested alternative designs which he opined would be safer.  <u>Id.</u> at 541.  Here, Kitzes suggests warnings that should have been given.  However, the <u>Milanowicz</u> court barred testimony on the alternative design because the expert offered no evidence of the alternative design's feasibility or utility.  <u>Id.</u>  Thus, the alternative design's validity was highly questionable.  <u>Id.</u>

16

Likewise, here, this Court will bar testimony of Kitzes'
suggested warnings because he has offered no evidence on why the
placement of the board in relation to the user's body is more or
less dangerous than other placements, i.e., the utility of the
recommended warning.

Kitzes also admits that he did not reconstruct the accident.
(Def.'s Br. Ex. C at 48).  He further admits that he could not
tell "physically specifically" what would have happened to Ms.
Masterson had she followed a warning to ride with her head behind
the nose of the board.  (Id. at 85).  Specifically, in his
deposition, Kitzes testified:

> Q:    Do you have any basis for concluding that
>       it's at all beneficial for a person to have
>       their head in back of the front of the body
>       board when body boarding other than the fact
>       that other manufacturers have put such a
>       warning in their materials?
>
> A:    Well, I haven't done a reconstruction, again,
>       but it's just my understanding that that's
>       the proper and safe way to ride it.
>
> Q:    And is that understanding obtained from the
>       fact that other manufacturers included that
>       warning in their materials?
>
> A:    Well, and just studying, you know, some of
>       the other material that we've marked here.
>       It mostly comes from the manufacturers, but
>       that's just my understanding.

(Id. at 141:6-21).

In short, Kitzes admits that he is not able to give an
opinion as to whether the position of Ms. Masterson's head on the
board had anything to do with her accident.  It is clear,

therefore, that Kitzes has employed no methodology, much less a reliable methodology, to reach his causation conclusion.  It is based on his "understanding" that two other manufacturers have warnings.  That is not sufficient by any standard.

Accordingly, the Court will grant the motion, excluding Kitzes' opinions that Sunspecs failed to adequately warn bodyboard users to keep their heads below the nose of the board and that this instruction warning would have substantially reduced or eliminated the injury.[2]  The Court will allow, however, Kitzes to testify as to the general principles of product safety management and the methodology and sources utilized.  The Court will also allow Kitzes to testify that, based upon his analysis of these foregoing principles, Sunspecs failed to warn users of the risks of catastrophic neck injury associated with the foreseeable use of the bodyboard, as discussed more fully below.


III.  SUNSPECS' RENEWED MOTION FOR SUMMARY JUDGMENT

Sunspecs argues that once Kitzes' expert opinion that a warning would have reduced the risk of injury to the Plaintiff is excluded, the Plaintiff cannot prove either that the bodyboard should have had a warning or that the lack of warning proximately caused Plaintiff's accident.  This Court agrees that the

---

[2]     The same testimony by the Plaintiff is likewise barred.

18

exclusion of Kitzes' testimony will impact the sufficiency of the Plaintiff's case.  The question is, does any part of Plaintiff's case survive summary judgment without Kitzes' testimony as outlined above?  In order to answer this question, an understanding of the exact nature of Plaintiff's claim is critical.

### A.  Plaintiff's Claims

The claims alleged by Plaintiff have had some refining, to say the least.  At an earlier hearing on Sunspecs' initial motion for summary judgment it appeared to the Defendant and the Court that Plaintiff was complaining of two warnings that should have been given.  One, a warning that bodyboarding is dangerous (the so-called "general warning"), and the other, a warning on how to properly use the bodyboard, by keeping one's head below the nose of the board (the so-called "instruction warning").  Upon probing by the Court, counsel for Plaintiff indicated that Plaintiff was only complaining of the instruction warning.  Counsel conceded that the dangers of bodyboarding were obvious.  (Nov. 2, 2006, Hearing Tr. at 31:7-20).

