# EXHIBIT M

# Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561) 241-1900

**Wm. F. Kitzes, J.D.**
Board Certified
Product Safety Manager

————

Safety Analysis
Warnings

Safety Management
www.productsafety .com
kitzes@productsafety.com

————

Expert Testimony
Recalls

January 18, 2020

Jesse A. Drumm, Esquire
Friday & Cox LLC
1405 McFarland Road
Pittsburgh, Pennsylvania  15216

Re:  Nelson / Fehlman v. Honda

Dear Mr. Drumm,

The following report is preliminary and based on information available to date. The opinions described below are subject to change should additional information become available.

## *Product Safety Management*

Product safety management is a system that a reasonably prudent manufacturer puts in place before the first product is conceived to ensure that the final product, along with its warnings, packaging and marketing materials, is reasonably safe. It starts with a statement of commitment for product safety from top management and develops a company's procedures to identify hazards, assess the risk, apply adequate safety measures to eliminate hazards from the design, places a guard between users and potential injury and to warn users of all hazards that have not been eliminated or



adequately guarded through technically feasible and economically practical safety measures.

To ensure that product safety management programs are in place, a product safety audit as outlined by the National Safety Council can be used to test the validity of the company's program and to identify the objective techniques to be applied. Once established, ensuring that the required elements are incorporated in the plan is generally not prone to error. Although the application of documents and data may be subject to discussion, the actual principles are well established in the literature.

Product safety management theory has been published and reviewed by scholars in the field for over 50 years. An annotated bibliography is attached.m As can be seen from the wide dissemination and acceptance by academia, business and legal professionals, their concepts are widely used and accepted throughout the safety community.

Safety management is primarily a tool to protect consumers before they purchase products. When used correctly, these principles are a reasonable model for injury prevention. It is only after an injury that they are applied to determine if the managers failed to apply the accepted principles.

When evaluating a company's product safety management program, it is incumbent upon a reasonably prudent manufacturer to apply the following accepted safety principles to ensure that the products are reasonably safe.

1.    Establish and observe a written safety policy. This policy should emphasize commitment to safety. In writing, it will ensure all employees obtain clear guidance on safety issues. The policy should set forth a method for discussing safety responsibilities and establish an independent review to ensure consumers are protected from unreasonable risks of injury.

Under the circumstances, therefore, it is absolutely essential
that top management as a whole, and the chief operating
executive in particular, provide the same kind of leadership in
accident prevention as they provide in the field of production.
If the manager becomes convinced that accidents can and
must be prevented, he will issue the necessary orders that are
to be carried down through the
organization; he will follow through to see that his orders are
carried out; he will set a good example for safety.

Roland Blake, Industrial Safety, 1943

2.      Adequately identify and evaluate product hazards.  A hazard is the inherent
capability of a product to do harm.  Manufacturers must review the potential injury-
causing energy and evaluate severity and foreseeability.

A predesign analysis determines those hazards that might be
present in a product to be developed.  It may be the basis for
the preparation of specifications and criteria to be followed in
design; it may indicate undesireable product characteristics,
materials, and design practices to be avoided; it may determine
safeguards to be provided; and it may tentatively establish
tests to be undertaken to verify safety devices and safety-
critical aspects of the product.

Willie Hammer, Safety Management, 1980

3.      Perform an adequate design review integrating product hazards, the
environment, and foreseeable consumer use.  Once hazards are identified, the reasonably
prudent manufacturer must consider the conditions of use under which the injury-causing
mechanism (hazard) can cause harm to the user.

Analysis of the environment where the product will foreseeably be used,
especially in light of product promotion, is critical in discerning how the consumer may

3

foreseeably use the product, even if it is not the use intended by the manufacturer. The manufacturer also must identify who the end user will be and their level of education and experience.

The product must be reasonably safe prior to distribution in commerce. If it is not possible to eliminate the hazard, the reasonably prudent manufacturer must take steps to guard against the hazard, to adequately inform users of the danger inherent in the product, and to motivate them to avoid that danger.

> The system safety concept, on the other hand, involves a planned, disciplined, systematically organized, and before-the-fact process characterized as the identify-analyze-control method of safety. The emphasis is placed upon an acceptable safety level designed into the system prior to actual production or operation of the system. The system safety discipline requires timely identification and evaluation of system hazards--before losses occur.
>
> Harold Roland and Brian Moriarty,
> System Safety Engineering and Management,
> 1983

4.     Develop adequate warnings and training to motivate consumers to understand and avoid dangers. This is critical and relatively inexpensive. When consumers have sufficient data to make an informed decision about safety, they are in a better position to protect themselves from injury.

