IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMIE NELSON, individually and )
As Administratrix of the Estate of )
Dylan Fehlman, deceased, )
                                )    Case No. 1:18-cv-000210 (Erie)
      Plaintiff, )
                                  )
vs. )
                                  )    RICHARD A. LANZILLO
AMERICAN HONDA MOTOR CO., )    UNITED STATES MAGISTRATE JUDGE
INC., )
                                  )
     Defendant )     REPORT AND RECOMMENDATION
                                  )    ON DEFENDANT'S MOTION FOR
                                  )    SUMMARY JUDGMENT
                                  )
                                  )    ECF NO. 60

I.     Recommendation

     It is respectfully recommended that Defendant's Motion for Summary Judgment (ECF No.

60) be **GRANTED** in part and **DENIED** in part.

II.    Introduction

     This lawsuit arose from the untimely death of Dylan Fehlman (Dylan), a seventeen-year-old

young man from Warren County, Pennsylvania.  Dylan was operating an all-terrain vehicle (ATV)

manufactured by Defendant American Honda Motor Company, Inc. (Honda) at the time of his

death.  Dylan's mother, Jamie Nelson (Mrs. Nelson), as administratrix of his estate, filed this action

against Honda asserting several theories of liability under Pennsylvania state law.  Honda's motion

for summary judgment (ECF No. 60) has been referred to the undersigned for a Report and

Recommendation.

III.    The Undisputed Facts

The accident that claimed Dylan's life occurred sometime between 7:00 p.m. and 11:56 p.m. on February 19, 2017.  At the time of the accident, Dylan was operating a 1984 Honda ATC200ES "Big Red" ATV (Subject ATV) that was owned by his stepfather, Christopher Nelson (Mr. Nelson).

A.      Product History

Mr. Nelson was not the original owner of the Subject ATV.  He purchased the Subject ATV from a private seller, Matthew Curry (Curry), in Indiana, Pennsylvania, in September 2016.  Curry had owned the Subject ATV for a year or two.   Mr. Nelson purchased the Subject ATV "mostly" because of the price but also based on his prior positive experience with another three-wheeled ATV manufactured by Honda that was owned by Mr. Nelson's stepfather.  Mrs. Nelson was present when Mr. Nelson purchased the Subject ATV, but Dylan was not.

When Mr. Nelson purchased the Subject ATV from Curry, he did not receive any written materials other than a bill of sale.  A decal on the Subject ATV instructed users to read the owner's manual and always wear a helmet.  Mr. and Mrs. Nelson did not receive an owner's manual when they purchased the Subject ATV in September 2016, and they did not attempt to obtain a copy at any point thereafter.  Mr. Nelson never received, read, or relied upon any written materials from Honda regarding the safe use or operation of the Subject ATV.

B.      The Accident

February 19, 2017 was a "spring fever day"—unusually warm after a typically cold western Pennsylvania winter—"a nice day to be outside." ECF No. 62-1, p. 71.  Mrs. Nelson and her family began that day splitting firewood. ECF No. 62, ¶ 25. Later in the afternoon, Dylan left home on the Subject ATV to visit his friends Robert Hadley and Fred Bailey, who lived a few miles away. *Id.*, ¶ 26.  Dylan traveled to his destination along area trails. *Id.*, ¶¶ 26-27.  He was not wearing his helmet. *Id.*, ¶ 28.

After spending a short time working on a car, Dylan and his friends returned to Bailey's house. *Id.*, ¶ 31.  Around sunset, Dylan left Bailey's house to return home. *Id.*, ¶ 32.  About the same time, John Bulick and his wife were driving from Kane, Pennsylvania to Warren, Pennsylvania for dinner and movie. *Id.*, ¶ 33.  As they drove along Route 6, they noticed an individual operating an ATV on what appeared to be gravel alongside some railroad tracks. *Id.*  While returning home a few hours later, Bulick noticed what appeared to be an overturned ATV alongside the same tracks where he had seen the ATV earlier that evening. *Id.*, ¶ 26.  Bulick stopped his car in a right-of-way beside the railroad tracks. *Id.*, ¶ 37.  When he came upon the overturned ATV, he discovered Dylan's body lying on the railroad tracks. *Id.*, ¶ 39.  He checked for signs of life but discovered none. *Id.*, ¶ 39.  He returned to his car and called for emergency assistance. *Id.*, ¶ 40.  Emergency medical services and the Pennsylvania State Police soon arrived at the scene and confirmed that Dylan had died. *Id.*, ¶ 43.  The coroner's report listed blunt force trauma to the head as Dylan's cause of death, noting the death was accidental. *Id.*, ¶ 44.

IV.    Procedural History

Mrs. Nelson filed her Complaint in this action on July 31, 2018.  ECF No. 1.  In addition to Honda, the Complaint named Honda Motor Co., Ltd., Honda R&D Americas, Inc., and Honda R&D Ltd. as defendants, but the parties later stipulated to the dismissal of all defendants except Honda.  ECF No. 10.  Honda filed an Answer on October 17, 2018.  ECF No. 11.  After the completion of discovery, Honda filed the instant motion for summary judgment and supporting documents on October 13, 2020.  ECF No. 60.  Nelson filed a memorandum in opposition on November 13, 2020, and Honda filed a Reply.  ECF No. 64; ECF No. 69.

In addition to its motion for summary judgment, Honda filed three motions in limine, seeking to prohibit the testimony at trial of Nelson's experts, John Talbot, M.D. (ECF No. 54); Robert Wright, Ph.D. (ECF No. 56); and William F. Kitzes, J.D. (ECF No. 58).  Nelson filed briefs

in opposition these motions. *See* ECF Nos. 65, 66, and 67. The Court denied the motions without prejudice as premature. ECF No. 74. However, the Court indicated that it would consider and address the parties' contentions regarding the foundational sufficiency of the expert's opinions in conjunction with this Report and Recommendation. *Id.* A hearing was held in open court on April 15, 2021, and this Report and Recommendation follows.

V.      Standard of Decision

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond

his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

VI.     The Claims and Supporting Expert Opinions

Mrs. Nelson's Complaint originally raised ten claims against Honda, but the parties later stipulated to the dismissal of Counts V (Breach of Express Warranty), VI (Breach of Implied Warranties), and IX (Pennsylvania Unfair Trade Practices and Consumer Protection Law). *See* ECF No. 9. The following claims remain pending:

- Count I—Strict liability based on Honda's failure to warn users of the product concerning its alleged dangerous condition (ECF No. 1, ¶¶ 23-27);

- Count II—Strict liability based on the alleged defective design of the product (*Id.*, ¶¶ 28-31);

- Count III—Strict liability based on alleged manufacturing defects in the Subject ATV (*Id.*, ¶¶ 34-38)

- Count IV—Negligence (*Id.*, ¶¶ 39-42);

- Count VII—Fraud by concealment (*Id.*, ¶¶ 55-60);

- Count VIII—Negligent misrepresentation (*Id.*, ¶¶ 61-66); and

- Count X— Wrongful Death (*Id.*, ¶¶ 77-84).