The issue of the exact nature of Plaintiff's claim appeared settled until the parties appeared before the Court on Sunspecs' motion to exclude the expert testimony of Kitzes.  At that argument, it eventually became clear to the Court that there was confusion among the parties as to Plaintiff's precise claim. Plaintiff's counsel contended that he had never, nor intended to,

abandon Plaintiff's claim that the bodyboard at issue should have had a warning that "neck injury" could occur.  With such warning, Plaintiff would have had a choice to make, and would never have gone into the water.  (Mar. 6, 2007, Hearing Tr. at 23:9 to 24:3).

After much colloquy, Plaintiff's claims were clarified.  In essence, Plaintiff conflates the general warning and instruction warning, that is, that there should have been a warning as to how to use the board and to alert the user that use of the board could cause "neck injury."[3]  (See, e.g., id.).  The Court will proceed with its analysis on the basis of these two claims: that the bodyboard should have contained a warning advising users of the risk of catastrophic neck injury associated with the use of the bodyboard (the general warning); and, that the bodyboard should have contained a warning that a user should ride with his or her head below the nose of the board to reduce the risk of neck injury (the instruction warning).

Although, arguably Plaintiff conceded the first claim, the Court finds no prejudice in considering it at this stage.  For

---

[3]     For example, Plaintiff insisted that with a proper warning she would not have used the bodyboard.  (Mar. 6, 2007, Hearing Tr. at 25:2-4).  It follows that if Plaintiff claims she would not have used the board she must, by definition, be complaining of an absent general warning.  Otherwise, if Plaintiff were complaining of the absence of a proper use instruction, the consequence of a proper instruction would have been that Plaintiff would have heeded it and properly used the board by keeping her head below the board's nose.  Not, as she alleges, that she would not have used the board.

one, the exact nature of Plaintiff's claims has been a source of confusion for both the parties and this Court.  Plaintiff continues to conflate the two claims in the proposed jury instructions where Plaintiff presents the question as whether "Sunspecs should have provided warnings and instructions about the dangers of the use of a boogie board <u>and</u> instructions regarding the safe use of a boogie board."  [Doc. 88-1 at 1-2 (emphasis added)].   Such confusion indicates that any concession could not have been made knowingly if neither the parties nor the Court knew precisely what was being conceded.  Moreover, the facts supporting Plaintiffs' first claim, the general warning, are part of the Joint Final Pre-Trial Order signed by the parties and approved by the Honorable Ann Marie Donio, United States Magistrate Judge, on February 28, 2006.  [Doc. No. 78 at 7 ("The boogie board on which Mrs. Masterson was riding at the time she was injured did not have a warning as to the potential dangerous nature of the board.")]; <u>see also</u>, <u>Crispin v. Volkswagenwerk Ag</u>, 248 N.J. Super 540, 561 (App. Div.) ("plaintiff's complaint and his pretrial memorandum were sufficient to put Volkswagen on notice of this alternative basis of liability."), <u>certif. denied</u>, 126 N.J. 385 (1991).  Plaintiff's supplemental brief refers to "one of two warnings."  [Doc. 81 at 2].  Finally, the evidence needed to advance and rebut both warning claims are nearly identical.  Therefore, Sunspecs will not be prejudiced by the Court considering both claims at this juncture.

**B. Elements of a Failure to Warn Claim**

A cause of action for failure to warn is governed by the New Jersey Products Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-1 et seq. Under Section 2 of the NJPLA, N.J. Stat. Ann. § 2A:58C-2, a plaintiff can prove that a product was defective if:

> the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it . . . failed to contain adequate warnings or instructions.

A product, while perfectly designed, may still be considered dangerous if not used with certain precautions and not accompanied by a warning which includes directions and information essential to make the use of the product safe. See Freund v. Cellafilm Props., Inc., 87 N.J. 229, 243 (1981). A plaintiff must show, by a preponderance of the evidence, that a "manufacturer did not warn the consumer of the risks attendant to the product, and that the failure to warn was a proximate cause of plaintiff's injuries." Sharpe v. Bestop, Inc., 314 N.J. Super. 54, 62-63 (App. Div. 1998) (citing Campos v. Firestone Tire & Rubber Co., 98 N.J. 198 (1984)), aff'd, 158 N.J. 329 (1999)(per curiam). A manufacturer is not liable, however, where an adequate warning is provided. N.J. Stat. Ann. § 2A:58C-4. An adequate warning is defined as,

> one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger, . . . taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be

22

used . . . .