> Closely allied to the issue of unreasonable danger, and often determinative of it, are the warnings and instructions that accompany a product. A product may meetD the most exacting production and design requirements and still be judged defective if the warnings and/or instructions are inadequate, because the danger level of the product can be substantially reduced by carefully worded warnings and instructions on product use and the possible consequences of misuse. Since

4

> warnings are relatively inexpensive and require no major
> redesigning of the product, the natural tendency of
> manufacturers is to warn against rather than redesign against a
> foreseeable danger.
>
> Alvin Weinstein, Product Liability and the
> Reasonably Safe Product: A Guide for
> Management, Design, and Marketing, 1978

5.      Continuously monitor product safety data to evaluate safety performance
both prior to sale and after distribution to consumers.  Historical information such as
injury data, warranty claims, lawsuits, complaints, standards and regulations must be
reviewed to substantially reduce or eliminate injuries.  Monitoring procedures include
internal testing, focus groups and task analysis.

6.      Corrective action must be taken to remove defective products from the
hands of consumers.  Product recalls, field modification and warning campaigns can "fix"
otherwise unreasonably dangerous products.  Under the Consumer Product Safety Act,
manufacturers must report defects that could create a substantial product hazard, and
recall products that present an unreasonable risk of severe bodily injury.

> If a hazard is discovered after a product is sold, the
> manufacturer should consider informing product users or other
> appropriate persons about the risk. In some cases the product
> may have to be modified. In other cases it may be advisable to
> create a safety label.
>
> Westinghouse Electric Corporation, Product
> Safety Label Handbook, 1985

*       *       *       *       *

A key precept of safety management concerns products with inherent capability to do catastrophic harm.  In priority order, the duty of a reasonably prudent manufacturer is to eliminate the hazard, or, if this is not possible while preserving utility, guard against the hazard.  At a minimum, the manufacturer must properly inform users of the danger inherent in the product and motivate them to avoid injury.

The first concept is the safety engineering hierarchy of priorities:

- Eliminate hazards

- When hazards cannot be eliminated, provide feasible safeguards against them

- Provide warnings and personal protective equipment against remaining hazards

> National Safety Council
> Product Safety Management Guidelines,
> 1989

\*       \*       \*       \*       \*

In 1931, H. W. Heinrich, Assistant Superintendent for the Engineering and Inspection Division of the Travelers Insurance Company published the primary modern text of Safety Management, *Industrial Accident Prevention, A Scientific Approach*.  The results of his in-depth analysis of more than 5000 accidents revealed four fundamental principles of scientific accident prevention:

1. Executive interest and support
2. Cause-analysis
3. Selection and application of remedy
4. Executive enforcement of corrective practice

These concepts, developed by Heinrich for the Joliet Steel Works, have evolved into modern day safety management practices. Scholarly research has further developed the foundation for safety management practices.

The Consumer Product Safety Commission incorporated these principles in its 1975 publication, *Handbook and Standard for Manufacturing Safer Consumer Products*. The Commission addressed executive action, design review, distribution and corrective action.

In 1983, Harold Roland of the University of Southern California Institute of Safety and Sy0stems Management and Brian Moriarty authored *System Safety Engineering and Management*, outlining the need for product safety policy and analysis to prevent injuries. They evaluated hazard identification, severity and a systematic approach to identify defects.

The National Safety Council first published *Product Safety Management Guidelines* in 1989 describing the relationship between marketing, manufacturing, and safety communications as a key to corporate accident prevention. Their analysis includes the hierarchy of safety management and prevention programs to substantially reduce or eliminate injuries.

Throughout the years, major U.S. and international corporations have established corporate safety policies. These include, among many others, Honeywell, John Deere, Sears, General Motors and Volvo.

### *Background and Qualifications*

I am a Board Certified Product Safety Manager and Hazard Control Manager. I hold an Executive Certificate in Safety Management from the American Society of Safety Engineers, and I am a member of the Human Factors and Ergonomics

7

Society.  I hold a Certificate in Risk Communication from the Harvard School of Public Health. For the past 30 years, I have provided risk assessment and product safety management services to attorneys, corporations and government organizations.

From 1974 to 1981, I worked at the U.S.  Consumer Product Safety Commission (CPSC), part of which time I served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying products which contained a defect which could create a substantial product hazard, developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act including the recall of substantially hazardous consumer products, and notification to the public of the danger through warnings and other media.  (See attached Curriculum Vitae).