In support of her claims, Mrs. Nelson has offered the opinions of two liability experts, Robert Wright, Ph.D., and William F. Kitzes, J.D.  Dr. Wright is proffered as an expert in "Force Analysis and Dynamics which includes the areas of product and vehicle design, stability of vehicle, and accident reconstruction."  ECF No. 57 (Exhibit 8, p. 1) (Report and CV of Dr. Wright).  Dr. Wright opines that the following defects in the design of the Subject ATV caused or materially contributed to Dylan's accident and death:

1.   "The weight distribution and the location of the center of gravity" for the Subject ATV "with a rider is totally inappropriate" for its "configuration and desired use"; the Honda ATV "is laterally unstable," making it "prone to forward pitch rolls," which caused Dylan's accident.  *Id.*, p. 7.

2.   The Subject ATV's rear axle is "mounted rigidly to [its] frame."  The Subject ATV "has no suspension other than the soft balloon tires on which it rides."  *Id.*, pp. 7, 10.  The rigid mounting of the frame to the Subject ATV and its lack of a rear suspension "cause[s] control or steering problems."  *Id.* "Lack of adequate rear suspension will cause the ATC to bounce up and down or gallop at speeds of less than 10 mph," which can cause the handlebars to "get turned or rotated involuntarily."  *Id.*  "If the handlebars get turned (either voluntarily or involuntarily) 10° to 15° with no significant movements of the rider, the ATV will go into a forward pitch roll" and flip over, which is what happened to Dylan.  *Id.*, pp. 7-8.

3.   The Subject ATV should have had "some sort of occupant protection system" given its instability.  *Id.*, p. 8.

4.   The seat of the Subject ATV "is too long" and "allows the operator to move and change the dynamics of the machine many times involuntarily because of unexpected events or unanticipated changes in the terrain."  *Id.*

5.   The warnings on the machine do not address the stability problem inherent in its design.  *Id.*

Mr. Kitzes is a "Board Certified Product Safety Manager and Hazard Control Manager." ECF No. 59-13, p. 1 (Kitzes Expert Report).  His report lists five opinions regarding Honda's

business practices and/or the adequacy of the warnings and instructions Honda provided regarding

the Subject ATV:

1.   Honda failed in its responsibility as a reasonably prudent manufacturer/distributor to adequately protect ATV users in general, and Dylan Fehlman in particular, from the catastrophic risks of injury and death associated with the foreseeable use of ATVs.

2.   By 2016, the Consumer Product Safety Commission National Electronic Injury Surveillance System (NEISS) estimated nearly 3,365,000 hospital emergency room-treated injuries associated with the use of ATVs.  In addition, by that time there had been over 14,000 injuries associated deaths reported to the CPSC.  As early as March, July, and August of 1984, in successive letters to Tetsuo Chino, then President of American Honda, the Consumer Product Safety Commission (CPSC) informed Honda of the "dramatic rise in the number of injuries associated with 3-Wheeled ATVs" and stated they were "extremely concerned."

3.   To substantially reduce or eliminate the catastrophic injuries associated with ATVs, it is the responsibility of Honda to implement a system safety program to identify risks and minimize them.  Honda failed to apply the accepted principles of product safety management to adequately:

   a)   Establish and observe a written corporate safety policy

   b)   Identify product hazards and evaluate severity

   c)   Perform a risk assessment to adequately integrate product hazards, the environment and foreseeable consumer use

   d)   Monitor the safety performance of their product

   e)   Take adequate corrective actions to eliminate, guard or warn customers of the danger and motivate them to avoid injury.

4.   Honda failed to adequately warn and train users of the dangers associated with the foreseeable use of ATVs and their unique handling characteristics.  Beginning in December of 1984, the Consumer Product Safety Commission (CPSC) and the Specialty Vehicle Institute (SVIA), the ATV industry

safety organization, jointly issued a Consumer Safety Alert, intended to inform consumers of the dangers of ATVs, and the number of injuries and deaths associated with ATV use. This data was intended to provide consumers with a basis to make an informed decision about ATV use.  These alerts were reissued in March of 1985, August of 1985 and June of 1986 as the injury statistics grew.  Yet Honda failed to distribute these Alerts to either purchasers or other ATV operators.  Honda failed to adequate provide safety data and warnings required by the 1988 final consent decree.

5.     Since 1984, Honda has failed to take adequate corrective action to recall 3-wheel ATVs.

*Id.*, pp. 11-12. The remainder of Mr. Kitzes' report discusses his foundation for each of the foregoing opinions.

Honda has also submitted expert reports, including a report by Nathan T. Dorris, Ph.D., a consultant with Dorris and Associates, International, LLC.  *See* ECF No. 62-1, pp. 272-297.  Dr. Dorris is an expert in "human factors engineering," which he defines as the "scientific discipline concerned with the understanding of interactions among humans and other elements of a system, including written communications."  *Id.*, p. 274.  Honda presents Dr. Dorris as its expert on product warnings and, specifically, the adequacy of the warnings provided with the Subject ATV.  Dr. Dorris states that he has "reviewed the reports of … Dr. Robert Wright … and Mr. William Kitzes and generally disagree with their conclusions concerning human factors and warnings issues as it relates to this matter."  *Id.* p. 292.  Among other things, Dorris disagrees with Wright's opinion that the warnings do not address "the stability problem inherent in its design."  *Id.*  He also challenges Kitzes "reliance upon a 'safety engineering hierarchy of priorities,'" as well as Kitzes' opinion that Honda failed to "adequately warn and train users of the dangers associated with the foreseeable use of ATVs and their unique handling characteristics."  *Id.*

Countering Dr. Wright's opinions that the Subject ATV was defectively designed, Honda also provides a report from Graeme Fowler, Ph.D., P.E., an engineer.  *Id.*, pp. 299-321.  Dr. Fowler

disagrees with Dr. Wright, concluding that the ATV's "suspension is adequate for its intended mission." *Id.*, p. 307. Fowler further opines that when operating the ATV in question, "the rider's movements are both natural and instinctive. They are not complicated nor do they require extraordinary coordination and skill." *Id.* Dr. Fowler also disagrees with Dr. Wright's opinion on the design of ATV's seat. *Id.* As to Dr. Wright's opinion that the ATV has defects due to its lateral and longitudinal stability, Dr. Fowler opines that "one cannot conclude that increased stability would result in reduced risk of an ATV-associated injury." *Id.*, p. 308. On this topic, he takes issue with Dr. Wright's stability calculations. *Id.*, p. 309.[1] Dr. Fowler blames Dylan's failure to wear a helmet, his operation of the ATV in an "unsuitable" and "unfamiliar environment" and his driving the ATV "at too high a speed" for the accident, "not any defect associated with the Honda ATC200ES." *Id.* p. 318.

VII.   Discussion and Analysis

The competing expert reports submitted by Mrs. Nelson and Honda create a "battle of experts" in this case, which typically precludes the granting of a motion for summary judgment. *See, e.g., Hill v. Lamanna*, 2007 WL 777007, at *12 (W.D. Pa. Mar. 12, 2007) (citing *Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1036 (9th Cir. 2003) ("Who is correct in this battle of experts is not for us to decide.")). In a case involving competing experts, the defendant may still prevail on summary judgment if it can demonstrate that expert testimony is necessary to support an essential element of the plaintiff's claim and the plaintiff's proffered expert report or testimony is subject to exclusion on evidentiary grounds. *See, e.g., Ucciardi v. E.I. Du Pont Nemours and Co.*, 2016 WL 7338533, at *7 n. 14 (D.N.J. Dec. 19, 2016). That is the tact Honda takes here. Honda maintains that Mrs. Nelson's experts opinions lack proper foundation and amount, therefore, to conjecture and speculation.