Id. Thus, a manufacturer has a duty to adequately warn consumers of the known risks attendant to its product.

### 1. Sunspecs' Duty to Warn

The first step in the analysis is whether the manufacturer warned the consumer of the risks attendant to the product, i.e., the manufacturer's duty to warn. Id. The statement consists of two distinct concepts. The NJPLA imposes on Sunspecs a duty to all users of the product, to warn of the risks attendant to the product's foreseeable uses. N.J. Stat. Ann. § 2A:58C-2. The second concept is that of the risks attendant to the product. See, e.g., Becker v. Baron Bros., 138 N.J. 145, 152-53 (1994) (holding that a defendant is liable only for failing to warn of dangers it knew or should have known about). In a warnings case,

> conduct should be measured by knowledge at the time the manufacturer distributed the product. Did the defendant know or should he have known, of the danger, given the scientific, technological, and other information available when the product was distributed; or in other words, did he have actual or constructive knowledge of the danger?

Feldman v. Lederle Labs., 97 N.J. 429, 452 (1984). The manufacturer is held to the standard of an expert and is chargeable with all information reasonably available or obtainable. Id.

Defendant contends that it does not have a duty to warn of risks obvious to the ordinary user. The New Jersey Supreme Court, however, has observed that, under the right circumstances,

23

the duty to warn might extend to obvious dangers:

> [I]n our state the obviousness of a danger, as
> distinguished from a plaintiff's subjective knowledge
> of a danger, is merely one element to be factored into
> the analysis to determine whether a duty to warn
> exists.  A manufacturer is not automatically relieved
> of his duty to warn merely because the danger is
> patent.

Campos, 98 N.J. at 207.  Other factors in addition to the
obviousness of the danger, are relevant to the duty to warn
analysis: Is the lack of the warning consonant with the duty to
place in the stream of commerce only products that are reasonably
safe, suitable, and fit?  Will the absence of a duty encourage
manufacturers to eliminate warnings or to produce inadequate
warnings?  Is the danger so basic to the functioning or purpose
of the product – for example, the fact that a match will burn –
that a warning would serve no useful purpose?  Campos, 98 N.J. at
207-08.

Relying on the NJPLA's Section 3a(2), and a recent New
Jersey appellate court decision, Defendant argues that Campos no
longer applies in warning cases.  The Campos decision predates
the NJPLA and alters the common law approach to products
liability actions.  More recently, the Defendant argues, New
Jersey's appellate court stated that obviousness is an absolute
defense in a failure to warn case.  Mathews v. Univ. Loft Co.,
387 N.J. Super. 349, 362 (App. Div.) certif. denied, 188 N.J. 577
(2006).  Mathews in turn relied on the New Jersey Supreme Court's
statement that Section 3a(2) superseded Campos and made the

24

obviousness of the danger a defense.  <u>Dewey v. R.J. Reynolds</u>
<u>Tobacco Co.</u>, 121 N.J. 69, 96-97 (1990).  Plaintiff disputes that
obviousness is an absolute defense in a warnings case.

This Court will start with the acknowledgment that it is
bound by the holdings of the New Jersey Supreme Court on
questions of state law.  However, "[a]bsent clear guidance from
the [state] Supreme Court, [a federal court] must predict how it
would decide the issues . . . ."  <u>Fleck v. KDI Sylvan Pools,</u>
<u>Inc.</u>, 981 F.2d 107, 113 (3d Cir. 1992), <u>cert. denied</u>, 507 U.S.
1005 (1993).  Section 3a(2) of the NJPLA provides that a
manufacturer is not liable in a design defect case if,

> the harm was caused by an unsafe aspect of the product
> that is an inherent characteristic of the product and
> that would be recognized by the ordinary person who
> uses or consumes the product with the ordinary
> knowledge common to the class of persons for whom the
> product is intended . . .