As CPSC *Program Manager for Sports, Recreation and Power Equipment (1977-1980)*, I supervised a team of engineers, epidemiologists, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer products injuries.  Injury prevention tools combined mandatory and voluntary standards, on-product warnings, and safety education campaigns resulting in publication of the *Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 CFR 1205 (1979)*.  I served as Commission representative to various industry groups and standards development committees, including American National Standards Institute (ANSI), American Society for Testing & Materials (ASTM), the Outdoor Power Equipment Institute and the Sporting Goods Manufacturers Association.

I have been retained as a consultant for a number of major manufacturers, including the *Toro Company* on product safety issues, the *Vendo Company* for developing warning labels and safety bulletins, the *Jensen Corporation* for warnings and safe operation of industrial equipment, *Nobel Chemical Company* for adequacy of warnings, *Corning Glass* for evaluation of recalls, *BernzOmatic*, a division of the Newell Group, for development of point-of purchase recall displays, warnings, and advertising, *Arctic Cat, Inc.* for analysis of all-terrain vehicle off-road safety, including owner's manuals,

8

instructions, warnings and foreseeable use, and *Visioneer*, Inc. in developing a program to upgrade computer scanners.  I have developed a program for *Global Industries* to improve executive chair stability, reviewed warnings on heavy equipment for *Daewoo Heavy Industries America*, investigated safety issues for Carson Industries, Inc. and assisted *CISCO Systems* in recall development.  I have designed a warning label for *Whisper Communications, Inc*., and assisted *Wham-O, Inc*. in recall procedures.  I have provided risk analysis, recall assistance and consumer warnings and instructions to *Restoration Hardware, Inc*., have developed warnings for *Plastics Research Corp*. concerning use of decorative building materials as protective barriers.  I have reviewed advertising and promotional material for *ACH Foods* and assisted *Hilton Hotels* on recall issues.  I have advised *Swimways Corporation* on product safety management and warnings.  I have advised *AsiaEXP* on risk assessment, labeling and product standards and have assisted *Dick's Sporting Goods* in developing safety communications and warnings.  I served as Product Safety Coordinator for compliance with a Department of Justice/CPSC Consent Agreement and Order for *LM Imports*.  For *Rollz International* (Netherlands), I revised the user manual for American and Canadian markets.  I provided research and analysis on ATV safety for the National Association of Attorneys General and served as the Chairman of the *Florida Consumer's Council* (1993-2007).

I have developed on-product warnings and instructions for a number of manufacturers and distributors.  A few examples include:

- Vendo Company for vending machine warnings
- Arctic Cat, Inc. for ATV's
- Whisper Communications for electrocution hazards
- Plastics Research Corp. for building material warnings
- Daewoo Heavy Industries America for labeling of heavy machinery
- Swimways Corporation for warnings on children's pool products
- Dick's Sporting Goods for fitness equipment

I have lectured at the National Safety Council Annual Congress and Exposition on the following topics:

- When Risk Can't Be Eliminated:  <u>Building Adequate Warnings</u>, Los Angeles, California, 1998

- <u>Injury Prevention Analysis</u>:  Guidelines for Product Safety Managers, Chicago, Illinois, 1997

- Post Sale Corrective Action Plans - <u>Recalls and Consumer Notice</u>, Orlando, Florida, 1996

I have also addressed industry groups on warnings issues for the International Consumer Product Health and Safety Organization and the CPSC.

In 1991, I wrote an article for Professional Safety, the Journal of the American Society of Safety Engineers (ASSE), entitled *Safety Management and the Consumer Product Safety Commission*.  Reviewed and accepted by the ASSE editorial board, the section on warnings reads in part:

> *VI. Warn users of product dangers and motivate them to avoid injury.*
>
> In addition to hazard elimination, product warnings and instructions must help the user avoid dangers, including those that remain after thorough attempts to eliminate or guard.  An explicit warning that includes a signal word, statement of the hazard, appropriate behavior and description of the danger's consequences is required.  A pictogram illustrating consequences often helps communicate the danger, especially to those who cannot read.

I have written a chapter in <u>Children and Injuries</u>, entitled *Standards, Regulations and Safety Guidelines to Protect Children from Injury*.

## *Incident*

On February 19, 2017, 17-year old Dylan Fehlman was operating a 1984 3-wheeled Honda 200S ATC between the rails of the Pittsburgh - Buffalo railroad tracks. The ATC overturned and Mr. Fehlman was killed in the impact. An ATC is Honda's registered trademark for a 3-wheeled ATV.