---

[1] Dr. Fowler also disagrees with Dr. Wright on the directional stability of the ATV and contends that the "galloping and bouncing" of the vehicle posited by Dr. Wright did not occur. *Id.*, p. 317.

Honda thus contends that these reports should not be considered, leaving Mrs. Nelson without necessary support for her claims.

As noted, Honda filed motions in limine seeking to exclude the testimony of Mrs. Nelson's experts at trial, which were dismissed as premature. *See* ECF No. 74.  In a case where the parties have not consented to the jurisdiction of a Magistrate Judge, such decisions typically have been left to the discretion of the trial judge. *See, e.g., Cendan v. Truillo*, 2020 WL 6149800, *7 (S.D. Fla. Oct. 20, 2020) (leaving motion in limine on expert's proposed testimony to the discretion of the trial judge); *Sheldon v. Marquis*, 2019 WL 590877, at *3 (S.D. Ohio Feb. 13, 2019), *report and recommendation adopted*, (S.D. Ohio Oct. 6, 2020), *certificate of appealability denied sub nom. Sheldon v. Black,* 2021 WL 1654419 (6th Cir. Apr. 20, 2021) (holding that a motion in limine is "directed to the inherent discretion of the trial judge").  For purposes of this Report and Recommendation then, the undersigned will defer any analysis of challenges to Mrs. Nelson's experts' qualifications and the soundness of their methodology to Judge Baxter's discretion and instead, will limit the focus to a review of whether Mrs. Nelson's experts have a proper foundation for their opinions.

A.    Count I—Strict Productions Liability: Failure to Warn

Count I of the Complaint asserts a survival claim under Pennsylvania law based upon Honda's failure to warn Dylan of the ATV's design and manufacturing defects that rendered it unreasonably dangerous and unsafe for its intended and foreseeable uses.  ECF No. 1, ¶ 25(e).  Mrs. Nelson alleges that Honda failed to provide "proper warnings and instructions to ensure that incidents of roll-overs resulting in personal injury or death would not occur, and to "alert users and consumers of the danger posed to users of the Subject ATV" and, on this basis, seeks to hold

Honda strictly liable for Decedent's death.  *Id.*; *see also* ECF No. 62, ¶ 46.  She supports this claim with Kitzes' expert report.[2]

As noted above, Kitzes opines that Honda's internal product safety system was deficient which precluded the company from designing a safer ATV and prevented the company from properly informing the public of dangers.  *See* ECF No. 59-13, p. 13.  However, even acknowledging that Kitzes has expertise in the field of "product safety management," and that such expertise could be relevant to other issues raised in this case, whether Honda had the best or worst safety program is irrelevant to the failure to warn claim.  *See, e.g., Schmidt v. Conagra Foods, Inc.*, 2020 WL 7027445, *27 (D. Conn. Nov. 30, 2020) (excluding Kitzes' testimony as to defendant's "product safety management").  If a product was defective due to inadequate warnings and that defect caused the plaintiff's injuries, the defendant would face strict liability regardless of the quality of its safety program.  Conversely, if the product had appropriate warnings, the defendant would not be liable on a failure to warn theory, no matter what deficiencies may have existed in its safety program.  Thus, Kitzes' opinion is, with one exception, irrelevant to the failure to warn claim.

As pleaded, Mrs. Nelson's failure to warn claim sets out three related but distinct failures or deficiencies:(1) inadequate warnings at the time of the initial sale; (2) post-sale failures to warn/notify users of dangers; and (3) failure to recall the ATV in question.

---

[2] Dr. Wright's report includes a conclusory statement that "the warnings on the machine do not address the stability problem inherent in its design."  ECF No. 57-8, p. 10.  Dr. Wright, however, offers no foundation for this opinion, nor does he provide any information concerning the hypothetical additional warning or warnings he believes should have been provided on the Subject ATV.  Further, Mrs. Nelson did not designate Dr. Wright as an expert supporting her failure to warn claim or attempt to qualify him as such.  Indeed, in his deposition, Dr. Wright acknowledged that he is not an expert regarding the proper content of warnings.  ECF No. 80, p. 51.  Consequently, Dr. Wright's undeveloped assessment of the adequacy of the warnings on the Subject ATV are not supportive of this claim.  Thus, any expert support for Mrs. Nelson's failure to warn claim will have to come from Kitzes' expert opinions.

1.   Time-of-Sale Warnings

To the extent Mrs. Nelson's claim is based on inadequate warnings at the time of sale, it fails based on a lack of causation.  To support the causation element of the claim, "the plaintiff must establish that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of the injuries."  *Pavlik v. Lane Ltd./Tobacco Exps. Int'l*, 135 F.3d 876, 881 (3d Cir. 1998) (citing *Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997).  "In other words, 'the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller.'"  *Whyte v. Stanley Black & Decker, Inc.*, 2021 WL 230986, at *9 (W.D. Pa. Jan. 22, 2021) (quoting *Phillips v. A-Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1171 (1995)).  As discussed, the record establishes that Dylan never received, read, or relied on the time-of-sale documentation, including the manual and any warnings or instruction contained in those documents.  Therefore, no matter how robust the warnings in those documents could or arguably should have been, their deficiencies could not have been the cause of Dylan's accident and death.

Notwithstanding these undisputed facts, Mrs. Nelson argues that the "heeding presumption" satisfies her burden of production on the causation element of her claim.  The heeding presumption presumes that a warning, if given, would have been heeded by the user of the product.  *Pavlik*, 135 F.3d 883.  Where applicable, the heeding presumption relieves a plaintiff opposing summary judgment of his obligation to produce evidence to show that the user of the product would have avoided the risk had he been warned of it and shifts the burden of production to the defendant to rebut the presumption.  *Colegrove v. Cameron Mach. Co.*, 172 F. Supp. 2d 611, 617 (W.D. Pa. 2001).  In response to Mrs. Nelson's argument, Honda asserts that the heeding presumption applies only to toxic tort and asbestos exposure cases.  Indeed, there is support for this position in Pennsylvania case law.  *See e.g., Dolby v. Ziegler Tire & Supply Co.*, 2017 WL 781650, at *5 (Pa. Super. Ct. Feb. 28, 2017) ("[Plaintiff's] reliance upon the heeding presumption doctrine is misplaced as the doctrine has

been authorized in Pennsylvania only in cases involving workplace exposure to asbestos.") (citing two Pennsylvania Superior Court cases). Yet several federal courts applying Pennsylvania law, including the Third Circuit, have extended the heeding presumption failure to warn claims outside the toxic-tort context. *See, e.g., Pavlik*, 135 F.3d at 881; *Whyte*, 2021 WL 230986, at *10 (Ranjan, J.); *Dorshimer v. Zonar Sys., Inc.*, 145 F. Supp. 3d 339, 355 (M.D. Pa. 2015); *Trask v. Olin Corp.*, 2016 WL 1181428, at *13 (W.D. Pa. Mar. 28, 2016) (Fischer, J.); *Flanagan v. martFIVE, LLC*, 259 F. Supp. 3d 316, 320-21 (W.D. Pa. 2017) (Schwab, J.); *Kurzinsky v. Petzl Am., Inc.*, 2019 WL 220201, at *4 (E.D. Pa. Jan. 16, 2019). And, as early as 1997, the Pennsylvania Supreme Court stated that "the law presumes that warnings will be obeyed" in a case involving the adequacy of warnings accompanying an industrial blender. *Davis*, 690 A.2d at 190. Thus, the weight of authority appears to favor extension of the heeding presumption beyond the toxic tort context.