N.J. Stat. Ann. § 2A:58C-3a(2).  It is true that the state
Supreme Court, in <u>Dewey</u>, stated that the NJPLA altered "the
method of analyzing the 'obvious danger' as established in <u>Campos</u>
. . . ."  121 N.J. at 96.  However, the statement can be only
dicta because the claim at issue in <u>Dewey</u> arose prior to the
NJPLA.  <u>Id.</u> at 95.  In fact, Section 3a, by its express terms,
presents defenses in an "action . . . for harm allegedly cause by
a product that was <u>designed</u> in a defective manner . . . ."  N.J.
Stat. Ann. § 2A:58C-3a (emphasis added).

Section 4, on the other hand, applies explicitly to failure

to warn claims.  That section provides immunity from liability
where a defendant provides an adequate warning of dangers it knew
or should have known.  N.J. Stat. Ann. § 2A:58C-4.  An adequate
warning is one "that a <u>reasonably prudent person</u> in the same or
similar circumstances would have provided . . . taking into
account the characteristics of, and the ordinary knowledge common
to," the intended user.  <u>Id.</u> (emphasis added).  Implicitly, then,
where no warning would be adequate, no warning need be given.
However, the standard in Section 4 is that of a "reasonably
prudent person," not the obviousness of the danger as in Section
3.  This standard appears to be a question of fact most
appropriately resolved by the jury.  Thus, it seems, Section 3a's
obviousness defense in design defect cases does not extend to
failure to warn cases.[4]

This conclusion is in accord with sixteen years of
intervening state law decisions, with the exception of <u>Mathews</u>,
that have continued to apply the <u>Campos</u> obviousness-as-one-factor
analysis in failure to warn cases.  <u>See, e.g.</u>, <u>Fabian v. Minster</u>

---

[4]     Defendant also relies on <u>McWilliams v. Yamaha Motor
Corp., U.S.A.</u>, 780 F. Supp. 251 (D.N.J. 1991) <u>aff'd in part,
rev'd in part</u>, 987 F.2d 200 (3d Cir. 1992), a case criticized by
commentators on precisely this ground, William A. Dreier, John E.
Keefe & Eric D. Katz, <u>Current N.J. Products Liability & Toxic
Torts Law</u> 70 (2007) (The court's conclusion that the manufacturer
had no duty to warn because of an "open and obvious danger" was
"inconsistent with both <u>Campos</u> and <u>Fabian</u>.  Moreover, the court
may have been unduly influenced by its application of the
[Section 3a(2)] defense to the plaintiff's design defect claim.
That defense, which focuses on open and obvious dangers . . . is
specific to <u>design</u> defect cases.")

_Mach. Co., Inc._, 258 N.J. Super. 261, 278-79 (App. Div.) _certif._
_denied_, 130 N.J. 598 (1992).  Indeed, the panel in _Mathews_
reached its conclusion without first extending Section 3a to
warnings cases.  There, a jury granted judgment in favor of the
plaintiff on a claim that a loft bed manufacturer failed to warn
of the danger of falling from the bed.  _Mathews_, 387 N.J. Super.
at 351.  The panel, citing Section 4, acknowledged that where no
warning would be adequate, none need be given; it then held that
the defendant was entitled to summary judgment.  _Id._ at 358-59.
The court extended Section 3a(2)'s obviousness defense to product
warning cases by identifying warnings cases as a subset of design
defect cases.  _Id._ at 362.  This is contrary, however, to the
NJPLA's treatment of such cases differently, as discussed above.
_Compare_, N.J. Stat. Ann. § 2A:58C-3 _and_ N.J. Stat. Ann. § 2A:58C-
4.