## *Opinions*

The opinions contained herein are stated to a reasonable degree of certainty in the areas of safety management, warnings and safety communications.

1.      Honda failed in its responsibility as a reasonably prudent manufacturer/distributor to adequately protect ATV users in general, and Dylan Fehlman in particular, from the catastrophic risks of injury and death associated with the foreseeable use of ATVs.

2.      By 2016, the Consumer Product Safety Commission National Electronic Injury Surveillance System (NEISS) estimated nearly 3,365,000 hospital emergency room-treated injuries associated with the use of ATVs. In addition, by that time there had been over 14,000 associated deaths reported to the CPSC. As early as March, July and August of 1984, in successive letters to Tetsuo Chino, then President of American Honda, the Consumer Product Safety Commission (CPSC) informed Honda of the "dramatic rise in the number of injuries associated with 3-wheeled ATVs" and stated they were "extremely concerned."

3.      To substantially reduce or eliminate the catastrophic injuries associated with ATVs, it is the responsibility of Honda to implement a system safety program to identify risks and minimize them. Honda failed to apply the accepted principles of product safety management to adequately:

a)     Establish and observe a written corporate safety policy

b)     Identify product hazards and evaluate severity

c)     Perform a risk assessment to adequately integrate product hazards, the environment and foreseeable consumer use

d)     Monitor the safety performance of their product

e)     Take adequate corrective actions to eliminate, guard or warn consumers of the danger and motivate them to avoid injury.

4.     Honda failed to adequately warn and train users of the dangers associated with the foreseeable use of ATVs and their unique handling characteristics. Beginning in December of 1984, the Consumer Product Safety Commission (CPSC) and the Specialty Vehicle Institute of America (SVIA), the ATV industry safety organization, jointly issued a Consumer Safety Alert, intended to inform consumers of the dangers of ATVs, and the number of injuries and deaths associated with ATV use. This data was intended to provide consumers with a basis to make an informed decision about ATV use. These alerts were reissued in March of 1985, August of 1985 and June of 1986 as the injury statistics grew. Yet Honda failed to distribute these Alerts to either purchasers or other ATV operators. Honda failed to adequately provide safety data and warnings required by the 1988 final consent decree.

5.     Since 1984, Honda has failed to take adequate corrective action to recall 3-wheeled ATVs.

## *Discussion*

On May 21, 1985, Honda testified before the Subcommittee on Commerce, Consumer and Monetary Affairs of the House Committee on Government Operations. In that statement, Honda states that the design of the ATC creates a "unique handling characteristic". They further stated that prior to the initial March 21, 1984 notification by the CPSC of the "dramatic rise in injury" that they "believed that safety awareness and training would result in lowering the accident rate and increasing the safety of its customers." Finally, Honda states, "training programs can significantly reduce accidents." Yet given this belief in the need for safety awareness and training, Honda clearly failed to fulfill its obligation to inform users of the dangers associated with riding ATVs.

In the early summer of 1985, the Specialty Vehicle Institute of America (SVIA), formed by Honda and others in February of 1983 to foster and promote ATV safety programs, knew that a 5 million dollar public awareness and training campaign was crucial "if the solution to ATV safety problems was to be long term . . . 1/2 of 1% to protect a 1 billion dollar industry." In December of 1986, the SVIA voted to decrease the education budget by 40 percent and then doubled the government relations fund. Further, SVIA eliminated all chief instructor training and most instructor training.

Yet Honda failed to adequately warn and train users of the dangers associated with the foreseeable use of ATVs and their unique handling characteristics. Honda marketed the vehicles as safe family fun over "all terrain" when they knew that there were specific limitations to the safety of the vehicles.

In 1982, in the Honda "Super Trike" brochure (distributed only in Japan), Honda admits the deceptive appearance of the ATV:

> Anyone who thinks that the ATC appears easy to operate
> because of its steady appearance on three wheels is mistaken. It

is more difficult to operate than it appears. Just turning the handlebars will not turn the vehicle. You have to use your whole body to keep balance and to control the ATC . . .

Further, in the 1985 "Honda ATV Safe Ride Guide," in Section 3, Turning, under the heading "Watch For", Honda states:

ATV leans to one side.

Front wheel(s) plow straight ahead when you turn the handlebars.

ATV turns wide.

At the October 23, 1984 meeting between the CPSC and the ATV Industry, the Specialty Vehicle Institute of America (SVIA) submitted a paper by Donald LaFond entitled, "The Young Child and the Motorized All Terrain Vehicle."  It states:

°  It is evident that instruction for the use of such vehicles is lacking.