In this case, however, Mrs. Nelson's reliance on the heeding presumption suffers from a more fundamental problem—specifically, any foundation for its application to this case is negated by the undisputed facts of record. The Court cannot presume that Dylan would have heeded a more robust warning unless there is some basis to believe that it would have been provided to him or otherwise would have come to his attention. Here, the record is undisputed that the time-of-sale warnings (except the decal, discussed below) were never available to Dylan because they were not provided to Mr. Nelson when he purchased the Subject ATV. While the heeding principle presumes that a person would have followed a more robust warning contained in a manual or other document in his possession or at least available to him, it cannot presume that a person would have relied on warnings that the record establishes he never would have received. Nothing Kitzes might opine alters this conclusion. *See, e.g., Kenney v. Watts Regulator Co.*, 2021 WL 84065, *1 (E.D. Pa. Jan. 11, 2021) (holding that an expert cannot "opine as to the sufficiency of warnings the homeowner never knew.").

13

While the absence of causation regarding any time-of-sale warnings contained in the product manual and instructions is apparent from the record, additional analysis is necessary regarding a time-of-sale warning affixed to the product.  Unlike a separate warning in an owner's or instruction manual, a product label or sticker typically accompanies the product through changes in ownership and users regardless of whether original or successive owners provide the sale documents to secondary purchasers.  In this case, however, counsel for Mrs. Nelson acknowledged during oral argument that Mrs. Nelson's experts have not identified any additional or alternative language that should have been included on the Subject ATV and the absence of which rendered the product defective.  And nothing else in the record informs such a claim.  Therefore, any argument that the label or decal on the Subject ATV was inadequate and led to accident is without foundation and entirely speculative.  *See Flanagan*, 259 F. Supp. 3d at 321 ("Viewing the evidence in the light most favorable to Plaintiff, … the Court concludes that Plaintiff did not produce sufficient evidence for a reasonable jury to conclude 'that additional warnings or reminders may have made a difference.'"); *Chandler v. L'Oreal USA, Inc.*, 340 F. Supp. 3d 551, 562 (W.D. Pa. 2018), *aff'd*, 774 Fed. Appx. 752 (3d Cir. 2019) (same); *Conti v. Ford Motor Co.*, 743 F.2d 195, 199 (3d Cir. 1984) ("a defendant may be liable in failure-to-warn claims 'only when there is sufficient evidence that additional warnings or reminders may have made a difference.'"). Furthermore, even if such expert opinion had been provided, it would not support the causation element of the claim absent a testable methodology to demonstrate that it would have been effective.  *See Ruggiero v. Yamaha Motor Corp.*, U.S.A., 2017 WL 1197755, at *8 (D.N.J. Mar. 31, 2017) (excluding on multiple grounds Kitzes' expert opinion regarding failure to warn), *aff'd sub nom. Ruggiero v. Yamaha Motor Corp., U.S.A*, 778 Fed. Appx. 88 (3d Cir. 2019).

While some failure to warn claims can proceed without supporting expert testimony, Mrs. Nelson's claim is not one of them.  A plaintiff may prove the existence of a product defect by expert

testimony or, where the issue is within common understanding of the factfinder, by circumstantial evidence. *Ruggiero v. Yamaha Motor Corp.*, U.S.A., 2017 WL 1197755, at *10 (D.N.J. Mar. 31, 2017) (New Jersey law) (citation omitted), *aff'd sub nom. Ruggiero v. Yamaha Motor Corp.*, U.S.A, 778 Fed. Appx. 88 (3d Cir. 2019). In *Ruggiero*, for example, where the issue was whether the manufacturer placed the warning decal on the product in a location the user was likely to see and read, the district court held that expert testimony was not required because this issue was not a matter requiring specialized knowledge. *Id.* In reaching this conclusion, the court emphasized that "the contents of the warnings [were] not at issue." *Id.* (where "the contents of the warnings are not at issue, it is not necessarily beyond the common knowledge of an average juror to determine whether the placements of the warnings were reasonably visible to a passenger using the PWC"). "However, expert testimony is required in a warning defect case where the subject matter 'falls outside of the common knowledge of the factfinder and depends on scientific, technical, or other specialized knowledge.'" *Id.* (quoting *Jerista v. Murray*, 883 A.2d 350, 364 (N.J. 2005)). In the present case, Mrs. Nelson claims that the Subject ATV suffered from a variety of defects that affected its stability and that Honda should have included appropriate warnings regarding these defects and their effects on the handling of the Subject ATV. These subjects are not within the common knowledge of jurors; the contents of the existing warnings and any potential additional warnings are squarely at issue. Thus, expert testimony is necessary to support Mrs. Nelson's warning defects claim. But Mr. Kitzes and Dr. Wright have not identified any different or additional language they believe was necessary for the Subject ATV's warning decal; nor have they offered any analysis or even proposed a methodology to analyze the issue. These deficiencies are fatal to Mrs. Nelson's time-of-sale warning defect claim.

2.   Post-Sale Duty to Warn

In contrast to Mrs. Nelson's time-of-sale warning claim, her post-sale duty to warn claim is adequately supported by Kitzes' opinions and testimony.  Under Pennsylvania law, a manufacturer has a limited post-sale duty to warn where the product was defective from the date of its manufacture and where the manufacturer had notice of the defect.  *See Inman v. General Electric Co.*, 2016 WL 5106939, at *6 (W.D. Pa. Sept. 20, 2016) (citing *Walton v. AVCO Corp.*, 530 Pa. 568, 610 A.2d 454 (1992).  Kitzes contends that, as early as 1984, Honda was informed by the Consumer Products Safety Commission (CPSC) of the "dramatic rise in the number of injuries associated with 3-wheeled ATVs."  ECF No. 59-13, p. 12.  Specifically, Kitzes states that in December of 1984, the CPSC and the Specialty Vehicle Institute of America (SVIA) issued a "Consumer Safety Alert" to inform consumers of the dangers of these type of ATVs.  *Id.*, p. 13.  These alerts were then reissued in March of 1985, August of 1985, and June of 1986.  *Id.*

Further, Kitzes relates that Honda itself appeared to acknowledge defects in its three-wheeled ATVs.  For example, as early as 1982, Honda recognized that "anyone who thinks the ATC appears easy to operate because of its steady appearance on three wheels is mistaken.  It is more difficult than it appears.  Just turning the handlebars will not turn the vehicle."  *Id.*, p. 14.  This, and other information identified in Kitzes' expert report, raise a genuine issue of material fact whether Honda was aware of the alleged stability defects when it initially sold the Subject ATV.  Thus, summary judgment is precluded on Mrs. Nelson's post-sale failure to warn claim, and Honda's motion should be denied as to that claim.