Finally, the Court is convinced that Section 4's "reasonably
prudent person" standard is not interchangeable with, or
effectively identical to, Section 3a(2)'s "obviousness" standard.
As stated, the first step in a failure to warn claim is the duty
to warn, which is the intersection of a legal duty created by
statute and knowledge of a risk attendant to the product.
_Sharpe_, 314 N.J. Super. at 62-63.  A danger that is objectively
obvious, if an absolute defense, would appear to absolve the
manufacturer of any liability even if it were aware of the
attendant risk, or put differently, foreclose a claim by the

27

manufacturer that it was unaware of the attendant risk. This conflicts with the duty created by statute, which arises if a "reasonably prudent person" would warn others of the obvious danger.[5]

In contrast to Section 4 of the NJPLA, Section 3 alleviates the duty of a manufacturer to warn of a design defect that exposes users to an obvious danger. N.J. Stat. Ann. § 2A:58C-3a(2). Returning to whether a reasonably prudent person would warn of obvious dangers, the Campos factors provide the necessary analysis; an analysis consistent with the public policy objectives of both tort law and the NJPLA. Cf. Maisonave v. Newark Bears Prof. Baseball Club, Inc., 185 N.J. 70, 85 (2005) (modifying limited duty rule to hold that property owner must warn business invitees of open and obvious dangers where, from invitee's subjective reference, danger might not be open and obvious); Restatement (Second) of Torts § 343A cmt f (1965) (noting and illustrating examples).

Therefore, in light of Section 4 and the express language of Section 3a(2), this Court will not conclude that Dewey's dicta is "clear guidance from the [New Jersey] Supreme Court" that the

---

[5] If the answer is yes, then the issue becomes one of causation. Coffman, 133 N.J. at 603. At this stage, the obviousness of the danger would again come into play. However, here the measure is a subjective one, whether the plaintiff was aware of the danger even absent a proper warning. If so, the absent warning was not a proximate cause of plaintiff's injuries.

NJPLA says something it does not.  Rather, this Court predicts that when properly confronted with the conflict between Section 3a(2) and Section 4 in warnings cases, the New Jersey Supreme Court will apply Section 4, which does not suggest that obviousness is an absolute defense.

Finally, the Court notes that if it is wrong in its prediction that the NJPLA does not raise obviousness to the level of an absolute defense, the Defendant will not necessarily be prejudiced.  The Court will put the question of the obviousness of the danger to the jury.[6]  The implications of the jury's conclusion is discussed more fully below

### (a)  Instruction Warning v. General Warning

### i. Instruction Warning Claim

Plaintiff's proper instruction warning claim is predicated on the risk that not properly positioning one's body on the board puts one at risk for catastrophic neck injury.  Plaintiff's general warning claim is predicated on the risk that a bodyboarder can suffer catastrophic neck injury while bodyboarding.  Because there exists a duty to warn of risks attendant to the bodyboard, Plaintiff must produce evidence that a reasonable trier of fact could conclude that Sunpecs knew of should have known of the alleged risks in order to proceed with her claims.  Plaintiff has sought to rely on the testimony of her

---

[6]     For example, "are the catastrophic risks associated with bodyboarding obvious?"

expert witness William Kitzes.  Applying the <u>Daubert</u> standards
for expert testimony, this Court has excluded many of Kitzes'
expert opinions.  What remains is critical to whether Plaintiff
will survive summary judgment.

As a qualified expert, Kitzes will be permitted to testify
as to the general principles of product safety management.  To
that end, Kitzes may also testify to the sources and methods
employed by a manufacturer in conducting a product safety
analysis.  In the process of explaining the methodology and
manner in which a product safety management program is conducted,
Kitzes refers to two other bodyboards that contained warnings
about neck injuries and advised users to ride with their head
behind the nose of the board.  (Pl.'s Opp. Ex. C at 7-8).  These
warnings, however, are not relevant because they pre-date the
purchase of the board at issue here, or do not warn of any risk
of injury.  Thus, Kitzes will not be permitted to introduce such
evidence.