°  Emphasis of the inherent unique behavior of these vehicles in specific situations needs to be understood.

°  Advertisement could be more realistic in its portrayal of the vehicle. The industry could be encouraged to be more safety oriented in its advertisement and sales pitch.

Honda promoted their ATVs as safe family fun, yet it was clear from the early 1980's on that Honda was well aware ATVs often were neither safe nor family fun after a catastrophic injury.

Television advertisements depicted Honda ATVs traversing rough terrains and being easily driven by children. Print ads said they could go:

-- "practically effortlessly"
-- "over an astonishing array of terrain"
-- "over rocks and fallen logs"
-- where "even some animals" can't go
-- "easily over most obstacles
-- "Darn near everywhere"
-- "tackling the just-about impossible"
-- over "some of the most torturous terrain on earth"

Yet Honda knew this was often not true.

• In the late 1970's and early 1980's, Honda's own workers' compensation documents showed numerous instances of injury under foreseeable conditions of use where safety precautions had been taken.

• In 1982, in the Honda "Super Trike ATC" brochure, Honda admits the deceptive appearance of the ATV:

> "Anyone who thinks that the ATC appears easy to operate because of its steady appearance on three wheels is mistaken.  It is more difficult to operate than it appears."

• In August of 1984, CPSC informed Honda that they were "extremely concerned about the dramatic increase in injuries associated with ATVs" and the apparent doubling of injuries between 1983 and 1984.  The CPSC suggested:

a) Rider training
b) Dealer programs
c) Safety publicity and promotion
d) Mailing safety data to warranty holders

and other identified ATV owners

    e)    Standards for labeling and instruction

    f)    Paid advertisements and TV ads

- On May 21, 1985, Honda's testimony to Congress admitted:

  a)    They were aware of an "ominous note -- a rise in the †number of injuries."

  b)    A wider market than anticipated.

  c)    That safety education and training could reduce the number of injuries.

- In December of 1985, the CPSC published "Survey of ATV-related Injuries" (Preliminary Report). The report reflected a "Special Study" where the Commission selected all ATV injuries reported by the National Electronic Injury Surveillance System (NEISS) from May 1 to July 15, 1985. During the 75 day period, there were an estimated 27,100 hospital emergency room treated injuries. Three-wheel ATVs accounted for 87% or 23,500 injuries. There were 125 deaths recorded in the first 9 months (January to September) of 1985.

  ○    53 percent of the accidents occurred at speeds estimated to be less than 16 miles per hour

  ○    68 percent hit a terrain irregularity or large obstacle during the sequence of events leading to the injury

  ○    41 percent of are classified as overturned

  ○    26 percent of the ATVs landed on the injured person

  ○    28 percent occurred during turning

  ○    18 percent of persons treated at hospital emergency rooms were hospitalized

  (The hospitalization rate for all products averages 4%)

- In September of 1986, the CPSC Task Force Report on ATVs contained the Evaluation of the Directorate for Engineering Sciences:

  ° The control limits of ATVs may readily be exceeded within the range of normal operating conditions.

  ° Particularly troubling were those incidents where it appeared that the vehicle was being operated within reasonable limits for the circumstances. A rider has no reason to suspect that operating at twenty miles per hour in a smooth grassed pasture may result in a sudden and complete loss of control resulting in death.

  ° The obstacle encounter tests conducted as part of this evaluation have demonstrated the difficulty of maintaining control over six-inch high bumps at 10 miles per hour for some vehicles. The test ruts which were employed looked much like the ruts found in a soft road or trail, and the ATV size is such that the most violent response occurs at about 10 mph. If a rider were to encounter a pair of ruts like that suddenly while doing 20 miles per hour, the normal (but wrong) reaction would be to slow down. It turns out to be the wrong reaction precisely because the vehicles' maximum response to these obstacles occurs at lower speed. Hitting the ruts at 20 or 30 mph reduces the magnitude of the response.

- Such loss of control during foreseeable and intended use of the ATV creates a defective and unreasonably dangerous condition, or stated another way, in light of hundreds of thousands of hospital emergency room treated injuries and thousands of fatalities, an unreasonable risk of serious injury and death.

- Attached to the CPSC task force report in September of 1986, is the Franklin Research Center's Medical Analysis of ATV injuries. The findings include:

  ° While it might be logically assumed that accidents, involving a vehicle specifically designed for off-road use, would be associated

17

with rough terrain and adverse ambient conditions, this is clearly not the case. Approximately one-half the accidents occur in a level terrain environment with very favorable ambient conditions. As will be discussed later in this report, the event associated with the apparent distortion is the rollover. That is, the ATV rolls over in a number of accidents where it might be reasonably expected to remain upright.