3.   Failure to Recall the Subject ATV

Finally, Mrs. Nelson also bases her failure to warn claim on a duty to recall the Subject ATV after its sale.  This claim fails because Pennsylvania law rejects a seller's post-sale duty to recall a defective product.  *See Inman*, 2016 WL 5106939, at *7 (citing *Girard v. Allis Chalmers Corp., Inc.*, 787

16

F. Supp. 482, 486 n. 3 (W.D. Pa. 1992); *Talarico v. Skyjack, Inc.*, 191 F. Supp.3d 394, 399 (M.D. Pa.

June 13, 2016) (citing *Habecker v. Copperloy Corp.*, 893 F.2d 49, 53 (3d Cir. 1990)).  Thus, Kitzes'

assertion that Honda should have recalled the Subject ATV is irrelevant, and Honda is entitled to

judgment as a matter of law on this aspect of Mrs. Nelson's failure to warn claim.

      B.      Count II—Strict Products Liability: Design Defect

      Mrs. Nelson also asserts a strict liability design defect claim.  ECF No. 1., ¶¶ 28-31.

Although there is no dispute that the overturning of the Subject ATV resulted in Dylan's death, "the

mere happening of an accident does not establish liability."  *Callender v. Brighton Mach. Co.*, 2014 WL

10575351, at *3 (Pa. Super. Sept. 17, 2014) (quoting *Cornell Drilling Co. v. Ford Motor Co.*, 359 A.2d

822, 826 (Pa. Super. 1976)).  Under Pennsylvania law, where a plaintiff alleges a design defect, he or

she must "demonstrate that the design of the machine results in an unreasonably dangerous

product.*"* *Timmonds v. AGCO Corp.,* 2021 WL 1351868, *3 (Pa. Super. Ct. April 12, 2021) (citing

*Barton v. Lowe's Home Centers, Inc.*, 124 A.3d 349, 354-55 (Pa. Super. Ct. 2015).  "[T]he question is

whether the product should have been designed more safely for its intended use."  *Schindler v. Sofamor*

*Inc.*, 774 A.2d 765, 772 (Pa. Super. 2001), *appeal denied*, 567 Pa. 727, 786 A.2d 989 (2001).  A design

defect exists where the product "left the supplier's control lacking any element necessary to make it

safe for its intended use or possessing any feature that renders it unsafe for the intended use."

*Phillips v. Cricket Lighters*, 576 Pa. 763, 841 A.2d 1000, 1005 (2003) (emphasis in original);

*Commonwealth Department of General Services v. United States Mineral Products Co.*, 809 A.2d 1000, 1027

(Pa. Commw. Ct. 2002).  The plaintiff may prove the product is "defective" by showing that either:

(1) "the danger is unknowable and unacceptable to the average or ordinary consumer" (the

"consumer expectations standard"); or (2) "a 'reasonable person' would conclude that the

probability and seriousness of harm caused by the product outweigh the burden or costs of taking

precautions" (the "risk-utility standard").  *Tincher*, 104 A.3d at 385–91 (citations omitted).  A plaintiff

may proceed under either theory, but only needs to prevail on one to demonstrate the existence of a defect. *Id.* at 391. "Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." *Kenney v. Watts Regul. Co.*, 2021 WL 84065, at *13 (E.D. Pa. Jan. 11, 2021) (citing *Tincher*, 104 A.3d at 339).

To defeat summary judgment on this claim, Mrs. Nelson relies primarily on the report and deposition testimony of Dr. Robert Wright.[3] After reviewing Dr. Wright's report and deposition testimony, the undersigned concludes that Mrs. Nelson has adduced sufficient evidence to raise a genuine issue of material fact as to whether the Subject ATV was defectively designed and unreasonably dangerous to users and whether the alleged defect or defects caused Dylan's accident and death. Therefore, it is recommended that Honda's motion for summary judgment on Count II be denied.

Fairly read, Dr. Wright's Report and his deposition opine that while the ATV was being operated in an expected fashion, a combination of defects and deficiencies caused it to flip over (a "pitch-roll"), killing Dylan as a result. *See, e.g.*, ECF No. 65-1, p. 35. When asked at his deposition what his criticisms were of the Honda ATV's design, Dr. Wright identified four: "lateral stability, longitudinal stability, suspension, and steerability or maneuverability problems."[4] ECF No. 80, p. 43.

---

[3] Mrs. Nelson also appears to rely, at least in part, on the report of Mr. Kitzes in support of this claim. *See* ECF No. 64, p. 8. Having concluded that Dr. Wright's report creates genuine issues of material fact thereby negating summary judgment on the design defect claim, this Report and Recommendation offers no opinion on whether Kitzes' expert report may be relevant to this claim. That determination is left to the Court's later review on any motions in limine.

[4] Dr. Wright also noted a defect in the design of the ATV's rear axle, which was "mounted rigidly to the frame." ECF No. 80, p. 51. But Wright stated that "in my opinion, [the rear axle defect] was not causative or did not contribute to this accident." *Id.* Dr. Wright, despite reservations about the adequacy of the ATV's seat, also stated that any design defect in connection with the seat was not "causative" of Dylan's accident. *Id.*, p. 80.

1.    Lateral Stability Defect

The lateral stability of an ATV concerns the degree to which the vehicle resists sideways rollovers. *See, e.g., Drury v. Am. Honda Motor Co.*, 93-1414 (La. App. 1 Cir. 12/22/94), 659 So. 2d 738, 746, *writ denied*, 95-1012 (La. 6/23/95). Here, Dr. Wright opines that the Subject ATV was laterally unstable to such an extent as to render it unreasonably dangerous based on the following methodology:

> My calculations and analysis ... show that this vehicle (1984 Honda
> ATC 200ES "Big Red" Three-Wheel ATV) with an operator of
> approximately the same size and weight of Dylan Fehlman has the
> lateral stability ratio (b/h or $K_{st}$) of only about 0.5 to 0.6. This ratio is
> approximately half of the accepted value (it should exceed 1.0
> preferably exceed 1.2). Thus, the vehicle is very unstable and is
> subject to side roll-overs and forward pitch rolls.

ECF No. 65-1, pp. 37-38. Wright explained that the measurement or formula used to determine vehicular lateral stability is identified as "$K_{st}$."[5] ECF No. 80, p. 48. He asserts that he used that formula to calculate the ATV's lateral stability. *Id.*, p. 98. Wright contends that the standard $K_{st}$ value for an all-terrain vehicle operating with a rider should be greater than 1.0, but preferably 1.2. *Id.*, p. 99. Wright calculated that the ATV in question had a lateral stability of 0.75 (with a 134-pound rider) and 0.57 (with a 175-pound rider). *Id.*, p. 98. While Honda may disagree with Dr. Wright's methodology and conclusion and dispute that lateral instability caused Dylan's accident, these are matters properly left to the jury.