In explaining how a manufacturer of bodyboards would conduct
a product safety analysis employing the product safety
principles, Kitzes also relies on an article on the dangers of
bodyboarding.  (Presumably, Kitzes will testify that this 1990
article is the kind of information referred to in principle
number 5, set forth in his report, i.e., "[h]istorical
information such as injury data . . . ."  (Pl.'s Opp. Ex. C. at
3))  This article, from 1990, discusses the prevalence of neck

30

injuries to bodyboarders at or near low tide. (<u>Id.</u> at 6-7).
This is sufficient evidence from which the trier of fact could
conclude that Sunspecs knew or should have known of the risk of
neck injuries when bodyboarding. Accordingly, granting all
reasonable inferences in favor of Plaintiff, the non-moving
party, Sunspecs is not entitled to summary judgment on
Plaintiff's general warning claim.

The 1990 article, however, does not discuss the risks when
riders do not keep their head below the nose of the board.
Indeed, there is no evidence in the record from which a
reasonable trier of fact could conclude that such mis-use
presents a risk or that Sunspecs knew of should have known of
that risk. As discussed above, Kitzes is unable to render
opinions on this instruction.

Accordingly, because there is <u>no</u> admissible evidence to
support Plaintiff's claim that Sunspecs had a duty to warn of the
proper position in using a bodyboard, Sunspecs will be granted
summary judgment on Plaintiff's use instruction claim.

### ii. General Warning Claim

Plaintiff's surviving claim, the general warning claim,
again invokes Defendant's assertion that the alleged risk
attendant to the bodyboard is open and obvious. The Court
concluded above that obviousness alone is not a defense. The
Court will now consider obviousness in conjunction with the other
factors set out by the New Jersey Supreme Court in <u>Campos</u>. 98

N.J. at 207-08.  Briefly, those factors include: the duty to place in the stream of commerce only products that are reasonably safe, suitable, and fit; whether the absence of a duty will encourage manufacturers to eliminate warnings or to produce inadequate warnings; and whether the danger so basic to the functioning or purpose of the product – for example, the fact that a match will burn – that a warning would serve no useful purpose?  Id.

At the outset the Court notes that if the danger is obvious, as Defendant contends, the question moves directly to the weighing of the Campos factors.  The jury need not find that Sunspecs knew or should have known of the danger if it finds the danger obvious.  The Court also notes that these factors must be viewed under the facts of the instant case.  Here, the allegation, supported in part by the article relied upon by Kitzes, is that bodyboarding is dangerous even in shallow water. Turning then to the Campos factors, the Court is of the opinion that Sunspecs had a duty to warn users of the danger of neck injury if it were aware of the risk at the time the board in question was manufactured.  The cost of such warnings is negligible to non-existent.  Sunspecs' responsibility to sell a product it intends users to bring into the ocean counsels in favor of advising those users - who potentially have no experience with the ocean or bodyboarding - of the dangers present.  The Court sees no reason why requiring a simple

32

warning, one that other manufacturers, including Sunspecs, now include on their products, cf. Fed. R. Evid. 407 (subsequent remedial measures admissible to show feasibility), would deter other manufacturers from doing likewise. Finally, this is not the situation where the danger is a function of the product.

Accordingly, the Court will grant all inferences in favor of Plaintiff, the non-moving party, and will assume that Sunspecs did, in fact, have a duty to warn. This question will be presented to the jury for ultimate resolution.

### 2. Proximate Cause

In a failure to warn case, the plaintiff must also prove that the absence of an adequate warning or instruction was a proximate cause of the accident. Campos, 98 N.J. at 207. To prove proximate cause, the plaintiff must show that the inclusion of an adequate warning or instruction would have reduced the risk of injury posed by the product, or that the absence of a warning was a substantial factor in bringing about the alleged injury. Coffman v. Keene Corp., 257 N.J. Super. 279, 285 (App. Div. 1992), aff'd 133 N.J. 581 (1993).

Under New Jersey law, the Plaintiff is afforded the use of a presumption that she would have followed an adequate warning had one been provided. Coffman v. Keene Corp., 133 N.J. 581, 602 (1993). But even though plaintiff is afforded this heeding presumption, the plaintiff must still show a causal connection between the lack of warning and her injury.