°   Although many of the operators involved in rollovers where the vehicle is tripped apparently do not see the hazard prior to involvement, there are a number of operators who do see the obstacle prior to contact. Very often operators in this category simply fail to anticipate that this innocent appearing obstacle will trip the vehicle.

•   On December 12, 1986, the CPSC voted to declare that ATVs presented an imminent and unreasonable risk of death and serious illness or severe personal injury, based on the task force report. As a result of such finding, the Commission voted (2 to 1) to authorize an enforcement action under Section 12 of the Consumer Product Safety Act providing a refund program that would essentially recall all 3-wheeled ATVs. This would permit consumers to return their ATVs to the manufacturer for a reasonable refund. The program also included a requirement to provide notice and warnings to all past, present, and future ATV owners and users about catastrophic ATV injuries and the danger of rolling over, among other safety issues.

According to the statement of Commissioner Carol Dawson, "There is reason to believe that some form of a refund program may be needed to protect the citizens of this country." Commissioner Anne Graham agreed, stating, "Without the reasonable refund this would have the practical effect of placing on these consumers the full financial and safety burden of a decision that was not based on adequate information or informed choice." She went on to say that without a reasonable recall and refund program, the burden of the manufacturers' failure to inform of the hazards associated with ATVs would fall solely on the consumer.

18

- On December 29, 1987, Honda (and other ATV distributors) and the United States Government entered into a Preliminary Consent Decree (finalized on April 27, 1988) requiring Honda to:

  ○ stop producing 3-wheeled ATVs,

  ○ provide all past purchasers with a Safety Alert warning them of the dangers of ATVs,

  ○ send warning labels to all past purchasers to be affixed to the ATV, including an age label for the 200S.

## HONDA
## <u>ATV SAFETY ALERT</u>

"The Consumer Product Safety Commission has concluded that ALL-TERRAIN VEHICLES (ATVs) may present a risk of DEATH or SEVERE INJURY in certain circumstances. . .

\*        \*        \*        \*        \*

- Many people have become severely paralyzed or suffered severe internal injuries as a result of accidents associated with ATVs. . .

**You should be aware that an ATV IS NOT A TOY AND MAY BE DANGEROUS TO OPERATE.**
An ATV handles differently from other vehicles, including motorcycles and cars. According to the Consumer Product Safety Commission, an ATV can roll over on the rider or violently throw the rider without warning and even hitting a small rock, bump, or hole at low speeds can upset the ATV."

19

**Honda Consent Decree Warning label**

**WARNING**

**THIS VEHICLE CAN BE HAZARDOUS TO OPERATE.**   A collision or rollover can occur quickly, even during routine maneuvers such as turning and driving on hills or over obstacles, if you fail to take proper precautions. . .

As described by the CPSC in the December 12, 1986 vote, only a recall / refund plan for 3-wheeled ATVs could offer consumers the opportunity to return an imminently hazardous ATV, and remove the product from the hands of consumers.  Such recall / refund program was critical because Honda had deprived purchasers of the information they needed to adequately protect themselves.  Though the original Complaint in United States v. Honda et al. called for such a plan, Honda refused to agree.  In fact, under the terms of the Consent Decree, even though they agreed not to produce any imminently hazardous 3-wheeled ATVs, they continued to sell used 3-wheeled ATVs through their dealerships, leaving the public with the impression of reasonable safety.

The overall message from Honda is that 3-wheelers are reasonably safe.  In fact, Honda's stated rationale for stopping the sale of 3-wheelers was due to market conditions, not safety.  The risk of injury on 3-wheeled ATVs remains high.  Failure to recall the 3-wheeled ATV and placing the full financial burden of owning a defective and unreasonably dangerous product on consumers undoubtedly causes more 3-wheeled ATVs to remain in the marketplace, and fails to communicate the true nature of the danger to consumers.

In April 1988, the Final Consent Decree in United States of America, Plaintiff, v. American Honda Motor Co., Inc., Yamaha Motor Corp., U.S.A., U.S. Suzuki Motor Corp., Kawasaki Motors Corp., U.S.A., et al., stated that:

> The gist of the government's complaint is that ATVs appear relatively benign, but they actually are unique and complex, requiring a high degree of skill and constant attentiveness for safe operation.  It is alleged that the peculiar behavioral properties of ATVs, when coupled with their deceptively "safe" outward appearance, result in a high risk of injuries to users, particularly inexperienced and young users. Hundreds of ATV-related deaths and thousands of severe injuries have occurred since 1982, according to the complaint. The ATV industry, the government claims, has failed adequately to warn potential ATV users about the hazards presented by ATVs.