2.    Longitudinal Stability Defect

As to the ATV's longitudinal instability, Dr. Wright testified on cross-examination during his deposition:

---

[5] "$K_{st}$" refers to the metric used to compute the lateral stability coefficient. See, e.g., "Vehicle Characteristics Measurements of All-Terrain Vehicles," Consumer Products Safety Commission Staff Statement, January, 2017. Available at www.cpsc.gov.

> Q:    You talk about longitudinal stability, and when we measure
>       longitudinal stability statically, it's measured in terms of Kp,
>       correct?  Capital letter K, lower case letter p?
>
> A:    K sub p.  And K sup p is – we were the first to come out in
>       our papers with the terminology a/h, which a/h is totally
>       equal.  K sub p is the same as a/h.
>
> Q:    And it's my understanding that you have articulated the
>       position that an all-terrain vehicle should have a Kp with a
>       rider greater than 1.0, correct?
>
> A:    Correct.

*Id.*, p. 44.  For this calculation, Dr. Wright explains that he first calculated the center of gravity via a

mathematical analysis based on two different driver weights and on a driver-less ATV.  *Id.*, p. 95.

Here, Dr. Wright reported a longitudinal stability of 0.77 with a 134-pound rider and 0.70 with a

175-pound rider.  *Id.* p. 96.  Without any rider, Wright calculated a longitudinal stability of 1.13.  *Id.*

Wright provided exhibits relating his calculations during this deposition.  *Id.*, p. 5 (noting Exhibits 8,

9).  Dr. Wright's conclusion regarding what constitutes proper longitudinal stability and the extent to

which longitudinal instability contributed to the accident is not entirely clear from his report and

testimony.  Nevertheless, they are sufficient to survive summary judgment.  To the extent Dr.

Wright may have based his conclusions in this area on flawed methodology, this issue will have to

await scrutiny on a motion in limine or on cross-examination at trial.

> 3.    Suspension and Steering Defects

Dr. Wright believes that because the ATV in question had a solid rear axle, "the two rear

wheels drive at the same rate, since they're solid … one cannot differentiate from the other."  *Id.*, p.

49.  His Report states:

> Another design defect of the 1984 Honda ATC 200ES "Big Red"
> that contributed to this accident scenario, is that the rear end of this
> vehicle has no suspension.  The rear axle of this ATV is mounted
> rigidly to the frame.  This design will cause control or steering
> problems which are brought about by the fact that the rear of this
> vehicle has no suspension other than the soft balloon tires on which

> it rides.  Since this vehicle has little or no suspension (especially in the
> rear), it will bounce freely or gallop as it is driven and be airborne a
> good portion of the time.

ECF No. 65-1, p. 39.  He connects the alleged steering defect with the rear suspension problem.  As

he explained, "all of the ATCs all had a solid rear axle, and with a solid rear axle, it made the vehicle

very difficult to steer or maneuver properly."  ECF No. 80, p. 42.  But at his deposition, Wright

conceded that "in this case, the Fehlman case, turning was not a --- maneuverability was not a factor

in the case.  So even though this particular machine, Big Red, the '84 Big Red, did not have

differential, did have a solid rear axle, that, in my opinion, was not causative or did not contribute to

this accident."  *Id.* pp. 50-51.  Given his admission, the Court should not construe Mrs. Nelson to

allege a design defect relating to the ATV's solid rear suspension.

Honda appears to argue that Dr. Wright's opinions should not be considered on summary

judgment because he is a "career witness" who has testified in numerous other cases involving

ATVs and has consistently found them to be defective.  ECF No. 61, p. 16-17.  This is a credibility

argument best resolved by the jury.  *See Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 2012

WL 6562221, at *13 (W.D. Pa. 2012) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 753 (3d

Cir. 1994) ("The Third Circuit has found that an expert's background as a purported professional

witness goes to the credibility of the expert, rather than her qualifications.").

Honda also contends Dr. Wright's opinions lack the appropriate evidentiary foundation

(ECF No. 61, p. 18), and that, as a result, his conclusions are mere conjecture and speculation (ECF

No. 61, p. 20).  In essence, Honda argues that Dr. Wright's opinions are not reliable and therefore,

inadmissible.  Honda also raised this argument in its motion in limine to preclude Wright's

testimony and may do so again before trial.  *See* ECF No. 56.  At this stage of the proceedings and

for purposes of this motion, it appears that Dr. Wright has an adequate foundation for his design

defect opinions.

An expert's opinion need not "be supported by the best foundation, methodology, or research." *Rullo v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, 2021 WL 640063, at *5 (W.D. Pa. Feb. 18, 2021) (quoting *Wojciechowski v. Musial*, 829 Fed. Appx. 574, 576 (3d Cir. 2020); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017)). All that is required is that the opinion rests on "good grounds." *Wojciechowski*, 829 Fed. Appx. at 576 (citing *Karlo*, 849 F.3d at 83). Wright's opinions are adequately grounded. Not only does he base his opinions in this case on quantifiable data and calculations which may be quantitatively and independently assessed by Honda, he also based his opinions on published scientific articles on the topic. *See, e.g.*, ECF No. 65-1, p. 39 (citing Tan and Huston (1984a, 1984b, 1986a, 1986b) and Tan and Xia (19889)). As noted, Honda may further scrutinize the foundation and methodology underlying Dr. Wright's opinions by means of a motion in limine prior to trial and, certainly, cross-examination at trial. But as the record currently stands, Dr. Wright's opinions are properly considered in opposition to Honda's motion for summary judgment.

So considered, the competing expert reports of Dr. Wright and Dr. Fowler create a genuine issue of material fact as to whether the Subject ATV was defectively designed due to latitudinal and longitudinal instability and whether these asserted defects caused Dylan's accident and death. It is recommended, therefore, that Honda's motion for summary judgment on Mrs. Nelson's design defect claim be denied.

C.       Count III—Manufacturing Defect.

Mrs. Nelson does not oppose the entry of summary judgment for Honda on her manufacturing defect claim as set forth in Count III. *See* ECF No. 64, p. 9. The Court should, therefore, grant Honda's motion as it pertains to Count III.

D.    Count IV—Survival Action – Negligence

At Count IV, Mrs. Nelson brings a survival claim based on negligence as a theory of liability. ECF No. 1, ¶¶ 39-42.  In *Phillips v. Cricket Lighters*, the Supreme Court of Pennsylvania discussed the distinctions between strict products liability and negligence.  841 A.2d 1000, 1008 (Pa. 2003).  As the *Phillips* Court explained, "[s]trict liability examines the product itself, and sternly eschews considerations of the reasonableness of the conduct of the manufacturer."  *Id.* (citing *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590 (Pa. 1987).  Conversely, "a negligence cause of action revolves around an examination of the conduct of the defendant."  *Id. Phillips* subsequently acknowledged that whether a harm is foreseeable to the defendant is relevant to determining the defendant's negligence. Of particular significance, *Phillips* considered evidence of past similar accidents as probative of foreseeability.  *Id.*  Simply put, common law negligence claims are subject to a different standard and analysis.  *Schwartz v. Abex Corp.*, 106 F. Supp.3d 626, 635 (E.D. Pa. 2015) (citing *Tincher*, 104 A.3d at 336, 345, 358, 381-83, 384).  To succeed on her negligence claim, Mrs. Nelson must prove four elements: "[(1) the defendant had a duty to conform to a certain standard of conduct; [(2)] the defendant breached that duty; [(3)] such breach caused the injury in question; and [(4)] actual loss or damage."  *Whyte v. Stanley Black & Decker, Inc.*, 2021 WL 230986, at *12 (W.D. Pa. Jan. 22, 2021) (quoting *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1008 (2003)).