33

**(a)   Instruction Warning v. General Warning**

**i. Instruction Warning Claim**

The Court agrees, in part, that without Kitzes' testimony, the Plaintiff cannot prove proximate cause on Plaintiff's claim based on the lack of a proper use instruction.  There is <u>no</u> evidence in the record that the absence of an instruction as to where to position oneself on the board was a substantial factor in bringing about Plaintiff's injuries.  There is no evidence in the record to support Plaintiff's argument that having one's head below the nose of the board would have reduced the risk of injury to the Plaintiff.  Plaintiff offers no studies, no data, no research, no accident reconstruction or scientific analysis to support her argument.  While she is entitled to the presumption that she would have followed the instruction – and in many cases the heeding presumption is sufficient to prove proximate cause – that is not the case here where the issue involves <u>how</u> to use bodyboard.  Plaintiff has presented no evidence that using the bodyboard according to the instruction she proposes, or appears to propose, would have reduced her risk of injury.  <u>See</u> <u>Coffman</u>, 133 N.J. at 601.  ("The effect of the heeding presumption will be to direct factual inquiries to the real causes of the injury.")

Accordingly, because the Plaintiffs cannot prove an essential element – proximate cause – summary judgment is appropriate on this ground as well, as to Plaintiffs' instruction

warning claim. Plaintiffs are precluded from introducing any evidence or claim that the warning label should have instructed the rider to ride with the head below the nose of the board.

### ii. General Warning Claim

What remains then is Plaintiffs' claim that the bodyboard should have warned of the possibility of catastrophic injury. When the claim is a failure to warn, the heeding presumption applies to shift the burden of production of evidence to the defendant. Id. at 603 (as discussed in Sharpe, 314 N.J. Super. at 66-67). The defendant must come forward with evidence such as "the plaintiff's knowledge of the very risk that the absent warning was supposed to address," or of "plaintiff's attitudes and conduct apart from knowledge of the product's risk . . . ." Sharpe, 314 N.J. Super. at 74; see also, Hulmes v. Honda Motor Co., Ltd., 960 F. Supp. 844, 854 (D.N.J.) aff'd o.b. 141 F.3d 1154 (3d Cir. 1997).

Here, Defendant contends that the Plaintiff was well aware of the risks of the ocean because she grew up near and frequently visited the beach. Nonetheless, the question whether the heeding presumption has been rebutted is an issue for the trier of fact. See Seeley v. Cincinnati Shaper Co., Ltd., 256 N.J. Super. 1, (App. Div. 1992).

Accordingly, summary judgment will be denied as to Plaintiffs' claim that the Defendant failed to warn users of the risk of catastrophic neck injury associated with the foreseeable

35

use of the bodyboard.


IV.  <u>CONCLUSION</u>

For the reasons discussed above, Defendant's motion to exclude the expert opinion of William Kitzes will be granted in part and denied in part.  Defendant's renewed motion for summary judgment will also be granted in part, and denied in part.  An appropriate Order will issue this date.


<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: <u> March 20, 2007</u>

[Docket No. 70]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

---

MARY LOUISE MASTERSON and
RICHARD MASTERSON, her husband,

                Plaintiffs,

    v.

B.J. STORES, INC., T/A HOYS
5&10, SUNSPECS, INC., JOHN DOE,
MARY DOE, ABC PARTNERSHIPS AND
XYZ CORPORATIONS,

                Defendants.

Civil No. 03-3202(RMB)

**ORDER**

---

        This matter coming before the Court upon a motion to exclude the expert opinions of Plaintiff's expert William Kitzes, and a renewed motion for summary judgment; and the Court having read the briefs of the interested parties; and having heard argument on March 6, 2007; and for the reasons stated in the Opinion issued this date,

    IT IS, THEREFORE, on this **20th** day of **March** 2007

    HEREBY **ORDERED** that Defendant's motion to exclude the expert opinions of William Kitzes is **GRANTED** in part and **DENIED** in part; and

37

FURTHER **ORDERED** that Defendant's renewed motion for summary judgment is **GRANTED** in part and **DENIED** in part.


                                        s/Renée Marie Bumb
                                          RENÉE MARIE BUMB
                                          United States District Judge