Further, the Consent Decree required Honda to undertake a public awareness campaign to inform consumers of the risks associated with ATVs.  Honda was required to send ATV Safety Alerts, followed by warning labels to be affixed to all ATVs including all 3-wheeled ATCs.

Clearly, Honda's continuous promotion of their ATVs as safe family fun is at odds with their ever-growing knowledge of the unreasonably dangerous conditions created by the foreseeable use of their ATVs.  Such promotion creates an expectation by the consumer that the product has been designed and manufactured in accordance with the accepted principles of safety analysis and that the manufacturer and distributor have taken reasonable steps to insure that only safe use of the vehicle is promoted.

The CPSC publishes a list of ATV deaths by state between 1982 and 2014. Texas ranks first with 8.81% of the U.S. population and 773 fatalities.  Pennsylvania ranks second with 702 fatalities but only 3.83% of the population.

Beginning in 1988 when 3-wheeled ATVs were no longer available for sale, the number of 3-wheeled ATVs declined substantially as did the number of 3-wheeled ATV injuries.  Injuries and deaths on 4-wheeled ATVs substantially increased.

On September 9, 1998, the CPSC published a Federal Register Notice reviewing their "All-Terrain Vehicle Exposure, Injury, Death, and Risk Studies" of April 24, 1998 and discussing ATV safety issues going forward.  The Commission described their work to establish ATV Action Plans to continue the consumer protection under the Consent Decree, including prohibiting the sale of new 3-wheeled ATVs.  Among other things, the notice stated:

- About 22% of the ATVs are the three-wheel models (this compares with about 54% in 1989);

- 51% of the ATVs had been purchased as used vehicles; of this number, about 80% had been purchased from the previous owner, rather than from an ATV dealer.

- The percentage of three-wheel ATVs involved in deaths declined from 80% in 1985 to less than 20% in 1996;

- Overturns were involved in about 28% of all deaths.

- Holding all other factors constant, risk is 2.5 to 3 times higher on three-wheel ATVs than on four-wheel ATVs.

- Honda will not provide to dealers for dissemination to ATV purchasers the "ATV Safety Alert" that was required under the Consent Decrees.

- Although the Commission welcomes certain of the other actions that Honda will take, the Commission staff, as noted above, is dissatisfied with those parts of the company's program that relate to safety alerts, dealer monitoring, training incentives, and the refusal to notify the Commission at least 60 days in advance of any material changes in its program. For these reasons, the Commission staff cannot recommend to the Commission that its Resolution include a commendation of Honda's ATV program.

When the information detailed above is taken as a whole, it is clear that Honda had prior notice and was well aware of the danger associated with the foreseeable use of ATVs prior to Dylan Fehlman's catastrophic injury and death.  Honda knew that such incidents were both likely to occur and would be unexpected by the user.

Given Honda's knowledge of hundreds of thousands of injuries and deaths associated with ATVs; given Honda's knowledge of the defective and unreasonably dangerous characteristics of their ATVs; given Honda's knowledge of the latent and unexpected nature of the danger to ATV users; and given the tens of millions of dollars Honda spent to promote ATVs as safe family fun despite their knowledge of the dangers; it is apparent that Honda acted with clear, conscious and reckless disregard for the safety of ATV users.

JANUARY 18, 2020

*__Compensation__*

Compensation for research and analysis is $2450 per 8 hour day.  Fees for deposition and trial are $2950 per day.

*__Materials Reviewed__*

Depositions of:
>   Chris Nelson
>   Edith Ciongoli
>   Fred Bailey
>   Jamie Nelson
>   John Bulick
>   Robert Hadley

Depositions and Exhibits of:
>   Kenneth Hahn
>   Matthew Curry

Complaint

Pennsylvania State Police Death Investigation Report

Coroner Report and Death Certificate

Photos

Plaintiff's Initial Disclosures

Plaintiff's Supplemental Answers and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents

Rule 26(a)(1) Disclosures of American Honda Motor Co., Inc.