As discussed above, Mrs. Nelson's experts assert that the Subject ATV overturned due to defects in its design, rather than misuse of the Subject ATV.  *See* ECF No. 65-1, pp. 35.  In further support of her negligence claim, Mrs. Nelson relies upon Kitzes' report and deposition testimony opining that Honda lacked a reasonable and proper safety program to identify and correct such defects prior to the sale of Subject ATV.  Kitzes' opinions regarding policies and procedures at Honda are sufficient at this stage of the proceedings to raise genuine issues of material fact and defeat Honda's motion as it relates to Mrs. Nelson's negligence claim.

E.   Count VII and Count VIII—Fraudulent Concealment and Negligent
     Misrepresentation

Mrs. Nelson contends that Honda both fraudulently concealed the ATV's design defect and

negligently misrepresented its fitness for use.[6]  *See* ECF No. 1, ¶¶ 55-66.  The Court should grant

Honda's motion for summary judgment on these claims.

In support of her claim of fraudulent concealment (Count VI), Mrs. Nelson argues that

Honda "willfully and maliciously" concealed the ATV's defective design and its dangerousness,

including its propensity to cause "serious consequences to the users, including death."  *Id.*, ¶ 56.  As

for negligent misrepresentation (Count VII), Mrs. Nelson contends that Honda represented that the

ATV was safe for use as a "recreational and off-road vehicle," but made such a statement "knowing

that the product was defective."  *Id.*, ¶ 62.  Honda maintains summary judgment is appropriate on

this claim because Mrs. Nelson has failed to identify any misrepresentation made by the company

upon which Dylan relied.  *See* ECF No. 61, p. 27.

Fraudulent concealment in Pennsylvania is governed by Section 550 of the Restatement

(Second) of Torts, which provides that a "party to a transaction who by concealment or other action

intentionally prevents the other from acquiring material information" is liable for the loss the other

party incurred as a result of the concealment.  *Farhangui v. Grossinger*, 2020 WL 5121112, at *2 (E.D.

Pa. Aug. 31, 2020); *see also Roberts v. Estate of Barbagallo*, 531 A.2d 1125, 1130 (Pa. Super. 1987).  Mrs.

Nelson thus must show that Honda "(1) [caused] an omission; (2) the omission was material to the

transaction at hand; (3) the omission was made falsely, with knowledge of its falsity or recklessness

as to whether it is true or false; (4) the omission was made with the intent of misleading another into

relying on it; (5) the plaintiff justifiably relied on the omission; and (6) the resulting injury was

---

[6] Under Pennsylvania law, fraudulent concealment has the same elements as the tort of intentional misrepresentation,
with the exception that the party intentionally conceals a material fact rather than making an affirmative representation.
*See Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 612 n.6 (3d Cir. 1995) (citing *Gibbs v. Ernst*, 538 Pa. 193,
207 n.12, 647 A.2d 882, 889 n.12 (1994)).

proximately caused by the reliance." *Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 121 (E.D. Pa. 2019) (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 n.12 (Pa. 1994)). Negligent misrepresentation, in turn, "requires proof of: (1) a misrepresentation of material fact; (2) made under circumstances in which the misrepresenter ought to have known of its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *CALA Diamonds, LLC v. HRA Grp. Holdings*, 2017 WL 4222886, at *7 (E.D. Pa. Sept. 22, 2017) (citing *Telwell Inc. V. Grandbridge Real Estate Capital LLC*, 2016 Pa. Super. Ct. 159, 143 A.3d 421, 430 (2016)). A degree of reliance is common to both claims. *See e.g., Hena v. Vandergrift*, 2020 WL 1158640, *19 (W.D. Pa. Mar. 10, 2020); *Gaines v. Krawczyk*, 354 F. Supp.2d 573, 587 (W.D. Pa. 2004).

As to the fraudulent concealment claim, Kitzes ascribed the following omission to Honda:

> Beginning in December of 1984, the Consumer Products Safety Commission (CPSC) and the Specialty Vehicle Institute of American (SVIA), the ATV industry safety organization, jointly issued a Consumer Safety Alert, intended to inform consumers of the dangers of ATVs, and the number of injuries and deaths associated with ATV use. The data was intended to provide consumers with a basis to make an informed decision about ATV use. These alerts were reissued in March of 1985, August of 1985, and June of 1986 as the injury statistics grew. Yet Honda failed to distribute these Alerts to either purchasers or other ATV operators. Honda failed to adequately provide safety data and warnings required by the 1988 final consent decree.

ECF No. 65-1, p. 14. Thus, Kitzes' report identifies two omissions of information—safety warnings required by the 1988 consent decree and other "safety alerts" that were to have been published by ATV manufacturers in 1985 and 1986. *Id.* Kitzes contends that Honda instead continued to promote their ATV as suitable for "safe family fun," thereby concealing its dangerousness. *Id.*, p. 16.

Honda's expert Dorris disagrees, stating that the Nelson family had experience with a four-wheeled ATV, manufactured after the one in question, from which they would have been provided

with the uniform industry warnings.  ECF No. 62-1, p. 293.  Further, Dorris argues that Dylan's

extensive riding experience gave him the necessary experience to control the ATV.  *Id.*  Finally,

Dorris specifically notes that "Honda disagrees with Mr. Kitzes' opinion that they failed to provide

safety information as required by the final Consent Decree."  *Id.*  He reports:

> Further, in October 1988, American Honda provided additional
> warnings-related materials pursuant to a Consent Decree between the
> ATV industry and the United States Department of Justice.  Pursuant
> to the terms of the Final Consent Decree, American Honda also
> agreed to provide free rider training, a multi-million-dollar television
> safety awareness campaign, consumer information dissemination, and
> additional point of purchase safety materials.

*Id.*, p. 296.  This disagreement between competing experts about Honda's purported concealment of

information it was required to disclose by the consent decree might have created a genuine issue of

material fact as to any omission connected to the consent decree.  However, Honda's motion for

summary judgment should be granted, as far as Nelson's claim relates to the consent decree,

because Kitzes contradicted his own report during his deposition, acknowledging that Honda

complied with its obligations under the consent decree.  During questions from Honda's counsel,

Kitzes acknowledged:

> Q:   Did Honda meet all of its requirements under the consent
>      decree that was entered in either 1987 or 1988?  I don't recall
>      the exact date.
>
> A:   The time was '88.  Yes, as far as I know. You know, it's a
>      different story with the action plans when it expired, but
>      under the consent decree, yes.
>
> Q:   So you're not going to testify that Honda was supposed to do
>      something under the consent decree in 1988 and they did not
>      do it?
>
> A:   I have no plans to.