Response of American Honda Motor Co., Inc., to Plaintiff's Interrogatories and Request for Production of Documents

Response of American Honda Motor Co., Inc., to Plaintiff's Second Set of Requests for Production of Documents

Folders of Honda Documents (Honda-Nelson 000343 - 001216) (Honda-Nelson 005398 - 006503)

Handbook and Standard for Manufacturing Safer Consumer Products, CPSC, June 1975

Honda Workman's Compensation Documents

"The ATC Owner", Haug Associates Inc. report prepared for American Honda Motor Co., Inc., November 1981

"The Young Child and the Motorized All Terrain Vehicle," report prepared   by Donald LaFond, 1984.

CPSC Memo from Harvey Tzuker to Nick Marchica through Dr. Robert Verhalen entitled, "Further Information on All Terrain Vehicles (ATVs)", March 20, 1984

Letter from David Thome (CPSC) to Tetsuo Chino (Honda) regarding NEISS, March 21, 1984

Letter from David Schmeltzer (CPSC) to Tetsuo Chino (Honda), July 11, 1984

Letter from David Schmeltzer (CPSC) to Tetsuo Chino (Honda), August 15, 1984

American Honda Motor Company, Inc. written testimony regarding ATVs submitted at October 23, 1984 CPSC meeting

Transcript of Industry/CPSC Meeting on Safety Programs for Three Wheel All-Terrain Vehicles, October 23, 1984

CPSC/SVIA Safety Alerts regarding ATVs:
- a)   December 1984
- b)   March 1985
- c)   August 1985
- d)   May 1986
- e)   June 1986
- f)   May 1987 (CPSC only)
- g)   June 1991 (CPSC only)

Letter from Ed Glynn (Honda) to Elizabeth Haught (CPSC) regarding safety labeling on 1986 ATV models, March 28, 1985.

News from CPSC - "CPSC Approves Action Plan for All-Terrain Vehicle Accidents", April 3, 1985

Statement of American Honda Motor Company, Inc. before the Subcommittee on Commerce, Consumer and Monetary Affairs of the House Committee on Government Operations, May 21, 1985

Memo from Alan Isley, President of SVIA to the Board of Trustees regarding Increased SVIA Activities, July 1, 1985

Log of meeting dated December 6, 1985 regarding CPSC's meeting with American Honda

CPSC Hazard Analysis "Survey of All-Terrain Vehicle Related Injuries (1985) - Preliminary Report", Rae Newman, December 1985

Honda Safe Ride Guide, 1985

Letter from Terrence Scanlon (CPSC) to Alan Isley (SVIA), March 19, 1986

Memo dated August 11, 1986 from Alan Isley (SVIA) to the Board of Trustees regarding a board meeting in late August

Franklin Research Center - "Final Report - Medical Analysis of ATV Injuries Vol.1: Study Results" FRC Report no. 7505-1 from a division of Arvin Calspan for the CPSC, September 19, 1986

CPSC Memo & Report from Rae Newman to Nick Marchica, "Hazard Analysis Report on All-Terrain Vehicle Injuries and Deaths", September 27, 1986

CPSC Memo on the Transmittal of the ATV Task Force Report from Leonard DeFiore to the Commission, September 30, 1986

"Report on the Engineering Evaluation of All-Terrain Vehicles", Roy Deppa CPSC, September 1986

SVIA 1987 Budget approved December 11, 1986

CPSC Minutes of Commission Meeting - ATV Enforcement Options, December 12, 1986

Super Trike Honda ATC

Various Honda ATC ads, (late "1970's/early 1980's)

Complaint - United States of America v. American Honda, et al., CA87- 3525, December 30, 1987

Preliminary Consent Decree, United States v. American Honda, et al., December 30, 1987

Final Consent Decree; Civil Action 87-3525GAG; United States of America v. American Honda Motor Company, Inc., et al., April 28, 1988

Honda ATV Safety Alert and Consent Decree Labels, January 1988 and October 25, 1988

ATV Owner's Manual Supplement, 1988

Declaration of Michael Mazis, United States v. Honda et al., December 21, 1987

"Final Report on Undercover Investigation of ATV Dealers," prepared for CPSC by Gary T. Ford, American University, November 1989

Honda 4-H Community ATV Safety Program, December 1991

All Terrain Vehicles Exposure, Injury, Death and Risk Studies, CPSC, April 1998

CPSC Memorandum Annual Report of ATV Deaths and Injuries, May 15, 2002

"All-Terrain Vehicle 2001 Injury and Exposure Studies," CPSC, January 2003

Federal Register Notice, September 9, 1998, Consumer Product Safety Commission, All-Terrain Vehicles; Comment Request--Proposed Resolution

Death Associated With ATVs by State, cpsc.gov