ECF No. 79, p. 171.  Kitzes distances himself from his own statement in response to counsel's

attempts at clarification:

Q:      I thought we just covered that and you told me you're not
        offering the opinion that Honda was supposed to do
        something under the consent decree that they failed to do.

A:      Yea, I think [that was] my testimony – to the best of my
        recollection, correct.  I'll see if I – if there's any cite to that.
        If not, I'll withdraw that last sentence.

ECF No. 79, p. 175.  Given this testimony, any fraudulent concealment or negligent

misrepresentation based on an alleged failure by Honda to comply with the 1988 consent decree fails

by Kitzes' admission.[7]

　　　But Kitzes also testifies that Honda failed to publish any "safety communications" upon the

expiration of the consent decree, explaining that "after the consent decree Honda had to hand out

safety alerts talking about the number of injuries and that had a lot more information than is on

here."  *Id.*, pp. 129, 177.  These safety alerts were to be sent only to "first purchasers" and Kitzes

acknowledged that Honda did that.  *Id.*, p. 172.  Further, when asked whether the safety alerts were

required to be sent to anyone other than first purchasers, Kitzes indicated that "I think it had to be

hung in the dealership, but otherwise, no."  *Id.*, p. 173.  Further, Kitzes testified:

Q:      And to your knowledge, was the – that safety alert published
        in Honda dealerships following the entry of that decree in
        1988?

A:      Up until '98 or so, yes.

*Id.*

　　　Kitzes' testimony muddies the waters further.  He then states that Honda's post-consent

decree "action plan" was not ratified by the CPSC because "they refused to provide to dealers for

dissemination to purchasers the ATV safety alert that was required under the consent decree.  The

other manufacturers did, but Honda decided that they would not do that."  *Id.*  Dr. Dorris, Honda's

---

[7] Honda's counsel confirmed Kitzes' statement later in the deposition: "We talked a little bit about the consent decree
and the fact that you agree that Honda complied with its obligations under the consent decree."  ECF No. 79, p. 177.
Mr. Kitzes does not disagree with this summary.  *Id.*

expert, believed this testimony to be largely irrelevant, opining that even had Honda disseminated this information, "there is no basis to conclude this information would have reached the Nelson family, communicated any new information to them, or changed anyone's behavior."  ECF No. 62-1, p. 295.  Whether or not Honda omitted certain safety alerts, however, is ultimately not determinative because—even when assuming the safety alerts were not published—Mrs. Nelson failed to establish any evidence that Dylan relied on these omissions.  Put another way, nothing in the record shows that Dylan would have relied on these safety alerts had Honda published them.

Mrs. Nelson bears the burden of proving detrimental reliance and she simply has not done so here.  *See, e.g., Woolley v. Groft*, 2021 WL 1578249, *3 (M.D. Pa. Apr. 22, 2021) ("[t]he party asserting fraudulent concealment has the burden of proving such fraud or concealment by evidence which is clear, precise, and convincing) (citing *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987)).  At oral argument, counsel for Mrs. Nelson suggested that because Dylan is deceased, the reliance element of this tort "dovetails with the heeding principle" because it cannot be determined whether a decision by Honda to issue the safety alerts would have influenced Dylan's operations of the ATV.  But Mrs. Nelson's counsel acknowledged during argument that no court has extended the heeding principle to fraudulent concealment claims.

This lack of evidence of Dylan's detrimental reliance also dooms Mrs. Nelson's negligent misrepresentation claim.  Kitzes' report sets out a detailed history of Honda's advertisements and public representations concerning its ATV products, starting as far back as 1982 in Japan.  ECF No. 65-1, p. 15.  For example, Kitzes relates that Honda's television advertisements depicted children riding ATVs on rough terrain, and that their printed ads announced that operating Honda ATVs was "practically effortless," that the vehicles easily traversed "an astonishing array of terrain, over rocks," and could be operated "darn near everywhere."  *Id.* at 17.  Kitzes opines that "Honda promoted their ATVs as safe family fun, yet it was clear from the early 1980s on that Honda was

well aware ATVs often were neither safe nor family fun after a catastrophic injury." *Id.*, p. 16.  By 1985, however, Honda had admitted before Congress that it was "aware of an ominous note – a rise in the number of injuries" associated with its ATVs, and that "safety education and training could reduce the number of injuries." *Id.*, p. 18.  But again, even accepting Kitzes' assertions that Honda misrepresented the safety of the subject ATV, the record is devoid of evidence upon which a jury could infer that Dylan relied on these statements.  Because a reasonable jury could not conclude that Dylan relied to his detriment on any misrepresentation made by Honda as to the safety or utility of its ATV, summary judgment should be entered in favor of Honda on this claim.

 F.  Count X—Wrongful Death Claim

 Finally, at Count X, Mrs. Nelson brings a wrongful death claim under Pennsylvania law.  *See* ECF No. 1, ¶¶ 77-84.  "Because wrongful death and survival actions are not independent claims, a plaintiff asserting these claims must assert some other independent, cognizable claim to survive a motion to dismiss the wrongful death and survival claims." *Wartluft v. Milton Hershey Sch. & Sch. Tr.*, 2020 WL 1285332, at *16 (M.D. Pa. Mar. 18, 2020), *aff'd*, 844 Fed. Appx. 499 (3d Cir. 2021) (citing *Lansberry v. Altoona Area Sch. Dist.*, 356 F.Supp.3d 486, 504 (W.D. Pa. 2018) (additional citation omitted)).  The wrongful death claim exists "for the benefit of the spouse, children or parents of the deceased." *Grkman v. 890 Weatherwood Lane Operating Co.*, LLC, 189 F. Supp. 3d 513, 519 (W.D. Pa. 2016) (citing 42 Pa. C.S.A. § 8301).  Because it is recommended that the Court deny summary judgment on some of Mrs. Nelson's preceding survival action claims, it is recommended that the Court also deny summary judgment on this claim to the extent that it is premised on the survival action theories of liability concerning which the undersigned has recommended denial of Honda's motion.

VIII.    Conclusion

In conclusion, the undersigned recommends that Defendant Honda's motion for summary judgment be granted in part and denied in part as follows:

- Honda's motion should be DENIED as to Count I, but only to the extent Count I asserts a post-sale duty to warn claim.  In all other respects, Honda's motion should be GRANTED as to Count I;

- Honda's motion should be DENIED as to Count II;

- Inasmuch as Mrs. Nelson does not contest Honda's motion as it relates to Count III, the motion should be GRANTED on that claim;

- Honda's motion should be DENIED as to Count IV;

- Honda's motion should be GRANTED as to Count VII;

- Honda's motion should be GRANTED as to Count VIII; and

- Honda's motion should be DENIED as to Count X.

IX.    Notice to the Parties

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Rule 72.D.2 of the Local Rules of Court, the Parties shall have fourteen (14) days from the date of the service of this Report and Recommendation to file written objections thereto.  The failure to file timely objections will constitute a waiver of his appellate rights.

Should the Parties wish to expedite this matter, they may inform the Court before the expiration of the fourteen-day period, via a Notice on the docket, that they do not intend to file any objections.

Submitted to the Court this 17th day of May, 2021.

RICHARD A. LANZILLO
United States Magistrate Judge