1            IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   JAMIE NELSON, individually    :
    and as Administratrix of      :
4   the Estate of DYLAN FEHLMAN,  :
    deceased,                     :
5            Plaintiff            :
                                  :
6       v.                        :    No. 1:18-CV-210-SPB
                                  :
7   AMERICAN HONDA MOTOR CO.,     :
    INC.,                         :
8            Defendant            :

9

10                          VOLUME I

11

12      Transcript of the proceedings on April 19, 2022,
        United States District Court, Erie, Pennsylvania,
13      before District Judge Susan Paradise Baxter.

14

15   APPEARANCES:

16      For the Plaintiff:        Peter D. Friday, Esquire
                                  Benjamin Michael Kelley, Esquire
17                                Friday & Cox, LLC

18      For the Defendant:        Clem C. Trischler, Esquire
                                  Pietragallo Bosick & Gordon
19
                                  William Francis Auther, Esquire
20                                Bowman and Brooke, LLP

21
        Court Reporter:          Janis L. Ferguson, RPR, CRR
22                               17 South Park Row
                                 Room A340
23                               Erie, PA 16501

24
        Proceedings recorded by mechanical stenography;
25   transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2                       10:07 a.m.
 3              (All parties present in open court.)
 4              THE COURT:  All right.  Obviously, this is Nelson
 5    versus Honda Motor Company, Inc.  This is our Daubert hearing.
 6    And I think we're ready to go.  Do we have the expert on the
 7    Zoom?  I see him.  We're good.
 8                   All right.  We may begin.  Thank you.  I
 9    received your filing of yesterday.
10              MR. FRIDAY:  Good morning.  Peter Friday.
11              THE COURT:  Good morning.
12              MR. FRIDAY:  And I'm here with my co-counsel, Ben
13    Kelly.
14              THE COURT:  Attorney Friday, good morning.
15              MR. FRIDAY:  So can the witness be sworn in?
16              THE COURT:  Certainly.  Ms. Mayo, thank you.
17         WILLIAM F. KITZES, a witness herein, having been
18    first duly sworn, was examined and testified as follows:
19                        DIRECT EXAMINATION
20    BY MR. FRIDAY:
21         Q.   Good morning, Mr. Kitzes.  Would you please state
22    your full name.
23         A.   William F. or Bill Kitzes, K-I-T-Z-E-S.
24              THE COURT:  Can we make that louder, by any chance,
25    for me?
```

```
 1                  (Discussion held off the record.)
 2                  MR. FRIDAY:  Okay.  I can barely hear the witness.
 3                  (Discussion held off the record.)
 4    BY MR. FRIDAY:
 5         Q.    Would you please state your full name.
 6         A.    William F. or Bill Kitzes, K-I-T-Z-E-S.
 7         Q.    And, Mr. Kitzes, what's your date of birth?
 8         A.    November 24th, 1950.
 9         Q.    And as you know, we're here to inquire about your
10    expertise today.  There is a declaration of William F. Kitzes,
11    Junior, CPSM, that was filed -- it has -- it bears your
12    signature, and it's dated April 13, 2022.  Is that correct?
13         A.    Yes, sir.
14         Q.    All right.  Did you read and review and sign this
15    declaration?
16         A.    Yes, I did.
17         Q.    And you did that for this case; is that correct?
18         A.    Yes, sir.
19         Q.    And is it true and correct?
20         A.    Absolutely.
21         Q.    All right.  Does it give an overview of your
22    experience as an expert, including your background -- your
23    education, background, training, court testimony, and the
24    like?
25         A.    Yes, sir.
```

1          Q.    And, Mr. Kitzes, how many times have you been

2     qualified in a court in the United States to testify as an

3     expert on consumer product safety matters?

4          A.    I believe the number is 136 times over the last 40

5     years.

6          Q.    Can you give the Court an overview of what

7     jurisdictions you've been qualified in as an expert.

8          A.    I've testified in Federal and State Courts.  I

9     believe in 29 states across the country.

10         Q.    Does that include Pennsylvania?

11         A.    Yes, sir.

12         Q.    State Court and Federal Court?

13         A.    Federal Court in Erie about 25 or 30 years ago.

14         Q.    All right.  So you've been qualified to testify as

15    an expert on consumer product safety matters in the Western --

16    U.S. District Court for the Western District of Pennsylvania;

17    is that correct?

18         A.    Yes, sir.  Eimers v. Honda.

19               THE COURT REPORTER:  I'm sorry?

20         A.    Eimers, E-I-M-E-R-S, v. Honda.  It was a motorcycle

21    kickstand case.

22         Q.    And is that noted in your declaration?

23         A.    Yes, sir.

24         Q.    What paragraph would that be?  I have Paragraph 14

25    on Page 6.

```
1        A.    Yes, sir.  That's correct.

2        Q.    And can you tell the Court about that matter and

3   what you testified about, what you were qualified to express

4   expert opinions on.

5        A.    That case involved a Federal Motor Vehicle Safety

6   Standard 123, which requires a motorcycle kickstand to retract

7   when the motorcycle moves forward.  The Honda kickstand failed

8   to retract, and it threw the rider off onto the pavement

9   creating basically catastrophic injury.  Judge Miner [sic] was

10  the Judge in that case --

11            THE COURT REPORTER:  Judge -- I'm sorry.  I'm sorry,

12  sir.  Judge?

13            THE WITNESS:  Judge Miner [sic].  And I testified

14  for the better part of the day about warnings and recalls and

15  the defect in that motorcycle and its failure to comply with

16  the Federal Motor Vehicle Safety Standards.

17  BY MR. FRIDAY:

18       Q.    And the Court permitted you to express your opinions

19  in that matter?

20       A.    Yes, sir.

21       Q.    Pardon me?

22       A.    Yes, sir.

23       Q.    All right.  Do you know what the outcome of that

24  case was?

25       A.    The jury awarded the Plaintiff $20 million.
```

1          THE COURT:  It was Judge Mencer.

2          THE WITNESS:  I'm sorry, Your Honor.

3          THE COURT:  That's okay.

4   BY MR. FRIDAY:

5      Q.   Now, have you been called as an expert to testify in

6   any other matters involving all-terrain vehicles?

7      A.   I've testified 20 times, I believe is the number,

8   give or take, in courts all across the country involving

9   all-terrain vehicles.

10     Q.   And what were the topics that you were qualified to

11  testify as an expert about in those matters?

12     A.   Product safety management, safety analysis, the

13  principles of safety management, warnings, the epidemiological

14  and special studies done by the Consumer Product Safety

15  Commission identifying the defect in ATV's, as well as the

16  Consent Decree and the post-sale duties that were established

17  under that Consent Decree.

18     Q.   Okay.  Now, Mr. Kitzes, I know we have your expert

19  report in this matter, the matter before the Court today.

20  It's been filed.  And can you -- we know what you wrote in the

21  report.  But can you explain to the Court where your expertise

22  is with respect to that report and the opinions that you

23  express in that report.

24     A.   Well, my background is I have a law degree.  And in

25  the middle of my second year of law school, I went to work at

1      the Consumer Product Safety Commission, the U.S. Consumer

2      Product Safety Commission in Washington.  I went to American

3      University Law School.  And I started in the recall division

4      and warnings and participated in consumer notification in over

5      200 cases when I was with the Commission.  I've assisted other

6      manufacturers once I went into the private sector in

7      structuring warnings, on-product warnings.  And I -- I worked

8      in the mid '90s for Arctic Cat, which is a -- they were

9      developing their first ATV, and they hired me to come to Deep

10     River Falls, Minnesota, where I gave them a seminar on ATV

11     safety, I rode ATV's with them.  And then spent another day

12     inned Eden Prairie, Minnesota, working with their people

13     publishing the owner's manual, making sure all the safety

14     issues were covered.

15             I've written on ATV's.  I wrote an article for the

16     Journal of Law, Medicine, and Healthcare in 1989 for the World

17     Health Organization outlining the issues involved with ATV

18     safety.  I participated in a press conference with the

19     Attorney General of New York on ATV's.  I gave a seminar to

20     the National Association of Attorneys General on ATV's.  And

21     I've presented ATV safety issues in many seminars that are

22     listed in my CV.

23             And I -- my expertise is in risk assessment; in

24     identifying product hazards and -- and risk reduction; the

25     safety measures that companies --

```
1              THE COURT REPORTER:  I'm sorry.  The safety measures
2    that companies --
3              THE WITNESS:  -- have to identify before they
4    manufacture the product.  And then they get another chance
5    after the product is sold to the public to identify hazards
6    and then take risk reduction measures.  And in the hierarchy
7    of safety management, the highest and bestest will eliminate
8    the hazard.
9              And that's not really possible with an ATV, because
10   you wouldn't have one.  But you can also guard against the
11   hazard.  And, importantly, you can warn consumers about the
12   danger and motivate them to avoid danger with an adequate
13   warning.
14   BY MR. FRIDAY:
15        Q.   Thank you.  So in the Dylan Fehlman/Jamie Nelson
16   case that we're here about, have you discussed in your report
17   hazards associated with ATV's; in particular, this three-wheel
18   ATV, the Big Red?
19        A.   I have.  I have discussed the special studies done
20   by the CPSC, identifying the risks especially to children.
21   There have been over 3 million hospital emergency room
22   treatments associated with ATV's by 2016 and 14,000 deaths,
23   and about 30 to 40 percent of those are to children.  And the
24   CPSC studies it quite intensively and found that over half,
25   53 percent of accidents occurred at less than 16 miles an
```

```
 1    hour; 68 percent due to terrain irregularities --
 2              THE COURT REPORTER:  I'm sorry.  I'm sorry, sir.
 3    I'm sorry, sir.
 4              THE COURT:  Hold on, Mr. Kitzes.
 5              THE WITNESS:  Yes, Your Honor.
 6              (Discussion held off the record.)
 7    BY MR. FRIDAY:
 8         Q.    Okay, the 68.  Can you explain what --
 9         A.    Yeah.  68 percent is a terrain irregularity or an
10    obstacle leading to the injury.  41 -- 4-1 -- percent are
11    overturns.  26 percent landed on the injured parties.  And
12    18 percent of persons treated in hospital emergency rooms were
13    admitted to the hospital as opposed to an average of
14    four percent for general products.
15              The engineering task force at CPSC found that
16    control limits of ATV's may readily be exceeded within the
17    range of normal procedures -- operating conditions.  And they
18    found that where the vehicle was being operated within limits,
19    a rider has no reason to suspect that at 10 miles an
20    hour the -- maintaining control over --
21              THE COURT REPORTER:  I'm sorry.  I'm sorry, sir.
22    I'm sorry, sir.  And they found that where the vehicle was
23    being operated within limits, a rider has no reason to suspect
24    that at 10 miles an hour --
25              THE WITNESS:  Going -- going slower created more of
```

1    a hazard than going faster over an obstacle.  Plus, the impact
2    at the lower speeds was greater with the ATV.
3            The Franklin Research Institute in Philadelphia
4    found that while it might logically be assumed that accidents
5    designed -- on a vehicle designed for off-road vehicles -- let
6    me get this exactly right -- would be associated with rough
7    terrain, but that is clearly not the case.  One-half of
8    accidents occur in level terrain in favorable ambient
9    conditions.
10           I'll stop there.  There's a lot more, but --
11   BY MR. FRIDAY:
12       Q.   Mr. Kitzes, what's your understanding, based upon
13   the information available in this case, of the type of terrain
14   that Dylan Fehlman was operating the Honda Big Red three-wheel
15   ATV on?
16       A.   I'm not an accident reconstructionist and don't
17   claim to be, but it's my understanding that he was riding on
18   the railroad tracks, and the incident occurred at the junction
19   of the tracks and the grade crossing.
20           THE COURT REPORTER:  The tracks and the what?
21           MR. FRIDAY:  Grade crossing.  G-R-A-D-E.
22   BY MR. FRIDAY:
23       Q.   Okay.  So have you expressed opinions on the safety
24   issues presented to Dylan Fehlman with respect to the Honda
25   Big Red three-wheel ATV?

1      A.   Yes, I have.  Particularly in the issue of post-sale

2  warnings.

3      Q.   All right.  And those are expressed in your report

4  that's been filed in this matter?

5      A.   Yes, they are.

6      Q.   Have you expressed opinions about risk reduction

7  measures in this matter?

8      A.   Yes.

9      Q.   Briefly, can you tell us about that.

10     A.   Well, I'm not an engineer, and I'm not here to talk

11  about what should be done to the vehicle.  But in 1988 and

12  '89, a Consent Decree required Honda to post injury statistics

13  and provide warnings to people who bought ATV's.

14          They stopped making three-wheelers in 1988 stating

15  market conditions, but they actually continued to sell used

16  three-wheelers.  And used three-wheelers have been on the

17  market continuously, and particularly in rural areas.  And if

18  you went into a dealership, you were given a safety alert and

19  new warnings.

20          But on the outside market, there was no -- these

21  warnings were not available, generally.  I mean, you could

22  find them on the Internet if you were looking for them, but,

23  otherwise, purchasers of used products didn't get the

24  warnings.

25          In fact, if you look at the list of ATV deaths by

1    state between 1982 and 2014, Texas was almost nine percent of

2    the U.S. population.  Had 773 fatalities.  Pennsylvania ranked

3    second in the country with 702 fatalities, with only

4    3.8 percent of the population in the U.S.

5        Q.   Have you commented on hazard elimination in this

6    matter?

7        A.   Yes.  Basically, again, on letting people know what

8    Honda knew about the dangers and their -- their required

9    post-sale duty to warn.

10            51 percent of all ATV's are purchased used, and

11   80 percent from a previous owner rather than from a Honda

12   dealer.  So the post-sale information which is published based

13   on Honda's prior knowledge is really not communicated to that

14   51 percent who bought it from a previous owner.

15       Q.   All right.  And forgive me if you've mentioned.  The

16   ATV in this case that Dylan Fehlman was operating at the time

17   of his death, that was purchased not from a Honda dealer,

18   correct?

19       A.   That's correct.

20       Q.   So he would be using an ATV purchased in the

21   80 percent group; is that right?

22       A.   Well, 51 percent are used, correct.  And 80 percent

23   purchased from a previous owner.

24       Q.   Okay.  Were the warnings in this matter adequate for

25   users and consumers, in your opinion?

```
1          A.   No, sir.  No, sir.

2               MR. AUTHER:  Your Honor, I'm going to object to this

3      because this was subject to the summary judgment --

4               THE COURT REPORTER:  I'm sorry; can I get you to use

5      your microphone, please.

6               MR. AUTHER:  My apologies.  I had it turned off, the

7      audio/video part.

8                    But this was the subject to a summary judgment

9      motion that was granted in Honda's favor, and that would be

10     the instructions and warnings provided with the original sale.

11              THE COURT:  He's just touching on it at this point,

12     so I'm going to let it go.  And I don't like to interrupt and

13     mess with anyone's presentation.

14              MR. FRIDAY:  Thank you.

15              THE COURT:  But I want to remind you that we're here

16     to determine not whether I agree -- I'm not the jury -- not

17     whether I agree with his opinion, but whether or not there's

18     support for it, and it is an --

19              MR. FRIDAY:  I'll move on.

20              THE COURT:  As you know.

21              MR. FRIDAY:  Thank you.

22              THE COURT:  It's a basis for expert testimony.

23     Thank you.

24              MR. FRIDAY:  So recognizing that these documents

25     have been filed in this matter, for the purpose of this
```

```
 1   hearing, I would offer the declaration of William Kitzes,
 2   Junior into evidence, Mr. Kitzes' curriculum vitae --
 3           THE COURT:  Wait, he wants to answer.  Go ahead, Mr.
 4   Kitzes; what?
 5           THE WITNESS:  It's just a small correction.  It's
 6   William F. Kitzes, JD, not Junior.
 7           THE COURT:  Oh, JD, not Junior.  Okay.
 8           THE WITNESS:  I'm not a Junior.
 9        MR. FRIDAY:  Oh, JD.  Okay.  Did I say "Junior"?
10   I'm sorry.  Pardon me.
11           THE COURT:  Is there an objection to the -- let's go
12   one at a time.  Is there objection to his -- let me get the
13   name of it -- declaration?
14           MR. AUTHER:  Well, it is hearsay, Your Honor, and
15   he's here to testify live, so, yes, there is an objection to
16   it.
17           THE COURT:  All right.  The declaration would be
18   what -- would it be offered in place of testimony at trial?
19   Not.
20        MR. FRIDAY:  It would be offered in support of
21   Plaintiff's position in this matter; the Daubert challenge.
22           THE COURT:  All right.  I'll allow it on that basis.
23        MR. FRIDAY:  Thank you.
24            The CV, any objection to that?
25           MR. AUTHER:  Same objection, Your Honor.  Hearsay.
```

1              MR. FRIDAY:  Same comment.  We would -- it's just

2     for this matter.

3              THE COURT:  I'll allow it.

4              MR. FRIDAY:  And Mr. Kitzes' report, which has also

5     been offered as a document in this -- in this case, we would

6     offer in support of Plaintiff's position in this hearing.

7              MR. AUTHER:  Same objection.  Hearsay, Your Honor.

8              THE COURT:  For the purposes of this Daubert

9     hearing, my take-away so far is that -- that he has an

10    expertise in safety requirements and -- that he's trying to

11    show me he has an expertise in safety requirements and safety

12    notices.  Is that correct?  Is that the basis of his hoped-for

13    testimony at trial?

14             MR. FRIDAY:  Yes.

15             THE COURT:  All right.  He has explained to us his

16    background and that he has testified in this regard in other

17    cases, and, in particular, in cases precisely like this one.

18    That's my understanding.  Correct?

19             MR. FRIDAY:  I wouldn't necessarily say "precisely".

20    Every case is different, every fact pattern is different.  But

21    generally --

22             THE COURT:  But against a three-wheel ATV made by

23    Honda.  Yes?  No?

24             MR. FRIDAY:  Well, ATV's in general.  All-terrain

25    vehicles.  Not necessarily just three-wheel.

1          THE COURT:  Okay.

2          THE WITNESS:  Three- and four-wheel, Your Honor,

3    involving Honda.

4          THE COURT:  All right.  And the issue in this case,

5    which comes up elsewhere, I believe I understood, is that

6    there may be correct notices in new sales, but that in used

7    sales, that is not always the case.

8          THE WITNESS:  That's correct, Your Honor.

9          THE COURT:  And is it your opinion that a Consent

10   Decree that is already in place covers used sale Hondas?  And

11   what's the basis -- if that is your opinion, what's the basis

12   for that?

13         THE WITNESS:  Well, the Consent Decree covers what

14   the dealerships had to provide.  If a person purchased a used

15   vehicle and walked into a Honda dealership, those -- that

16   material would need to be provided under the Consent Decree.

17   The Consent Decree couldn't -- because ATV's generally are not

18   registered like cars, it did not touch upon the issue of used

19   ATV sales.  Although Honda was still selling three-wheel used

20   ATV's even after the Consent Decree, even though they were no

21   longer manufacturing them.

22         THE COURT:  And when they did that, did they provide

23   the notice that was required under the Consent Decree, when

24   they sold them?

25         THE WITNESS:  Yes, ma'am.

1          THE COURT:  So the issue, then, is what is required

2     of them on a used sale between private parties.

3          THE WITNESS:  Well, it's also what they knew back in

4     the '80s, when they were manufacturing this vehicle that they

5     didn't warn about.  They didn't meet the American National

6     Standards Institute, the voluntary industry consensus standard

7     on warnings and labeling on their ATV's.  And that was first

8     drafted and published in 1980 and finally in the '90s.  But

9     they were well aware of those principles of warning.

10    Westinghouse published it in 1985.  FMC published it in 1980.

11              So it was not a new concept on the elements of

12    warnings that could have been applied during manufacturing.

13         THE COURT:  All right.  I know you have plenty more,

14    and I'm going to let you come back.  But it is easier for me

15    to take chunks at a time.  So I'm going to allow Defendants to

16    come up and do some cross-examination for as far as we've

17    gone, this far.

18              I want to also say that my standard is low.  I

19    want you to know.  And you have to show me that this is not

20    helpful to the jury.  All right?  Thank you.  Or doesn't have

21    a scientific basis, I guess, which is going to be tougher for

22    you because it's part of a Consent Decree.

23              Mr. Friday, I'm not messing with your

24    presentation too terribly.  I think it's best to keep it clear

25    in my brain.  Thank you.

```
1              MR. AUTHER:  I'll follow your lead, Your Honor.  We
2    appreciate the guidance.
3                         CROSS-EXAMINATION
4    BY MR. AUTHER:
5         Q.   Mr. Kitzes, who prepared the declaration that we
6    received yesterday?  Was that you or counsel?
7         A.   I prepared it 100 percent.
8         Q.   And was it you who decided what orders to include
9    and what orders not to include?
10        A.   Sure.
11        Q.   And you recognize, sir, that you left out some
12   orders that excluded you from testifying in cases around the
13   country.  Correct?
14        A.   Well, I didn't include all the orders that pertained
15   to me.  There have been some cases where I have not gotten to
16   testify, but not on the basis of my expertise and
17   qualifications, but, rather, on the issues in those cases.
18        Q.   But, sir, you did not put those cases where you were
19   excluded for any reason in your declaration that we received
20   yesterday.  Correct?
21        A.   Correct.
22        Q.   And, in fact, you have been excluded on the basis of
23   qualifications two or three times in the past.  Correct?
24        A.   I don't think so, but you're welcome to refresh my
25   recollection.
```

1     Q.   Well, let's look at your testimony in the Ogozaly

2  case.  You may not have it, but I have a copy of the

3  transcript here for the Court and counsel.

4          MR. AUTHER:  May I approach, Your Honor?

5          THE COURT:  You may.

6          (Discussion held off the record.)

7  BY MR. AUTHER:

8     Q.   And if you go to Page 28 of that transcript --

9  actually, we'll start at the very bottom of Page 27.  And when

10 it's printed, the pagination's a little messed up.  But when

11 the Court gets there, I will --

12         THE COURT:  I'm here.  Thank you.

13 BY MR. AUTHER:

14    Q.   At Line 23 it says, quote, "Mr. Kitzes --"

15         THE COURT:  Wait.  Hold on for Mr. Kitzes.

16         MR. AUTHER:  I don't know that Mr. Kitzes has a copy

17 of this Ogozaly transcript.

18         THE WITNESS:  I do not.

19         MR. AUTHER:  What's the best way to get it to him,

20 Your Honor?

21         THE COURT:  I'll defer to my courtroom deputy.

22         MR. AUTHER:  I think my assistant can put it up on

23 the screen so Mr. Kitzes can read along.  Let's see if we can

24 do it that way.

25         THE WITNESS:  Okay.  But just before we start, I

```
1    testified live --
2                THE COURT REPORTER:  I'm sorry.
3                THE COURT:  Okay.  We're missing you.  Try again.
4                THE WITNESS:  I testified live at trial in Scranton
5    in the Ogozaly case for the better part of a day.
6                MR. AUTHER:  Right.  And I have the transcript from
7    that testimony, which I've passed out here, dated October 18,
8    2005.  And the subject of your qualifications are discussed.
9                     Go ahead and share that, at Page 37, Line 23.
10               (Discussion held off the record.)
11   BY MR. AUTHER:
12        Q.   Mr. Kitzes, can you see the testimony?
13        A.   I can.
14        Q.   Okay.  Go ahead down to Line 23 or thereabouts.  At
15   Line 23, it says, "Mr. Kitzes, I'm not going to belabor the
16   point, but there have been cases, sir, where the courts have
17   excluded your testimony altogether."  Answer on Page 28,
18   Line 1, "For qualifications, a couple of times.  Two or three
19   times."
20                     Did I read that correctly?
21        A.   Yes.  That's defense counsel.  That's not the
22   Judge's Order.  That's defense counsel questioning me.
23        Q.   On the subject of qualifications --
24        A.   The Order.
25        Q.   -- correct, sir?
```

1          A.    Yes, sir.  The Judge's Order said differently.

2          Q.    And, in fact, sir, one of the cases that you did not

3    put on your list was one of the very first ATV cases that you

4    sought to testify in.  Correct?

5          A.    That's what it says.

6          Q.    Right.  And you remember that the Court in that case

7    said that as a lawyer and history major, you did not qualify

8    to give testimony.  Do you remember that, sir?

9                THE COURT:  What year is that, Attorney?

10               MR. AUTHER:  I have a copy for Your Honor, if you'd

11   like to --

12               THE COURT:  Well, it says here it was 18 years

13   before this questioning.

14               MR. AUTHER:  Yeah.  It was Ferris v. Honda.

15   BY MR. AUTHER:

16         Q.    Did I get that right, Mr. Kitzes?

17         A.    You did.  But in that case, the Judge from the bench

18   said that I could come back and testify in rebuttal if there

19   were issues concerning safety management.

20         Q.    Right.  Let me -- let me share the Order, actually,

21   with Your Honor here, the Ferris case.

22               MR. AUTHER:  May I approach, Your Honor?

23               THE WITNESS:  Would you tell me again what year that

24   was, sir?

25               THE COURT:  1991.  I'll tell you myself.

1    BY MR. AUTHER:

2         Q.   It was in 1991.  The proceedings that I've handed

3    out today are April 17, 1991.  The Court said, "He's a lawyer

4    and a historian."  And the Court said, "He doesn't have an

5    engineering background."  And the Court said, "At this point

6    his testimony will be excluded."  And the Court did say, "If

7    it becomes relevant because of a part of Honda's defense, the

8    Court might consider allowing it in in rebuttal."

9         A.   Thank you.

10        Q.   "But now I don't think -- this almost sounds like

11   corporate ethics, so it will be excluded."  That's what the

12   Judge's ultimate conclusion was, correct?

13        A.   In 1991, yes.

14             (Discussion held off the record.)

15        Q.   There's another Order that you -- well, let me just

16   ask you this way:  There were other Courts that have excluded

17   your testimony where the Court thought you were really trying

18   to testify about engineering issues or accident reconstruction

19   or statistical analysis, and the Courts felt that you did not

20   possess the expertise necessary in those disciplines.  Isn't

21   that true?

22             THE COURT:  He's frozen.

23   BY MR. AUTHER:

24        Q.   I think you're frozen.  Sorry.

25        A.   I got you now.  You froze up on me, but I think

1    we're good.

2        Q.   Okay.  And I don't know that I got an answer to my

3    question.

4        A.   Let me have it again, please.

5        Q.   Sure.  There have been Courts, other Courts who have

6    excluded your testimony because the Courts felt that you were

7    testifying about engineering issues, accident reconstruction

8    issues, statistical analyses, and that you did not possess the

9    expertise required in those disciplines.  Isn't that correct?

10       A.   I am not an engineer, and I do not testify on

11   engineering.

12            When I was a program manager at CPSC, I had

13   engineers and epidemiologists working for me, and I supervised

14   special studies like the one I quoted in my report.

15            So even though I'm not in epidemiology by training,

16   I have deep experience in analyzing epidemiological and injury

17   data and applying it to safety management.

18       Q.   And that was not my question, Mr. Kitzes.  The

19   question was:  There were Courts who have excluded you on

20   subjects where Courts felt you did not possess the expertise

21   required to testify on engineering, accident reconstruction,

22   statistical analyses.  Isn't that right?

23       A.   Well, I don't do those things.  So when defense

24   counsel wants to exclude me to those things, I agree.

25       Q.   And the Courts have -- and some Courts have excluded

1  you on those things as well.  Correct?

2      A.   I don't recall specifically, but I'll agree with you

3  that I don't testify on those issues.

4      Q.   And you also did not include on your list of cases

5  in your declaration the Leatt case in the Northern District of

6  Ohio in 2013, where you were excluded for lacking a reliable

7  methodology, correct?

8      A.   That's true, but I also didn't include the Leatt --

9  the Leatt case in Kentucky, where the Federal District Judge

10  accepted all my opinions for testimony.  Judge Coffman in the

11  Western District of Kentucky, it was the same issues and the

12  same lawyers.  So you're right.  The judges in Ohio did not --

13  did not allow my opinion, but on the very same set of facts,

14  lawyers, and opinions, the judge -- the Federal Court in

15  Kentucky did.

16      Q.   And, again, sir, that was not my question.  My

17  question is about the cases that you did not include in your

18  declaration.  And one of them that you did not include was the

19  S.S. v. Leatt, L-E-A-T-T, case in the Northern District of

20  Ohio, where you were excluded for lacking a reliable

21  methodology.  Isn't that right?

22      A.   Well, the Judge in that Opinion said I was qualified

23  in safety management, and, in fact, there may be relevant

24  issues that I could testify about.

25      Q.   And you did not include that case on your -- in your

1    declaration, correct?

2          MR. FRIDAY:  Excuse me.  I object.  Counsel

3    interrupted the witness.  I'd like the witness to finish

4    his --

5          THE COURT:  Well, that's fine.  But he's actually

6    answered that several times in his own way and added other

7    information.  So let's move on.

8          MR. AUTHER:  Okay.

9    BY MR. AUTHER:

10     Q.   So let's talk about the Landrin v. MGA case.  This

11   one was included in your declaration, right?

12     A.   Yes, sir.

13          MR. AUTHER:  May I approach, Your Honor?

14          THE COURT:  You may.

15   BY MR. AUTHER:

16     Q.   And if we go to -- and Miss Grimes will put it up on

17   the screen -- the last page of that Order, at the very bottom

18   of the last page, the Court wrote --

19          MR. AUTHER:  You can keep going down.  Yes.

20   BY MR. AUTHER:

21     Q.   So the last two lines on the left column, the Court

22   wrote, "However, the undersigned reaches the opposite

23   conclusion with respect to the ultimate opinions of Mr. Kitzes

24   regarding the existence of a design defect."  Go to the next

25   page there.  "Primarily, the undersigned concludes that these

1   opinions will not aid the trier of fact.  The examination

2   which was performed by Mr. Kitzes is easily performed by the

3   jury, particularly if they are guided by the applicable

4   principles of safety analysis and the Court's instructions on

5   the law.  There is no special expertise required in connection

6   with the examination of the product at issue.  The claimed

7   defect, which essentially consists of the use on a toy of hard

8   plastic corners and edges which serve no useful purpose, does

9   not require any special testing or the application of any

10  engineering principles."

11          The Court continued.  "In addition, the evaluation

12  does not meet the reliability requirements of Rule 702.  The

13  evaluation was based upon the conclusory subjective opinion of

14  Mr. Kitzes which he reached through a visual and physical

15  examination of the toy.  He did not rely upon his experience

16  to integrate data from other professionals such as human

17  factors experts, engineering experts, or relevant safety data

18  concerning similar injuries."  And at the bottom sentence, the

19  Court concluded that, "Mr. Kitzes has failed to meet this

20  burden."

21          Did I read that correctly, sir?

22  A.   You do, but you left out the Court's opinion on the

23  left side of that Opinion allowing my testimony in safety

24  analysis and what a reasonably prudent manufacturer would do

25  to analyze -- what the Judge concluded -- it was an Easy-Bake

1    Oven.  An 11-year-old fell over it and hit her eye on the

2    tower of the oven and blinded her.

3           What the Judge said was that I could present all the

4    data and the analysis about the product, but that it was up to

5    the jury to ultimately decide whether it was defective.

6       Q.   Sir, my question to you is that you left out of your

7    declaration the parts that I read to the Court just now,

8    correct?

9       A.   Yes.  But I did say in my declaration, the Court did

10   find, after permitting my testimony, that the ultimate finding

11   on causation was the responsibility of the jury.  It's in my

12   declaration.

13      Q.   And, sir, another case that you omitted from your

14   declaration was the Exclusion Order in the Williams v.

15   Southcorp USA Water Heaters case, correct?

16      A.   Yes.  The Judge said that a jury could look at the

17   warnings themselves, which was on the water heater.  And

18   though I was qualified to give testimony, the jury could do it

19   on their own.

20      Q.   Let me -- let me ask you a question first before you

21   give me an answer.  Okay?

22      A.   Uh-huh.

23           MR. AUTHER:  May I approach, Your Honor?

24           THE COURT:  Yes.  And I'm not missing anything, am

25   I?  These are all on reliability?

1          MR. AUTHER:  That's correct, Your Honor.  The
2   reliability methodology --
3          THE WITNESS:  This also was almost 30 years ago.
4          MR. AUTHER:  -- qualifications we've covered so far.
5          THE COURT:  I'm sorry we interrupted you, Mr.
6   Kitzes.
7          THE WITNESS:  The date on that is almost 30 years
8   ago, isn't it?
9          THE COURT:  Let him ask the questions, sir.  Thank
10  you.
11         MR. AUTHER:  Go ahead and pull up the Williams case.
12  It's on the third page of the Order.  Second paragraph.
13  BY MR. AUTHER:
14     Q.   And the Court went on to say, "Despite his title,
15  Kitzes has passed no recognized engineering exams.  His formal
16  education includes a Bachelor's Degree in history, a law
17  degree, and a five-and-one-half-day course in human factors.
18  Kitzes once worked for the Consumer Product Safety Commission
19  and has joined several consumer product safety associations,
20  but has never received formal engineering training.  However,
21  Kitzes has had some experience evaluating warning labels and
22  designing at least two.
23         "Kitzes proposes to testify that the Defendant's
24  warning was not adequate and that a more adequate warning
25  would have been the label later used on similar water

1    heaters."

2             The Court wrote, "This opinion is a pure conclusion,

3    however, since Kitzes has offered no tests to support it and

4    no manner to allow it to become tested."

5             Let me just stop there.  Did I read that part

6    correctly?

7        A.   You read it correctly.

8        Q.   And let's talk about this case, sir.  You have

9    offered no alternative warning for this case and this

10   three-wheeler, the 1984 200ES that you claim would make --

11   that would be reasonably safe and adequate, correct?

12       A.   No, sir.  I offered the warnings that were in the

13   Consent Decree that Honda agreed to in 1988, the basis for an

14   adequate label.

15       Q.   And you have created no warnings specifically for

16   this case that would have prevented Mr. Fehlman from riding at

17   night on railroad tracks without a helmet, correct?

18       A.   I can never say "prevented", but I can say that it's

19   reasonable that an adequate warning more likely than not would

20   provide the information that a consumer or a rider would need

21   to evaluate their riding.

22       Q.   Sir, again, I don't think you're hearing my

23   question.  And maybe we're having technical difficulties.  But

24   you have not put pencil to paper and created an alternate

25   warning for this case, correct?

1          A.    That is correct.

2          Q.    Okay.  And you have not tested any warning for this

3     case.  Correct?

4          A.    No, the Government and Honda did.

5          Q.    You, sir, is the question.  You have not tested any

6     warning --

7          A.    I have not.

8          Q.    -- for use in this case; correct?

9          A.    I -- I have not.

10         Q.    Okay.  And you have not created or tested any

11    warning that would have reached Mr. Fehlman 28, 30 years post

12    sale.  Correct?

13         A.    I have not.

14         Q.    And then, of course, we have the Bittner Court

15    Order.  That was not included in your declaration either, was

16    it?

17         A.    No, sir.

18         Q.    Actually, let me go back to the Williams case first.

19    One other conclusion that the Court reached --

20         A.    Sir -- sir --

21         Q.    -- at the last page is that --

22         A.    Sir --

23         Q.    -- is that -- quote, the Court wrote, "Kitzes'

24    testimony will be excluded as unhelpful under Rule 702."  And

25    there it is right there at the bottom of the first paragraph.

1          Did I read that correctly, sir?

2      A.    I don't see it.  I trust that you read it correctly.

3  I found it.  Okay.  Yes.

4      Q.    All right.  Let's go to the Bittner Order --

5            MR. AUTHER:  May I approach, Your Honor?

6            THE COURT:  You may.  I'm still looking for that.

7  That was in the last paragraph?

8            MR. AUTHER:  Last sentence in the first paragraph,

9  Your Honor.

10           THE COURT:  I see it.  Thank you.

11           MR. AUTHER:  And we'll put the Bittner up.  It's

12  under Heading No. 1, Ruling No. 1, August 1, 1991.

13  BY MR. AUTHER:

14     Q.    The Court wrote, "The Plaintiff has moved the Court

15  to reconsider its ruling on the Motion in Limine respecting

16  the testimony of Mr. Kitzes.  On reconsideration, this Court

17  will permit Mr. Kitzes to testify as to the workings of the

18  CPSC and to testify as to the methodology used by CPSC in

19  entering Consent Decrees, providing the Plaintiff furnish a

20  sufficient foundation that the Consent Decree respecting the

21  Honda ATC was entered pursuant to the methodology with which

22  Kitzes was familiar while working at the CPSC.  This Court

23  will not permit Kitzes to testify as a safety analyst."

24           Did I read that correctly?

25     A.    You did.  May I --

1      Q.   And, sir, in this case, the Nelson case, you agree

2  that Honda discharged and performed all of its obligations

3  under the Consent Decree, correct?

4      A.   As far as I know.  But your quote on the -- have you

5  read the transcript of that case?  And have you read that

6  there was a Supreme Court Order specifically allowing me to

7  testify as an expert in that case?

8      Q.   Sir --

9      A.   So you're cherry-picking --

10     Q.   -- the --

11          THE COURT:  Hold on.  Hold on.  Are you talking

12  about on appeal?

13          THE WITNESS:  Yes.

14          THE COURT REPORTER:  I can't hear you, Mr. Kitzes.

15          THE COURT:  Okay, we lost you.

16          THE WITNESS:  I'm sorry; can you hear me now?

17          THE COURT REPORTER:  Yes.

18          THE WITNESS:  Can you hear me now?

19          THE COURT REPORTER:  Yes.

20          THE WITNESS:  Okay.  In the trial court, I testified

21  for a day and a half, and all my opinions were accepted by the

22  Judge.  It was appealed to the Wisconsin Supreme Court on the

23  issue of comparative safety, and the Court called me an expert

24  to testify in that case.  Wisconsin Supreme Court.  You left

25  that out of your testimony or your analysis.

1    BY MR. AUTHER:

2         Q.   And, sir, you did not include the Bittner case in

3    your declaration, did you?

4         A.   I've testified in 135 cases.  I haven't included

5    them all.

6         Q.   And going back to my original question, sir, as far

7    as you know, Honda performed all of its obligations under the

8    Consent Decree.  Correct?

9         A.   As far as I know.  But when it came time to bring up

10   the Consent Decree, Honda refused to sign another agreement

11   with the Commission.

12        Q.   Sir, it's true that the Consent Decree expired in

13   1998, correct?

14        A.   That is correct.

15        Q.   And it's true that the Consent Decree expired before

16   Dylan Fehlman's family ever purchased the three-wheeler on

17   which he had his accident, correct?

18        A.   Correct again.  But all other manufacturers and

19   distributors were willing to sign a continuation with the

20   CPSC, but Honda refused.

21        Q.   Well, it is true, sir, that Honda did eventually

22   enter into an extension of the Consent Decree with an action

23   plan that was accepted by the CPSC, correct?

24             THE COURT:  Okay, we're getting into jury testimony

25   now.  We don't have to.

1    BY MR. AUTHER:

2         Q.   All right.  Let's look now at another case that you

3    left off your declaration.  That is the Kloepfer v. Honda

4    case.

5              MR. AUTHER:  May I approach, Your Honor?

6              THE COURT:  You may.

7              THE WITNESS:  That's 1990, sir?

8    BY MR. AUTHER:

9         Q.   That is 1990.  The opinion is dated March 12, 1990.

10   And this is a Court of Appeals reviewing the exclusion of your

11   testimony on appeal.  And, essentially, the -- well, not

12   essentially.  But let me just read to you the bottom -- it's

13   at Page -- let's see.  About the fifth page in.  I can't see a

14   page number on it.

15             It's on Page 7 of the Westlaw document, under

16   Heading C.  The Court's way ahead of me, as usual.  And just

17   go to the bottom of the left column.

18             It says that, "Having reviewed Kitzes'

19   qualifications and testimony, we hold that the limitations

20   placed on his testimony were not manifestly erroneous and did

21   not give rise to an abuse of discretion."

22             Did I read that correctly?

23        A.   You did.  And I can give you the background on that,

24   if you'd like.

25        Q.   Well, we're just reading the orders that you left

1    off your declaration for now.  Let's turn --

2        A.    No --

3            THE COURT:  He's either going to give the

4    information now or on redirect, so --

5            MR. AUTHER:  Go ahead and have him give it to you,

6    Your Honor.

7            THE COURT:  Go right ahead.

8            THE WITNESS:  I was testifying live at trial about

9    principles of safety, and then I was asked about Honda's test

10   documents.  And the Judge held that I couldn't know what Honda

11   was thinking of when they did those test documents and,

12   therefore, limited my testimony.  And I don't disagree with

13   that.

14   BY MR. AUTHER:

15       Q.    Let's move on to the Kenoyer v. Honda case.

16           MR. AUTHER:  May I approach, Your Honor?

17           THE COURT:  You may.

18   BY MR. AUTHER:

19       Q.    Again, this was one of the first ATV cases you had

20   testified in.  This is May 11th of 1987.  Correct?

21       A.    Yes, sir.

22       Q.    And just the second page of the Order.  Sort of in

23   the middle of the page, the Court says, "Regarding Mr. Kitzes,

24   the Court is going to reaffirm its motion on this and grant

25   the motion to exclude him as an expert and just grant the

1    Motion in Limine."

2              Did I read that correctly?

3        A.   Yes, sir.

4        Q.   Okay.  And then let's look at Moore v. William

5    Honda-Suzuki.

6              MR. AUTHER:  May I approach, Your Honor?

7              THE COURT:  You may.

8    BY MR. AUTHER:

9        Q.   This testimony is December 10, 1992.  And,

10   Mr. Kitzes, this is a transcript of you in the courtroom, with

11   the Judge ruling in advance on what examination would be

12   allowed in front of the jury.  And if we'd just go to the

13   third page of that transcript.  It starts at the top, "It

14   appears to me that he is not qualified to express any opinions

15   or conclusions on the following:  The law, B or 2,

16   defectiveness of the product, and if you have anything to

17   say -- he can't say the product is defective because, three,

18   negligence of Honda.  For example, that Honda was negligent

19   because it didn't do this or that.  That's a jury question.

20   I'm not going to let him testify in this case on the ultimate

21   issue.  Four, conscious disregard.  That will not be allowed."

22             Skip down to No. 2, the Court wrote, "No foundation

23   for the following," and it continues on the next page.

24             "All right.  No foundation for the following:  A or

25   1, flips over under foreseeable conditions of use.  No

```
1   foundation for foreseeable -- what is reasonably foreseeable.
2   Two, that consumers are not aware of.  Three, that they don't
3   expect.  And, E, deaths and injuries that he cannot aggregate
4   [sic] for the -- I don't want to be strictly limited to this.
5   I was about to say, aggregate [sic] the TRX 300 FW."
6           THE COURT:  He hasn't been offered in this case for
7   any of those things.
8           MR. AUTHER:  Well, he just went over injuries and
9   deaths on his direct examination, Your Honor.
10          THE COURT:  But he's not offered for that, is my
11  understanding.
12          THE WITNESS:  Read the next paragraph.
13          MR. AUTHER:  Well, I think he is going to testify
14  about CPSC accident and injury data, and that's one of the
15  issues that is the subject of our motion on Rule 702.
16          THE COURT:  Okay.  Let's talk about that for just
17  one second.  I just want to understand where you're coming
18  from.  If he reads that data, but gives no opinion on it, it's
19  a distinction.
20          MR. AUTHER:  It is.  And, I mean, the data is
21  hearsay, first of all.  And, second of all, he had no
22  involvement or participation in gathering that data.  He
23  doesn't have the basic education, training, or qualifications
24  to perform the calculations or to interpret the data.  And
25  those are subjects of my cross-examination that I'm about to
```

1    turn to.

2              THE COURT:  All right, go.  You'll have a chance to

3    respond to that, Mr. Kitzes.

4              THE WITNESS:  Okay.  And I also testified on the

5    stand for seven days in that trial.  Seven days.

6    BY MR. AUTHER:

7         Q.   Now, let's -- let's turn to your work for government

8    industry and lawyers.  It's true, sir, isn't it, that 90 plus

9    percent of your work is in connection with litigation?

10        A.   When I left the government, that is correct.

11        Q.   And it is true, sir, that 90 plus percent of your

12   litigation work is for Plaintiffs' lawyers, correct?

13        A.   No.  For Plaintiffs.  On behalf of the Plaintiff.

14   And that's who calls me.

15        Q.   And that involves a lawsuit brought against a

16   company, typically, correct?

17        A.   Yes, sir.

18        Q.   And you are not a mechanical engineer, correct?

19        A.   That is correct.

20        Q.   You are not a vehicle design engineer, correct?

21        A.   Correct again.

22        Q.   You're not a human factors engineer, correct?

23        A.   I have expertise in human factors.  I'm a member of

24   the Human Factors Society.  But, again, I'm not an engineer.

25        Q.   And you are not licensed in any state to practice

1  engineering of any kind.  Correct?

2       A.   Absolutely correct.

3       Q.   And you are -- you have no engineering degree,

4  correct?

5       A.   No degree.  I have taken a course at the University

6  of Michigan in human factors engineering; 50 hours over five

7  and a half days.  But I agree, I am not an engineer, and I

8  don't have a degree in engineering.

9       Q.   And aside from that seminar that you took on human

10  factors that you just mentioned, the seminars you have

11  attended are not the kind of seminars that engineers attend to

12  advance their postgraduate knowledge or education, correct?

13       A.   Well, most of them were sponsored by what was then

14  called the American Society of Safety Engineers.  That's who

15  put on the seminars.  So I think you're incorrect.

16       Q.   And, sir, other than the one human factors seminar

17  that you've mentioned, you've not attended the kinds of

18  seminars that engineers attend to advance their careers.

19  Correct?

20       A.   No, sir.  That's not correct.

21       Q.   And you yourself don't --

22            THE COURT:  Wait.  Let him explain.

23            THE WITNESS:  I have an executive certificate in

24  safety management from the American Society of Safety

25  Engineers which required about a hundred hours of seminars.

1    BY MR. AUTHER:

2         Q.   Right.  And that is -- does not apply to

3    engineering, but it applies to your human factors seminar that

4    we just discussed.  Correct?

5         A.   No, sir.  That involves safety management, including

6    engineering.

7         Q.   And --

8         A.   I'm not claiming to be an engineer.  I took those

9    courses with engineers.

10        Q.   And you don't hold yourself out as qualified in the

11   field of engineering, correct?

12        A.   No, sir, I don't.

13        Q.   And then -- and your University of Wisconsin

14   undergraduate degree which you obtained in 1972 was a liberal

15   arts education, correct?

16        A.   Yes, sir.

17        Q.   You had lots of credits in political science, but a

18   degree in history.  Correct?

19        A.   Correct.

20        Q.   And you took no mechanical engineering courses at

21   the University of Wisconsin, right?

22        A.   No, but I took a number of communications courses.

23        Q.   And you took no classes on product design or product

24   safety management, correct?

25        A.   I don't think they were offered back then.  But

1    that's my understanding.

2         Q.   And you took no courses in human factors,

3    engineering, or engineering math.  Correct?

4         A.   Not engineering, but human factors communications.

5         Q.   And at University of Wisconsin, you took no courses

6    on statistics or epidemiology, correct?

7         A.   Correct.

8         Q.   And you went on to law school in Washington, DC,

9    graduating in 1975.  Right?

10        A.   Yes, sir.

11        Q.   And your law school did not have a specialized

12   program for legal engineering or anything like that, did it?

13        A.   No.  But I -- I took a course -- allowed me to

14   extend my work that I was doing at the Consumer Product Safety

15   Commission for credit.

16        Q.   But you understand some law schools are affiliated

17   with engineering schools, where students can attend both the

18   law school and an engineering school.  But that was not the

19   kind of program you were in, right?

20        A.   That's correct.

21        Q.   Okay.  And the courses you took in law school were

22   the courses that all of the lawyers and the Judge in this room

23   took, like evidence and con. law and civil procedure.  Right?

24        A.   Yes, sir.  In addition to my work at the Consumer

25   Product Safety Commission --

1    Q.   And you never practiced law --

2         THE COURT:  Wait.  He's finishing.  Are you

3    finished?

4         THE WITNESS:  Thank you, Your Honor, I'm finished.

5         THE COURT:  Okay.

6    BY MR. AUTHER:

7    Q.   And you never practiced law upon graduation, did

8    you?

9    A.   Never.  I've never had a case, never took a client

10   as a lawyer.

11   Q.   And you've never had a client and never had a case,

12   right?

13   A.   That's correct.

14   Q.   Okay.  And then you testified earlier that you

15   reviewed and you even discussed some of the records that

16   you're relying on in this case, and some of those include

17   engineering documents like testimony reports.  Correct?

18   A.   Sure.  It's part of safety management.

19   Q.   Right.  And engineers, when they write engineering

20   documents, use engineering terms of art, correct?

21   A.   Well, I have a pretty deep background.  I was

22   responsible for -- I was -- I managed engineers at the

23   Consumer Product Safety Commission.  I was a program manager.

24   Q.   Sir --

25   A.   I had engineers, epidemiologists, human factors

1    people.  And I was responsible for the publication of the

2    federal safety standards for walk-behind lawnmowers that my

3    team and I developed.

4         Q.   Sir, I don't think you understood my question.  I

5    mean, when engineers write engineering documents like test

6    reports, they use terms of art in them, don't they?

7         A.   Sometimes.

8         Q.   I didn't get that.  I didn't hear the answer.

9         A.   Sometimes.

10        Q.   When, for example, an engineer discusses stability

11   in the context of a vehicle, you can't give me the technical

12   engineering definition of stability, can you?

13        A.   Well, I'm not an engineer.  I'm not going to give

14   you an engineering opinion about anything.  But I have an

15   understanding, as a manager, managing the engineers, as to

16   what needs to be analyzed with the epidemiology data to

17   determine what is necessary to protect consumers.

18        Q.   Well, let's -- we'll get to epidemiology, but let's

19   talk about the engineering basics here.  I mean, you can't

20   calculate for me the stability of any given vehicle, can you?

21        A.   No, sir, and I wouldn't offer an opinion about it.

22        Q.   And center of gravity also is another technical

23   engineering term that's used in engineering documents, is it

24   not?

25        A.   Yes, sir.

1      Q.   Okay.  And you can't calculate the center of gravity

2   for me, can you?

3      A.   No, sir, but I understand what it is.

4      Q.   And you understand that suspension is an issue in

5   this case, right?

6      A.   I didn't write about it, but I understand that it

7   is.

8      Q.   Right.  And you understand that suspension engineers

9   who, you know, spend their lives and careers studying

10  suspension use technical terms such as a spring rate, correct?

11     A.   Yes, sir, but it's not part of my opinion.  I can't

12  opine about anything like that.

13     Q.   And the engineering documents you've reviewed, can

14  you calculate for me a spring rate for suspension?

15          THE COURT:  Let's not go down that road any further.

16  He keeps saying I'm not going to enter an expert opinion on

17  any of these things.

18          MR. AUTHER:  All right.

19          THE COURT:  But your argument is that it's the basis

20  of knowledge for --

21          MR. AUTHER:  Well, it is -- it is what he's

22  reading -- what he intends to read to the jury from, Your

23  Honor.  He's reading documents where these concepts are

24  discussed, and he is offering an opinion based on those

25  documents and based on those concepts that he cannot calculate

1    and does not understand.

2           THE COURT:  Would you respond to that, Mr. Kitzes.

3           THE WITNESS:  Sure.  The engineers spoke in plain

4    English, and I quoted you saying that the vehicle tips over

5    within its supposed limits of operation.

6                I'm not going to testify about what the spring

7    rate is.  I'm going to present notice, only notice of what the

8    engineers said and what Honda understood.  I will not testify

9    about suspensions or brakes or any engineering data.

10          MR. AUTHER:  Your Honor, may I address that very

11   briefly?  This is the very subject that the other Court Orders

12   that we went through are saying there is no foundation for.

13   When someone who is going to rely on --

14          THE COURT:  What they're saying is the jury can

15   understand that as well; that he doesn't bring any expertise.

16   That's what those have said.  But there are other courts that

17   have said opposite to that.

18          MR. AUTHER:  Well, and it depends on -- it depends

19   on the nature of the technical issues in the case, Your Honor.

20   And here the technical issues are ones that he has no

21   expertise in, and he's reading from documents and intends to

22   read to the jury from documents that he doesn't even

23   understand the foundation for himself, so he could not have

24   foundation for those hearsay statements.

25          THE WITNESS:  I managed people who wrote those -- I

1    was the first person in the U.S. Government to analyze ATV's

2    for a petition in 1979, and I wrote it was my opinion to the

3    Commission.  We didn't have enough information at that point

4    in 1979 to say there was a defect.  But I was the first person

5    in the United States Government to analyze ATV data and

6    collect it.

7              MR. AUTHER:  Well, we're going to talk about that,

8    Your Honor.  I've got a whole subsection for that as well.

9    But let's go back --

10             THE COURT:  But I think we have the understanding of

11   what his education is and what he is -- and I've heard from

12   both sides that I'm not an engineer, I never hold myself out

13   to be an engineer, and I don't have any engineer training.  So

14   we can move on from that.

15             MR. AUTHER:  All right.

16   BY MR. AUTHER:

17       Q.   Well, let's talk about some other areas that are

18   addressed in the documents that you have reviewed and rely on

19   and intend to testify about in this case.  One of those areas

20   is accident reconstruction, correct?

21       A.   No, sir.  I am not an accident reconstructionist and

22   will not testify about accident reconstruction.

23       Q.   That was not my question, sir.  My question is:

24   Accident reconstruction and accident investigation are both

25   subjects addressed in the documents that you have reviewed and

1    relied on in this case.  Correct?

2        A.    Not really.  I mean, there is documents that have

3    engineering reviews, but not accident reconstruction.  And

4    there is other people in this case who will address that.  I

5    am not going to address it.

6        Q.    And, sir, you have no education or scientific

7    training in either accident reconstruction or accident

8    investigation.  Correct?

9        A.    Accident reconstruction, correct.  Accident --

10            THE COURT REPORTER:  I'm sorry; can you repeat your

11    answer.

12            THE WITNESS:  I have no expertise in accident

13    reconstruction, but I have significant expertise in accident

14    investigation as to what occurred and what applies in

15    developing safety management.

16    BY MR. AUTHER:

17        Q.    But you have no scientific training in investigating

18    an accident in the field, for example.  Correct?

19        A.    I don't know what that means.  I'm not -- I'm not an

20    engineer, and I do not investigate the engineering aspects of

21    incidents.  But I have been analyzing injury, fact patterns,

22    and the subject for 40 years, including epidemiological --

23    epidemiological in-depth investigation reports by the

24    Commission and injury investigations done by Honda, by the

25    government, and I have been doing it over 40 years.

1          Q.    And, sir, if you are reading something that involves

2     an accident reconstruction or accident investigation that

3     references a coefficient of deceleration, you cannot give me

4     the specific engineering definition of a coefficient of

5     deceleration, can you?

6          A.    Once again, no.  I'm not an engineer.  I admit it.

7          Q.    Another area that comes up in the documents that

8     you --

9               THE COURT:  Well, hold on a second.  Would you be

10    testifying to that by reading it from another report?

11              THE WITNESS:  No, ma'am.  No, Your Honor.  I'm only

12    reading and analyzing the conclusion that engineers wrote in

13    their report as notice to Honda.

14              MR. AUTHER:  Your Honor, herein lies the conundrum,

15    Your Honor.

16              THE COURT:  It is a never-ending puzzle that comes

17    back around.  The issue is notice, and what is notice is, is

18    where you have the concern.  I get it.  I get it.  Keep going.

19              MR. AUTHER:  But the point, Your Honor, is that he

20    is reading the conclusions of people who have specialized

21    engineering training and experience that he does not possess.

22              THE COURT:  But he is going to be opining as to

23    whether or not notice was given of those things, not of their

24    correctness.  But the question is, does the jury know that and

25    can they discern that.

1          MR. AUTHER:  What is his foundation for it, is

2    really the ultimate question, Your Honor.  And whether we have

3    an opportunity to cross-examine those engineers who wrote

4    those conclusions.  That is what this hearing is about.

5    BY MR. AUTHER:

6          Q.   So, for example, another area that is addressed in

7    the documents you have reviewed and relied on is biomechanics,

8    right?  And you are not a biomechanic, correct?

9          A.   I didn't write about biomechanics, I'm not

10   testifying about biomechanics.  I'm testifying about the

11   findings of special studies that outline the prevalence of

12   certain injury patterns, as noted.  I'm not a biomechanic, I'm

13   not going to testify about weight shifting and how that

14   relates to the vehicle.

15          I did provide a warning to Arctic Cat that they put

16   on their original Bearcat 454 that warned people that the

17   vehicle had a tendency to plow straight ahead when turning,

18   and Arctic Cat accepted that.

19          Q.   Sir, there are people who spend their careers

20   studying and learning about biomechanics, and that is how

21   accidents happen and injuries occur in an accident, right?

22   And that is not your background, correct?

23          A.   Well, I agree with the first half of the premise.

24   But biomechanics is not the -- not the whole of understanding

25   injury patterns.  That comes from the data that gets analyzed

1    by safety managers.

2         Q.   But there are people, sir, who spend their careers

3    studying and learning biomechanics, and that is not you.

4    Correct?

5         A.   Correct.

6         Q.   And those who study and spend their professional

7    careers on biomechanics use tools to help them understand

8    injuries and injury causations, correct?

9         A.   They can.

10         Q.   And they use things like a system for characterizing

11    the severity of injuries.  Correct?

12         A.   Well, I'm not sure that's biomechanics, but there

13    are such systems.

14         Q.   Right.  And, I mean, are you familiar with AIS?

15         A.   I am.

16         Q.   And what does that stand for, sir?

17         A.   Abbreviated Injury System.

18         Q.   Is it system or scale?

19         A.   Scale.  Fine.

20         Q.   All right.

21         A.   That's what --

22              THE COURT REPORTER:  I'm sorry, sir; that's what who

23    uses?

24              THE WITNESS:  That's what National Highway Traffic

25    Safety Administration uses.

1    BY MR. AUTHER:

2          Q.    And how many levels are in AIS?

3          A.    Five.

4          Q.    Are you sure it's not six?

5          A.    My recollection is five, but it could be six.

6          Q.    And you can't give me a definition of what AIS-3 is,

7    can you; the technical correct definition?

8                THE COURT:  It's not an exam.  Where are we going?

9                THE WITNESS:  And it doesn't apply in this case,

10   because it applies to registered motor vehicles on highways.

11               THE COURT:  And you're not going to testify to that.

12               THE WITNESS:  Absolutely not.

13   BY MR. AUTHER:

14         Q.    Well, let me ask you this:  The documents that

15   you've reviewed and relied upon reference injury scale, the

16   AIS, for injury and injury scales, don't they?

17         A.    Can you point me to that?  Not to the best of my

18   recollection.

19         Q.    And what about statistical risk analysis?  Sir, is

20   that an area that you hold yourself out as an expert in;

21   statistical risk analysis?

22         A.    I am not a statistician.  I have unique training and

23   work in risk assessment and risk reduction.  I have supervised

24   epidemiological special studies at the Product Safety

25   Commission.  I have deeply analyzed the results of those

1    studies to develop, for example, the lawnmower standard.  And

2    if you look in the Federal Register, it's my name on the

3    standard for questions about the development of the standard.

4        Q.   And you are not a member of the Society of Risk

5    Analysts, correct?

6        A.   Correct.

7        Q.   And you do not have any education in statistical

8    risk analyses, correct?

9        A.   I'm not a statistician.

10       Q.   Right.  And you also -- one of the things that you

11   addressed in your direct exam were epidemiology.  And, again,

12   that is an area where you do not have any scientific education

13   in epidemiology, correct?

14       A.   That's correct, but I have been working with

15   epidemiology and the Consumer Product Safety Commission --

16       Q.   And you are not, sir --

17       A.   -- oversees the National Electronic Injury

18   Surveillance System, which I have been deeply involved in and

19   using for over 40 years.  But I am not a statistician by

20   education.

21       Q.   Right.  There are people who spend their entire

22   professional careers studying and learning statistical risk

23   analysis and epidemiology.  Correct?

24       A.   Yes.  And I supervised them in my government work.

25       Q.   But you are not one of them, right?

1      A.    That's correct.

2      Q.    And you mentioned the NEISS System.

3            MR. AUTHER:   And for the court reporter, that's

4    N-E-I-S-S.

5    BY MR. AUTHER:

6      Q.    There are people with expertise in statistics and

7    math and epidemiology that have selected hospitals that are

8    representative in some manner of emergency rooms across the

9    country.   Correct?

10     A.    Yes.  I did not build that model.  I admit it.

11     Q.    Right.  And those people who have that specific

12   scientific education and training, that is not education and

13   training that you have, right?

14     A.    I did not build the model.  But I use it every --

15   not every day, but all the time in developing safety

16   management opinions.

17     Q.    And those professionals who spend their careers on

18   statistics and math and epidemiology, they have -- when they

19   estimate numbers of injuries and deaths, for example, they do

20   it to a specific degree of confidence.   Correct?

21     A.    Yes.  A coefficient of variability.

22     Q.    All right.  Co-efficience of variation.  You're

23   familiar with that?

24     A.    I am.

25     Q.    And co-efficience of variation is not something

1    you've ever calculated yourself, is it?

2        A.   No, sir, but I take it into account.  The smaller

3    the database, the larger the variation.  And they give a

4    range.

5        Q.   And those ranges with the co-efficience of variation

6    have very specific meaning to those people with the scientific

7    education and training that use them, correct?

8        A.   No.  They have a meaning to me.  And in ATV, it's

9    probably the largest database the Commission has ever

10   collected.  The coefficient in variation is quite small.

11             THE COURT:  Would the jury have the expertise to

12   look at that without help from an expert?

13             THE WITNESS:  Are you asking me, Your Honor?

14             THE COURT:  Yes.  Yes, sir.

15             THE WITNESS:  I don't think so.  All of this data is

16   very intricate.  And my testimony will be to present the jury

17   with the information and opine as the Court allows.

18             THE COURT:  Sorry to interrupt you, sir.

19             MR. AUTHER:  That's quite all right, Your Honor.  I

20   think let me just respond.  The point is that he doesn't know

21   how it's calculated or computed, and there's no opportunity to

22   cross-examine the people whose ultimately conclusions he's

23   reaching, which, of course, are hearsay in this case; simply

24   reading from a document for which the witness has no academic

25   education, training, or background.

BY MR. AUTHER:

Q.   Let's continue with the NEISS System a little bit
further, Mr. Kitzes.  Over time the NEISS System evolves,
doesn't it?

A.   Yes, sir.

Q.   The hospitals change from time to time occasionally,
right?

A.   Yes again.

Q.   And the product codes change from time to time?

A.   They can.

Q.   And do you know what the people who spend their
professional lives in epidemiology call the way the samples
are put together?

A.   I don't understand the question.

Q.   Don't epidemiologists, those who spend their
professional lives in epidemiology and statistics, have a term
of art called sample frame or sampling frame?

A.   Sure.

Q.   And when they put together a sampling frame,
sometimes corrections need to be made over time as the NEISS
System evolves, right?

A.   Sure.  And that's why they do the special studies,
where they investigate every single incident reported to them
in a specific time frame.

NEISS estimates are generalized estimates.  But the

1    Commission has collected thousands of individual injury

2    investigations and death certificates associated with ATV's,

3    and that is really the basis of the analysis, not the general

4    NEISS data.

5        Q.   Well, the point is that as the system evolves and

6    the professionals who spend their careers in statistics and

7    risk analysis and epidemiology make changes, they do so to

8    ensure that apples are compared to apples.  Correct?

9        A.   No.  They do so to make sure that their estimates

10   fit the modern context when they make adjustments.

11            THE COURT REPORTER:  When they make -- when they

12   make adjustments?

13            THE WITNESS:  Sure.  They change -- the hospitals

14   are weighted.  Big hospitals -- an injury at a big hospital

15   carries more weight in the estimate than a small rural

16   hospital because it's a national estimate.  Those sampling and

17   those decisions about how to weight it are not done by me.

18            THE COURT REPORTER:  I'm sorry.  Those samplings --

19   I'm sorry, sir.  I need to understand what you said.

20                Those samplings and those decisions about how

21   to weigh?  I didn't understand what you said.

22            THE WITNESS:  Yes, Your Honor.  Like a hospital in a

23   large urban area that gets an ATV injury, in the national

24   estimate, that might carry a weight of ten, whereas a small

25   rural hospital, the balance -- the estimates might only have a

1   weight of one.

2              But I do not make those algorithms.  I study

3   results of what those scientists have done.  And that is an

4   official government record.

5   BY MR. AUTHER:

6       Q.   And, sir, you do not know how those corrections to

7   the sampling frame are made, do you?

8       A.   No, sir.

9       Q.   And you have never made any of those adjustments to

10  the sampling frame, you yourself, correct?

11      A.   Never been my job.  And I wouldn't know what to do

12  with it.

13      Q.   Now, another area that was brought up on your direct

14  exam earlier, it also comes up in the documents that you have

15  reviewed and intend to testify about in this case, is testing

16  of ATV's.  But you are not an expert in testing of ATV's,

17  correct?

18      A.   Not of the physical machine, no, sir.

19      Q.   And you have not done any testing of the ATC 200ES

20  1984 model that we're here about in this case, right?

21      A.   I have not tested the physical machine.  I have

22  reviewed the warnings and the instructions, but I have not

23  done any testing on the machine itself.

24      Q.   Right.  And you have not even inspected the accident

25  vehicle in this case, right?

1      A.   Correct.

2      Q.   And you have not performed any sort of handling

3  tests, control tests, performance tests of any three-wheeled

4  ATV, correct?

5           THE COURT REPORTER:  I'm sorry, sir; you broke up.

6           THE COURT:  I made the noise.  I was making noise up

7  here on the bench with paper.  Try again.

8           THE WITNESS:  I'll repeat.  The engineering and

9  testing of an ATV is not what I'm here to testify about.  It's

10 not my expertise.

11 BY MR. AUTHER:

12     Q.   And in addition to not being an expert in ATV

13 testing, you are not an expert in the riding or operation of

14 ATV's either, are you?

15     A.   Well, I have ridden ATV's for Arctic Cat and

16 otherwise.  I am an expert in analyzing the data associated

17 with those features and describing them to the jury.

18     Q.   Sir, you've never ridden any three-wheeled ATV,

19 correct?

20     A.   Correct.

21     Q.   And you've never ridden or operated a 1984 200ES

22 like is involved in this case.  Right?

23     A.   That would follow.

24     Q.   And your --

25          THE COURT REPORTER:  I'm sorry; what was your answer

1    to that?

2          THE WITNESS:  That would follow the fact that I

3    haven't ridden a three-wheeler, that I haven't ridden one of

4    the subject vehicles.

5    BY MR. AUTHER:

6          Q.   And your experience on the Arctic Cat vehicle was on

7    four-wheelers, correct?

8          A.   Yes, sir.

9          Q.   And it amounts to just a few hours of riding,

10   correct?

11         A.   Right.  Probably four or five all together.

12         Q.   And you have never taken a formal ATV rider training

13   course, correct?

14         A.   I got most of the instructions from Arctic Cat

15   before I rode.  But I have not taken an ATV training course

16   outside of that.

17         Q.   And you understand that organizations like ASI or

18   SVIA offer training courses around the country to people who

19   wish to take them, right?

20         A.   They do, but probably less than 10 percent of ATV

21   riders take them.

22         Q.   Sir, the question is they offer them, correct?

23         A.   Correct.

24         Q.   And you've never taken one, have you?

25         A.   No, sir.

1          Q.    Okay.  And you yourself have not done any studies
2    regarding what ATV riders know about inherent risks of
3    operating ATV's, correct?
4          A.    I haven't gone out and interviewed them, but there's
5    ample information created by the Consumer Product Safety
6    Commission and others on that topic as again notice to Honda.
7    Honda has done their own internal studies.  But I'm only here
8    to present to the jury what is available and what Honda knew
9    about those things, because they don't have access to that
10   data.
11         Q.    Again, that wasn't the question.
12               THE COURT:  Let's take one second here.
13               (Discussion held off the record.)
14               THE COURT:  Thank you.  Please continue.
15               MR. AUTHER:  Thank you, Your Honor.
16   BY MR. AUTHER:
17         Q.    Now, Mr. Kitzes, you yourself have not performed any
18   comparative analyses of any ATV's with or without mechanical
19   rear suspension to determine how the vehicles respond in
20   different terrain environments, have you?
21         A.    It's engineering, and it's not my area.
22         Q.    So the answer is no, you haven't done any such
23   studies.  Correct?
24         A.    Correct.
25         Q.    And you haven't done any comparative analyses to

1    determine how different design features affect handling or

2    performance of ATV's, correct?

3        A.   I have in other fact patterns that don't apply here,

4    but I have done that.

5        Q.   But you have not done it in this case, correct?

6        A.   Correct.

7        Q.   Now, we -- you.  I should say you have had cases,

8    both three-wheeler and four-wheeler cases against all of the

9    U.S. distributors, correct?

10       A.   I believe so, yes, sir.

11       Q.   That would be Honda, Yamaha, Suzuki, Kawasaki,

12   Polaris.  Did I leave any out?

13       A.   Nope.

14       Q.   And let's go through your CPSC work history for just

15   a moment.

16            You started at the CPSC in June of 1975, correct?

17       A.   Full-time.  I started part-time when I was in law

18   school in February of 1974.

19       Q.   Full-time then in June of '75.  And you were roughly

20   24 years old at the time?

21       A.   Yes, sir.

22       Q.   And your position at that time was legal advisor to

23   director of office of product defect investigation -- or

24   excuse me, identification.  Correct?

25       A.   Correct.

1      Q.   And you held that position for roughly two years,
2  until about May of '77.  Correct?
3      A.   Correct again.
4      Q.   And then in 1977, you became a program manager.
5  Correct?
6      A.   Yes, sir.
7      Q.   And you occupied that position for roughly three
8  years until 1980?
9      A.   '81.  No.  Well, '80, yes.
10     Q.   And then your final year at the CPSC from '80 to
11  '81, approximately, was regulatory counsel.  Correct?
12     A.   Yes, sir.
13     Q.   And you were about 30 years old when you left the
14  CPSC?
15     A.   May of '81, yeah.
16     Q.   And your time at the CPSC ended in 1981.  Correct?
17     A.   Correct again.
18     Q.   And the CPSC records that you have provided in this
19  case that have been a part of your report, the ones that you
20  intend to talk about relate to the CPSC study of ATV's that
21  started in 1984 with the letter to Mr. Chino and other U.S.
22  distributors, right?
23     A.   Well, that was that investigation.  Again, I was
24  responsible for responding to a petition in 1979 about
25  three-wheelers, and that investigation was the initial

1    investigation done by the Commission.

2              But, yes, I agree with you that the investigation

3    I'm discussing started with those letters in 1984.

4        Q.   Right.  And the materials that you have referred to

5    in this case are all materials that were generated after the

6    letter to Mr. Chino in 1984.  Correct?

7        A.   Yes.  But I was invited back by the Commission to

8    participate in an expert forum on ATV's many years later.

9        Q.   And we'll talk a little bit about subsequent

10   activities, but let's just focus on the materials that you

11   intend to use in this case.  Starting with the letters to the

12   distributors in 1984 and going forward, you were gone from the

13   CPSC for three years by the time those letters were generated.

14   Correct?

15       A.   Approximately, yes, sir.

16       Q.   And when we see the CPSC internal memoranda in your

17   file that are dated after March of 1984, you were not at the

18   CPSC when those memos were generated.  Correct?

19       A.   Correct again.

20       Q.   And you were not personally involved with the

21   preparation of the CPSC memos after -- that were generated

22   after 1984, correct?

23       A.   Correct.

24       Q.   And in those memos or those memos generated by the

25   CPSC staff after 1984, nobody at the CPSC was working with you

1    at that time.  Correct?

2         A.   Well, other than my participation in the forum.

3         Q.   And the forum was an open, public forum where anyone

4    could attend, including members of industry.  Right?

5         A.   Sure.  But I was specifically invited to sit on the

6    panel discussing ATV safety.

7         Q.   And that was after the conclusion of the 1984 study.

8    Correct?

9         A.   Probably.

10        Q.   Right.  And that was --

11             THE COURT REPORTER:  I'm sorry; I didn't hear what

12   you said.

13             THE WITNESS:  I'm sorry.  I said, probably; I don't

14   recall the specific date.

15   BY MR. AUTHER:

16        Q.   Let's talk about the investigation of

17   three-wheelers.  You were a program manager at the time that a

18   petition involving a throttle defect, a potential throttle

19   defect came across your desk.  Right?

20        A.   Correct.

21        Q.   And that vehicle was a -- what they call a US-90 or

22   an ATC-90, correct?

23        A.   Very good, yes, sir.

24        Q.   And that was a three-wheeler, correct?

25        A.   Correct.

1       Q.   And the person who wrote that petition complained

2  about a number of issues, not just the throttle.  Correct?

3       A.   Mostly the throttle, as I recall, but it was a long

4  time ago.

5       Q.   But there were other issues raised, right?

6       A.   Well, you tell me.  I don't have it in front of me.

7            THE COURT:  I'm going to stop right here.  We're

8  talking about post-sale notice.  He's going -- he's being

9  offered to testify on five things post-sale notice following a

10  Consent Decree.  Why are we looking at 1980 testing of the

11  three-wheeler and his connection to it?

12           MR. AUTHER:  Because those are the records that he

13  has referenced and cited in his report that he intends to tell

14  the jury about.

15           THE WITNESS:  Not correct.  I have not mentioned

16  that 1979 petition in my report at all.

17  BY MR. AUTHER:

18       Q.   Well, you've mentioned it today more than once, and

19  the 1984 materials, which I think are the ones that the Judge

20  is talking about, are all throughout your report; '84 and

21  after.  Correct?

22       A.   That is correct.  And they -- those led to the

23  Consent Decree and the post-sale warnings.

24           THE COURT:  Then let's try to move away from this

25  ancient history.  Because we could do this for two days.

1            MR. AUTHER:  I'm trying not to, Your Honor.

2            THE COURT:  I'm happy that you are.

3            MR. AUTHER:  Let's move on a little bit.

4   BY MR. AUTHER:

5       Q.   In the '84 and forward materials that you are

6   intending to talk to the jury about in this case, there are a

7   variety of memoranda from different directorates at the CPSC,

8   correct?

9       A.   Yes, sir.

10      Q.   And one of those directorates is health sciences,

11  correct?

12      A.   Yes.

13      Q.   And health sciences directorate at CPSC has

14  technical experts in the field of health sciences; people who

15  have studied health sciences for their professional careers,

16  right?

17      A.   Yes.  But this is only a very specific subset of

18  that directory.  And those are the special studies that are

19  similar to the ones that I managed the epidemiologists in

20  creating.

21      Q.   And you are not one of the -- you have never been a

22  member of the health sciences directorate, correct?

23      A.   Correct.

24      Q.   Epidemiology is another directorate, right, and you

25  are not an epidemiologist, and you've never been a member of

1   that directorate at CPSC, correct?

2       A.   Well, epidemiology is actually within health

3   sciences.  It's not a separate directorate.  And I have not

4   been a part of it, but I managed the epidemiologists studying

5   those issues on my program team.

6       Q.   And economic analysis is another directorate at the

7   CPSC that you have never been a member of, correct?

8       A.   Correct.  I just managed them on my team.

9       Q.   And human factors is another directorate at CPSC

10  that you've never been a member of, correct?

11      A.   Just managed them on my team.  I was not a member of

12  that directorate.

13      Q.   After you left the CPSC, you went to work for the

14  Institute for Safety Analysis, correct?

15      A.   Correct.

16      Q.   And that was essentially an organization owned and

17  operated by Dr. Brenner, right?

18      A.   Right.  The former chief scientist and deputy

19  director of the National Highway Traffic Safety

20  Administration.

21      Q.   You knew when you joined the Institute for Safety

22  Analysis that Dr. Brenner was actively engaged in testifying

23  against the automobile industry, correct?

24      A.   Mostly, yes.

25      Q.   And he was a Plaintiff expert, and almost all of his

1  work was against the big three auto makers and other

2  automobile manufacturers, right?

3      A.   Well, he did also work in consumer products.  I did

4  some work in consumer products while working for him.

5  Testimony work.

6      Q.   And Dr. Brenner's work when you joined him was

7  90 percent plus Plaintiff's work, correct?

8      A.   I would say so, yes.

9      Q.   And Dr. Brenner testified in one of the very first

10  ATV cases in 1981, correct; Moon v. Kawasaki?

11          THE COURT:  It's frozen.

12          (Discussion held off the record.)

13  BY MR. AUTHER:

14      Q.   In any event, you understand when you joined the

15  Institute for Safety Analysis that Dr. Brenner was testifying

16  against Ford, GM, Chrysler, Honda, and Kawasaki?

17      A.   He was doing safety analysis and product safety

18  management on motor vehicles, yes, sir.  Mostly for the

19  Plaintiff in automobile cases.

20      Q.   And when Dr. Brenner announced you joining his firm,

21  he sent out an announcement to other Plaintiff's lawyers,

22  correct?

23      A.   Yes, sir.

24      Q.   And that announcement was intended to not just

25  announce you, but to generate more work for the Institute for

1    Safety Analysis, correct?

2        A.   I'm sure that it was.

3        Q.   And it references your JD, which is your legal law

4    degree, right?

5        A.   Yes, sir.

6        Q.   And the ad that Dr. Brenner sent out to the

7    Plaintiffs' lawyers lists several products such as power

8    lawnmowers, chainsaws, power tools, bicycles, football

9    helmets, snowmobiles, hot tubs, toys, cribs, playgrounds --

10            (Attorney Auther interrupted by the reporter.)

11       Q.   Snowmobiles, hot tubs, toys, playground equipment.

12   But specifically listed is not ATV's, correct?

13       A.   I guess, yeah.

14       Q.   I have a copy, if anyone to like to see it --

15       A.   Yeah, no, I --

16            THE COURT:  This is from his employer?

17            MR. AUTHER:  Yes.

18            THE COURT:  To advertise his joining.

19            MR. AUTHER:  Correct.

20            THE COURT:  Move on.

21            THE WITNESS:  In 1983.

22            THE COURT:  Move on.

23   BY MR. AUTHER:

24       Q.   And when you started your own business in 1983 --

25   Consumer Safety Associates, correct?

1          A.   Yes, sir.

2          Q.   And that business has only been you and your wife

3     since 1983, right?

4          A.   I've had a couple of administrative assistants, but

5     not substantive employees.

6          Q.   But you are the only one who has ever testified for

7     that organization, right?

8          A.   Correct.

9          Q.   And you've run that business out of your home since

10    1983, correct?

11         A.   I had an office for a couple of years in Rockville,

12    Maryland, but essentially I've operated it out of my home,

13    correct.  And --

14         Q.   And Consumer Safety Associates has never had any

15    engineers on staff, correct?

16              MR. FRIDAY:  Excuse me.  The witness was testifying.

17              THE COURT:  Oh, I didn't even hear.  Finish your

18    sentence, Mr. Kitzes.

19              THE WITNESS:  It's just the two of us.  I operate

20    out of my home to keep the expenses down and my costs for my

21    clients.

22    BY MR. AUTHER:

23         Q.   And you've never -- Consumer Safety Associates has

24    never had any engineers on staff, correct?

25         A.   Correct.

1      Q.   And it's never had any test facilities, correct?

2      A.   Correct.

3      Q.   Now, you testified about some of the corporate work

4  that you've done.  It was in the declaration that we received

5  yesterday.  And I just want to go over a couple of them as

6  examples.

7           Torro was listed, correct?

8      A.   Yes.

9      Q.   And you have never taken pencil to paper to redesign

10  a Torro product, have you?

11      A.   Not my job, no, sir.  They hired me to analyze

12  injury and recall and notice.

13      Q.   And the Jensen Corporation was a one-time project

14  that lasted a few days, right?

15      A.   More than a few days.  I developed labeling for them

16  on their industrial laundry equipment because some launderers

17  were getting their arms crushed in the rollers.  I also

18  instructed them on the use of a job switch to help prevent

19  those kind of injuries.  Not as an engineer, but as a

20  safetyman.

21      Q.   And then with Arctic Cat, which we've -- you've

22  mentioned a couple time today, we've touched on briefly, you

23  used the Consent Decree label and added a turning instruction

24  in the owner's manual and added an age recommendation to 18.

25  Correct?

1       A.   In addition to other things.  Arctic Cat at my

2   suggestion in their manual put stories about people who had

3   been killed on ATV's.  And on their own initiative, not mine,

4   they put a gray salt cross over those boxes.

5       Q.   And Arctic Cat's no longer using the age 18

6   recommendation that you created, correct?

7       A.   Correct.

8       Q.   And you don't know whether or not they're using any

9   of the other language that you created, correct?

10       A.   I -- I don't know.

11       Q.   And you, even with your input, you still believe

12   that the Arctic Cat vehicle is not a reasonably safe ATV even

13   with your instructions and warnings.  Correct?

14       A.   It's been my opinion that ATV's are not reasonably

15   safe.  They can be made safer with adequate warnings and

16   instruction.  But given the epidemiological data, clearly

17   they're not safe to use by children.

18            They can be used safely.  Don't get me wrong.  But,

19   generally, I think that the features, especially of a

20   three-wheeler, because they're two and a half to three times

21   more likely to be involved in an injury, are unreasonably

22   dangerous.

23            Four-wheelers can be made reasonably safe with the

24   use of front and back differentials.  And I'm not going to go

25   into all the engineering.  But three-wheeled ATV's are

1    unusually dangerous.

2        Q.   Sir, sitting here today, you are still not willing

3    to say that the Arctic Cat vehicle you worked on is a

4    reasonably safe ATV, even with your input.  Correct?

5        A.   That's my recollection.  And I told them that up

6    front in my safety seminar about ATV's.

7        Q.   The -- a couple more areas.  One of the things that

8    you mention in your declaration is your speaking engagements,

9    and you've mentioned it today.  And I notice there are some

10   state groups of the American Trial Lawyers Association that

11   you've made presentations and delivered seminars to.  And that

12   group -- those state groups are basically Plaintiffs lawyers,

13   right?

14       A.   I think it's in my vitae, not in my declaration, but

15   that's okay.

16            I have spoken to the Kentucky Trial Lawyers

17   Association in specific.  I don't have my vitae in front of

18   me, so help me out.

19       Q.   And I think Texas Trial Lawyers, the Kentucky

20   Academy of Trial Lawyers.  Plaintiffs -- Plaintiffs lawyers

21   groups, right?

22       A.   Well, that's some of them.  Also, I mentioned the

23   National Association of Attorneys General.

24       Q.   And the inner circle of advocates --

25            THE COURT:  He's still testifying.

1             MR. AUTHER:  I'm sorry.

2             THE WITNESS:  And the three presentations I made at

3    the National Safety Council, which is made up basically of

4    corporations.

5                  But go ahead, sir, I didn't mean to interrupt.

6    BY MR. AUTHER:

7        Q.   Right.  And the Inner Circle of Advocates, that's

8    another group that you've talked to that's a group of

9    Plaintiffs lawyers?

10        A.   Correct.

11        Q.   Now, you made some mention earlier today of your

12    certificates, and I want to make sure that I have the timeline

13    correct.

14             All of these certificates that you have obtained

15    were obtained after you left the CPSC.  Correct?

16        A.   Correct.

17        Q.   And they were all obtained after you hung out a

18    shingle as a litigation consultant.  Right?

19        A.   Except for the pejorative, yes.

20        Q.   All right.  And one of them -- it's in your

21    declaration -- is your board certification in product safety

22    manager.  That's one of them, correct?

23        A.   That was by examination, yes, sir.

24        Q.   Right.  And that was from the -- that's an

25    organization run by Hal Gordon, right?

1        A.   It was.  It's now run by an association management
2   group that's certified to certify.
3        Q.   Right.  And when you obtained your certification in
4   product safety management, it was being run out of
5   Mr. Gordon's house, right?
6        A.   No, sir.  He had an office in Rockville, and he
7   worked from home.  I took the test in his office in Rockville.
8        Q.   And when you took that test, it was in 1984,
9   correct?
10       A.   '83 or '84, yeah.
11       Q.   Right.  And you had to answer 125 multiple choice
12   questions.  Right?
13       A.   Correct.
14       Q.   And then in 1986, you went back to the same
15   organization, still being run by Mr. Gordon.  Right?
16       A.   I believe so.
17       Q.   And that was when you got your certification in
18   hazard control management, right?
19       A.   Yes, sir.  He was the --
20       Q.   And you did not take an exam for that certification,
21   did you?
22       A.   No.  Based on the work I did redoing the
23   examination, the product safety management, they accredited me
24   in hazard control management.  Mr. Gordon was the director of
25   safety for the District of Columbia.

1          Q.   And when you mention in your declaration your
2     membership in the American Society of Safety Engineers, that's
3     an association that anyone can apply to and join by paying a
4     fee, correct?
5          A.   There's a -- yes.  There's an analysis of your
6     background and expertise.  But, yes, people can join that, and
7     they do charge a fee.  And they provide intricate information
8     to members about safety analysis, starting with the space
9     program.  That's where it got started.
10         Q.   And the Human Factors in Ergonomics Society, that's
11    another one that you have on your CV or your declaration.
12    Right?
13         A.   Correct.
14         Q.   And, again, that's an organization that you can be
15    sponsored by one or two members, and all you have to do is
16    apply and pay a fee, right?
17         A.   Back then, I was sponsored by two members.  I
18    believe it's a little bit more intricate now.
19         Q.   And last I recall, you have never attended a meeting
20    of the Human Factors and Ergonomics Society.  Is that still
21    correct?
22         A.   That's still correct.
23         Q.   And Systems Safety Society, that's another
24    organization on your CV.  You're still a member of that,
25    right?

1          A.    Yes.   I think we just discussed that previously.

2          Q.    Okay.  Maybe we have.  I thought it was different

3     than the American Society.  But in any event --

4          A.    It is different.  It is different --

5          Q.    -- the Systems Society Safety, anyone can join by

6     paying a fee, right?

7                THE COURT REPORTER:  I'm sorry.  He's --

8                THE WITNESS:  American Society of Safety Engineers,

9     now called the American Society of Safety Professionals.  You

10    apply by providing your background.  And, yes, you can --

11    people can join.

12    BY MR. AUTHER:

13         Q.    And just so we have some -- and, again, I don't want

14    to belabor it and spend a lot of court time on it, but I do

15    want to make sure we have a flavor for the great number of

16    products that you have been involved in testifying about over

17    the years.  And I'll just go down the list in groups, and you

18    can tell me if I've -- if I've got any of them wrong.

19               Automobiles, balloons, cafeteria tables, chainsaws,

20    circular saws, construction heaters, drapery cords, dust

21    collection systems.  Am I good so far?

22         A.    Sure.

23         Q.    Gas valves, highchairs, lawn darts, lawn mowers,

24    liquid paper.

25               Still -- still correct?

1          A.   All within the concept of the principles of
2     safety --
3               THE COURT:  Safety analysis.  I've got this.  I've
4     got this.  I see a distinction between determining safety and
5     safety analysis.  He's an expert in safety analysis, is what
6     he's holding himself out to be.  You're not going to confuse
7     me on that.  I get the distinction.  So we can move on.
8               MR. AUTHER:  Understood, Your Honor.
9               THE COURT:  Thank you.  And at some point here we're
10    going to have to give this very patient and hard-working court
11    reporter a break.
12              MR. AUTHER:  You know, your Honor, I have about five
13    minutes, so can I just finish?
14              THE COURT:  Then let's give you five more minutes,
15    and we're going to take a break.
16    BY MR. AUTHER:
17         Q.   Right.  And you mentioned that you were invited back
18    to the CPSC at some point, and I think that part of that was
19    you attended two or three meetings and an ANSI SVIA committee
20    developing standards for ATV's.  You spent a couple of -- you
21    went to a couple of meetings before you declined to
22    participate any further.  Right?
23         A.   That's correct.  But those are two different things.
24    The forum at the Commission was not the ANSI meeting.  I did
25    participate in a couple of ANSI meetings, and it was basically

1    being run by Honda's chief counsel for ATV's.  And seeing the

2    direction that it was going, I decided that my participation

3    was not valuable.

4         Q.   And the point, though, sir, is that you yourself did

5    not participate in the development of the ATV standards,

6    correct?

7         A.   That's correct.

8         Q.   And you yourself have never served on the ANSI Z-535

9    committee that developed standards for product labeling,

10   correct?

11        A.   I have not served on the committee, that's correct.

12        Q.   All right.  Now, we had some discussion earlier

13   about the ruling on summary judgment.  Has that been provided

14   to you?

15        A.   I -- I believe so, yes.

16        Q.   Okay.  And you understand that post sale is the only

17   area of the case that's still in play in this case, right?

18        A.   Well --

19             THE COURT:  The post-sale duty to warn.

20        Q.   Post-sale duty to warn.

21        A.   That's what my testimony is going to be about.

22        Q.   Right.  And you understand, you know, post sale is

23   post original sale, which would have been in 1984, correct?

24        A.   I don't think the sale was in 1984.  The original

25   sale was in -- sometime in 1980.  The sale to Mr. --

1   Mr. Fehlman was much later than that.  I believe it was 2015.

2        Q.   Right.  And you understand that there is no failure

3   to recall under Pennsylvania law.  Has that been explained to

4   you?

5        A.   It has.

6        Q.   And for this case, you have not created a warning

7   that you believe to be an adequate warning for this vehicle.

8   Correct?

9        A.   Again, I have not created a warning for this case,

10  but I have presented the warnings that Honda agreed to post

11  sale.

12       Q.   And then has -- has counsel asked you to create a

13  warning that would be a reasonably safe and adequate warning

14  for this case?

15       A.   No.

16       Q.   It can be done, can it not?

17       A.   Again, I believe that the warnings that came out of

18  the Consent Decree are reasonable --

19            THE COURT REPORTER:  I'm sorry; can you restart your

20  answer.

21            THE WITNESS:  Again, I believe that the warnings

22  that came out of the Consent Decree are reasonable.  They're

23  not perfect.  And I added a warning on turning the Arctic Cat.

24  But, in general, I say that I can rely on those to provide the

25  information necessary in this case.

1    BY MR. AUTHER:

2        Q.   And the -- let me ask you this:  You have made --

3    well, first of all, you have no criticism as to the placement

4    of the warning label on the gas tank of the subject vehicle,

5    correct?  That's the place to put it?

6        A.   No, the Consent Decree warnings are on the fender.

7    The gas tank is the worst place to put a warning because the

8    gasoline degrades it.

9        Q.   And you have no -- because you have not created a

10   proposed warning, you've made no decision as to what color it

11   should be or what size it should be, correct?

12       A.   Again, that's all laid out in the Consent Decree.

13            THE COURT REPORTER:  That's all laid out?

14            THE WITNESS:  Yes.  Yes.  It's all laid out in the

15   Consent Decree.  They did much study of those issues.

16   BY MR. AUTHER:

17       Q.   And, again, sir, you have not identified a warning

18   that would have changed the outcome of Mr. Fehlman's accident

19   in this case, correct?

20            THE COURT:  Well, he's not allowed.  You would have

21   jumped all the over that as being the ultimate issue in the

22   case.

23            THE WITNESS:  Right.

24   BY MR. AUTHER:

25       Q.   And the Consent Decree warning label that you --

1    well, let me ask you this:  The Arctic Cat label that you

2    created had changed the Consent Decree label, correct?

3         A.   My recollection is that Arctic Cat added additional

4    material to their labeling beyond the Consent Decree, which is

5    perfectly --

6              THE COURT REPORTER:  Which is perfectly -- I'm

7    sorry.  I'm sorry, sir.  You broke up.

8              THE WITNESS:  What I'm saying is that Arctic Cat

9    provided an additional labeling to the Consent Decree label,

10   which is great.  But I'm saying that the Consent Decree

11   labeling is the baseline.

12   BY MR. AUTHER:

13        Q.   Sir, you recommended changes to Arctic Cat to the

14   Consent Decree label, correct?

15        A.   I recommended adding a label on turning, which is,

16   to my knowledge, not an issue in this case.

17        Q.   Well, and you also recommended a different age

18   recommendation than the Consent Decree required.  Correct?

19        A.   I did.  And they followed that.  But I don't

20   remember why they changed it.  Polaris also labeled 18

21   originally, but I think that the permission said 16, and I

22   think they went back to 16 for their own reasons.  I still

23   think 18's a better label, but I don't have control over that.

24   I recommended 18, and I still recommend 18.

25        Q.   And you still to this day do not believe that the

1    Consent Decree label is adequate in all respects, correct?

2         A.   I'd have to say that, yes, because I believe that 18

3    is an appropriate label, not 16.  But that's my opinion.

4              THE COURT:  He's not testifying to that.

5              MR. AUTHER:  No further questions, Your Honor.

6              THE COURT:  Thank you, sir.

7                   All right.  This gives you a better way to

8    redirect, rather than to go through his entire declaration.

9    This was my point on it.  And that -- we'll start that as soon

10   as we come back.

11                  Did we have something else scheduled for 1:30?

12                  (Discussion held off the record.)

13                  (Recess held from 12:18 p.m. till 1:12 p.m.)

14             MR. AUTHER:  Your Honor, before we begin, I have one

15   housekeeping issue I raised with counsel at the break.

16                  Honda's accident reconstruction expert,

17   Dr. Graeme Fowler, is in the courtroom to listen to Dr.

18   Wright's testimony.  And it would be our desire, if time

19   permits tomorrow, to call Dr. Fowler as Honda's witness in

20   this Daubert hearing.

21                  I just wanted everyone to know what was going

22   on --

23             THE COURT:  And why he was there.

24             MR. AUTHER:  Yeah.

25             THE COURT:  You understand; is that correct?  Are

```
 1    you objecting to that, Mr. Friday?

 2            MR. FRIDAY:  I don't think it's necessarily

 3    relevant, but --

 4            THE COURT:  We can talk about it at the end of --

 5    you're going to want him to testify in rebuttal to --

 6            MR. AUTHER:  To Dr. Wright.

 7            THE COURT:  To Dr. Wright.

 8            MR. AUTHER:  The witness this afternoon, yes.

 9            THE COURT:  Yeah, okay.  We can talk about it at

10    this point.

11            MR. FRIDAY:  Thank you.

12            THE COURT:  But I don't think it's wrong for him to

13    be in the courtroom.  He can be in the courtroom.

14                 Do you not agree?  Are you objecting to him

15    being in the courtroom?

16            MR. FRIDAY:  No, no, we don't object to him in the

17    courtroom.

18            THE COURT:  Oh, okay.  All right.

19            MR. FRIDAY:  So I may have mentioned this.  Just for

20    the record, for this proceeding, Your Honor, we would offer

21    the January 18, 2020 report of Mr. Kitzes.  It is attached

22    to --

23            THE COURT:  It's already in the docket.  Yes, we

24    were discussing this at break.

25            MR. FRIDAY:  I just don't want it to be missed.  If
```

1    the Court requires us to file these three exhibits separately

2    to be complete, we can do that today or tomorrow.

3            THE COURT:  All right.  But I want you to announce,

4    it's at docket -- it's attached to the docket entry at what

5    number?

6            (Discussion held off the record.)

7            MR. FRIDAY:  It was a brief in opposition to the

8    Motion in Limine to exclude Mr. Kitzes.  That Motion in Limine

9    was filed by the Defendant.

10           THE COURT:  All right.  What about his CV?

11           MR. KELLY:  So, Your Honor, I believe his CV was

12   also attached to that response, but I'm not certain.

13           THE COURT:  Is somebody looking at the --

14           MS. MAYO:  I'm looking.

15           MR. FRIDAY:  Can we clarify that and let the Court

16   know tomorrow?

17           THE COURT:  Yes.  Because we have to determine how

18   these are marked.  We have objections to the report.  And then

19   there's the affidavit that was filed yesterday, today,

20   whenever.

21           MR. FRIDAY:  The declaration, yes.

22           THE COURT:  The declaration, right.  So we have to

23   determine the admissibility of all those.  But they have to be

24   marked as something or other, if there aren't copies.  So

25   that's housekeeping we can do tomorrow or this afternoon.

1          MR. FRIDAY:  Okay.  And so with the final exhibit of

2     January 18, 2020, the report of Mr. Kitzes, we don't have any

3     more questions for Mr. Kitzes today.

4          THE COURT:  Oh, okay.  Thank you very much.  Then we

5     had you hang around, Mr. Kitzes, and get all that sound ready

6     to go.

7          THE WITNESS:  That's all right.  I'm actually at a

8     hotel room in Brooklyn.

9          (Discussion held off the record.)

10          THE COURT:  All right.  I appreciate your time,

11     Mr. Kitzes, and you are excused.  Thank you.  You may step

12     down, as we say.

13          (Discussion held off the record.)

14          THE COURT:  Attorney Auther, I apologize if I sped

15     you up too much at the end there, but I think -- I think I'm

16     on board with what you were trying to do.

17          MR. AUTHER:  Thank you, Your Honor.

18          (Discussion held off the record.)

19          THE COURT:  Are you prepared to call your -- I know

20     it's Mr. Friday's witness.  On the other hand, it's the

21     defense motion.  And so I thought it made more sense to just

22     have a slight introduction from Plaintiff and then move

23     directly to Defendants.  Is that a problem?  I'd like to

24     continue that with this.

25          MR. FRIDAY:  That's fine.

1           THE COURT:  Okay.

2           MR. TRISCHLER:  Perfectly fine, Your Honor.

3           THE COURT:  Okay.  Thank you.

4           (Discussion held off the record.)

5           THE COURT:  I take it from the fact that you stood

6    up, you're going to be the examiner?

7           MR. TRISCHLER:  Yes, Your Honor.

8           THE COURT:  And are you also going to examine,

9    Mr. Friday, or --

10          MR. FRIDAY:  Ben Kelly will.

11          THE COURT:  Okay.  Plaintiff has called his expert,

12   Dr. Robert Wright.  Attorney Kelly, we're going to have him

13   sworn in, please.

14      ROBERT R. WRIGHT, a witness herein, having been first

15   duly sworn, was examined and testified as follows:

16                          DIRECT EXAMINATION

17   BY MR. KELLY:

18      Q.   Good afternoon, Dr. Wright.  Can you please state

19   your name for the record.

20      A.   Robert R. Wright, W-R-I-G-H-T.

21      Q.   And can you please go through your educational

22   background for the Judge.

23      A.   I'd be happy to.  I went to high school at North

24   Central High School in Indianapolis, Indiana.  I was fortunate

25   enough to receive both an academic and athletic scholarship to

1   Butler University, where I majored in mathematics, with a

2   minor in chemistry and physics.

3           I then, after completing my Bachelor's Degree at

4   Butler University, I received a fellowship to go to Ohio

5   State -- the Ohio State University in Columbus, Ohio, where I

6   received both my Master's and Ph.D. Degree.  My Ph.D.

7   dissertation combined science, mathematics, and engineering,

8   so I was qualified to teach at the collegiate level in those

9   three areas, which I've done.

10          So that's my educational background.  Do you want me

11  to go forward in my -- in my career?

12      Q.   So, yeah.  Let me just start with this, Dr. Wright:

13  Did you sign a declaration in this matter?

14      A.   Yes, I signed one yesterday and faxed it back to

15  your office.

16      Q.   And did you review that declaration?

17      A.   Yes, I did.

18      Q.   And the contents of that declaration are accurate;

19  is that correct?

20      A.   That is correct.  Everything in there is -- is

21  factually correct.

22      Q.   And is that your signature on Page 4?

23      A.   That is my signature with yesterday's date.

24      Q.   So, Dr. Wright, can you go through your career.

25  First off, what do you do?

1        A.    Now I'm a consultant.   I -- we formed a consulting
2    company in 1985 called LEXPERT.   That's all capital letters,
3    L-E-X-P-E-R-T, Inc.; LEXPERT, Inc.   And we provide scientific
4    and technical service for attorneys.   So lawyers and law firms
5    are our clients.   We've done some non-litigated work for
6    non-lawyer clients, but 95 percent -- 90 plus percent is -- is
7    done in the legal arena for people who have been injured.   Or
8    if there's been an accident and people have been injured or
9    killed, then we will get called in to determine what happened,
10   why it happened, and then go forward with the assignments in
11   that manner.
12        Before I -- we started LEXPERT, I was assistant to
13   the Dean in the College of Engineering at the Ohio State
14   University.   I held that position for eight years.   I was on
15   the faculty, teaching engineering, mechanics, and mathematics
16   at Ohio State.
17        The topics of the courses I taught included
18   coefficients of friction, torques.   Studied moments of
19   inertia.   I taught differential equations, integral calculus,
20   dynamics, statics, strength in materials.   Those were some of
21   the topics that I taught while I was on the faculty at Ohio
22   State.
23        Q.    And, Dr. Wright, have you --
24        A.    Before I joined --
25        Q.    I'm sorry.

1     A.   Go ahead.  I'm sorry.

2     Q.   Dr. Wright --

3     A.   I was just going to say before --

4     Q.   Yeah, let me just ask --

5     A.   Go ahead.

6     Q.   -- have you authored any papers?

7     A.   I've authored quite a few papers.  Most of my papers

8  before they were published were peer-reviewed; reviewed by

9  people who were working in that area.  And I've published

10  papers on accident reconstruction and on papers involving

11  safety and dynamics of the all-terrain vehicles; three-,

12  four-, five-, six-wheel vehicles.

13     Q.   And those papers that you authored with respect to

14  the ATV's, what are -- what are the titles of those papers?

15     A.   The paper that's probably the most important is the

16  paper that was published in -- let me find the actual date

17  here.  It was published in 1991.  And it's -- the paper is

18  entitled "Stability and Maneuverability Problems of ATV's".

19  And I was the lead author of four co-authors, and it was

20  presented to the Society of Automotive Engineers In September

21  of 1991.

22          And, you know, the paper was deemed by the Society

23  to be one of the most outstanding papers delivered that year,

24  and it was selected to be included in the transactions of SAE.

25          Anything -- any papers included in the transactions

1    are deemed to be valuable enough for the scientific community

2    to be preserved for long-range use in the future.

3        Q.   And, Doctor, at Paragraph 3 of the declaration, you

4    note that your area of expertise is force analysis and

5    dynamics.  Can you please just talk about that, please.

6        A.   Force analysis and dynamics, if a person has that

7    area of expertise, they have the ability to look at any object

8    or objects and determine what will happen to that object or

9    objects if forces are applied.

10            So if we -- we study -- a vehicle falls into that

11   category.  So a vehicle has forces being applied through the

12   tires, through gravity, through the weight.  And as the

13   vehicle moves, those forces will react to the surfaces that

14   it's running on.  And my -- my expertise allows me to then

15   determine what -- what will happen as those forces are being

16   applied.

17            And accident reconstruction is actually a subset or

18   an area within the area of force analysis and dynamics.

19       Q.   And, Doctor, in that paragraph you also note that

20   you have been -- you've served and been retained as a

21   technical expert in litigated matters.  And I just want to ask

22   you, have you served as an expert for Plaintiffs and

23   Defendants?

24       A.   Correct.  I would say probably two-thirds,

25   thereabouts, roughly.  I've -- I've worked on assignments that

1    involved representing the Plaintiff in an accident scenario,

2    and approximately one-third of my assignments have been

3    working on behalf of a Defendant in a litigated matter.

4        Q.   And have you been retained, Doctor, as an expert in

5    cases related to ATV accidents?

6        A.   Numerous times.  I would say it's definitely more

7    than 400.  Probably 5- or 6-.  I haven't -- I've lost track.

8    But it's definitely more than 400 ATV cases I've looked at,

9    analyzed, and offered opinions when it comes to the accident

10   scenario that the ATV was involved in.

11       Q.   And then at Exhibit A to the declaration, Doctor,

12   you provided a list of various cases that include, by my

13   count, 62 cases that involved accidents involving Honda ATV's;

14   is that correct?

15       A.   Well, that -- that list is -- is only for vehicles

16   that go into lateral upset.  I've -- I've looked at more cases

17   than that involving Honda ATV's.  But those are just the ones

18   that involve the three-wheel ATV going into a forward pitch or

19   a lateral upset.

20       Q.   And, Doctor, you mentioned the pitch roll or lateral

21   upset.  Is that similar to what your opinion is of the case

22   involving Dylan Fehlman?

23       A.   Correct.  Dylan was involved in an ATC accident.

24   ATC is the three-wheel nomenclature that Honda uses for their

25   three-wheel ATV's.  And his was a forward pitch roll.

1            A forward pitch means that it goes laterally and

2     forward at the same time.  So as a machine goes into upset,

3     usually -- and as it happened in this case -- the rider goes

4     forward and slightly one side or the other and usually gets

5     ejected in that accident scenario, which is what happened in

6     this case.

7         Q.   Doctor, in all the cases that you have been tendered

8     as an expert, to your knowledge, have you ever been

9     disqualified by a court?

10        A.   Never.  Every time I've been tendered, when the

11    opposing counsel has challenged me at either a Daubert hearing

12    or a COMO or Frye, the Court has always ruled that I was

13    qualified to testify, and I went ahead and did testify in

14    those --

15             THE COURT:  Let's put this on the record at this

16    point.  It's my understanding that defense -- the Defendant is

17    not challenging Dr. Wright's expertise; is that correct?

18    You're challenging his methodology, his reliability?

19             MR. TRISCHLER:  That's correct, Your Honor.  I may

20    have some questions relating to his background, because I do

21    think it's relevant to the issues and methodology and

22    reliability.  But we're here to make a case that under Rule

23    702 this witness' testimony falls short of the methodology and

24    reliability components of Daubert.

25             THE COURT:  All right.  That's my understanding.  So

1    if you are going to question him, then I'll let Mr. Kelly
2    continue on in his line.  I was going to try to short-circuit
3    it a bit if that was not part of your presentation.
4              MR. TRISCHLER:  It won't be much, but I may -- I did
5    want to tell the Court I may venture into that area a little
6    bit.
7              THE COURT:  Well, lawyers do venture.  Okay,
8    Mr. Kelly.
9              MR. KELLY:  Yes.  So, Your Honor, I was basically
10   done with those types of questions.  I was going to move on to
11   the case that we're here for today.
12             THE COURT:  All right.  Excellent.  Thank you.
13   BY MR. KELLY:
14        Q.   So, Doctor, in this case, Jamie Nelson v. American
15   Honda Motor Company, you've prepared an expert report in this
16   matter; is that right?
17        A.   That is correct, I have.
18        Q.   And the expert report is dated January 2nd, 2020.
19   In this report, did you come to any conclusions?
20        A.   That, I did.  I came to a conclusion that -- that
21   the defects in the Honda vehicle, the Honda ATC, was what
22   caused this accident and which ended up resulting in Dylan's
23   death.
24        Q.   And before coming to those conclusions, what did you
25   review?  What materials did you review to reach that

1   conclusion?

2        A.   Oh, gee whiz.  It's a score -- score of information.

3   I read every one of the depositions that were taken -- I mean,

4   I read Mrs. Nelson's deposition, I read Mr. Nelson's

5   deposition, I read the deposition of the investigating

6   officer, Officer Hahn.  I read -- I can't remember her name,

7   but the grandmother's deposition.  I read the deposition of

8   two of the friends.  So those I examined in detail.  I

9   examined the accident report, the police report written by

10  Officer Hahn.  I visited the accident site.  I visited -- I

11  mean, I inspected the accident machine.  I've inspected

12  several other and made meticulous measurements of other

13  vehicles -- of other -- exactly the same vehicle, the ATC

14  200ES and have that data, used that data that I already

15  previously measured in other litigated matters, used that data

16  to compare that data to Honda's report of their AO documents.

17  I made calculations and analyzed this accident.  I've run

18  tests on similar Honda three-wheel vehicles, where we would

19  determine if my calculations were correct in the real world,

20  which they are.  So I know from my calculations what speed the

21  vehicles will go into an upset.

22        I made -- went ahead and made an animated video for

23  this particular accident scenario.  So I wanted to have a

24  demonstrative aid for the jury to get a better feeling when I

25  talk about lack of rear suspension, when I talk about lateral

1   upset, when I talk about forward pitch rolls, the video will

2   demonstrate to the jury what those terminologies are to get

3   better visualizations.

4          And after doing all that work, I've come up with my

5   conclusions, which I've put in my report that you just

6   referenced.

7      Q.   And, Doctor, before we get into more of your

8   methodology, you reference your primary conclusion is that the

9   Honda ATC was defective.  Could you please explain to the

10  Court what specifically is the basis for that opinion.

11     A.   Well, there's -- there's several things that all

12  work -- I guess the best terminology to use is in a symbiontic

13  relationship.  They're all kind of interrelated.

14         But, I mean, first of all, there's no warnings on

15  the machine that indicate to an operator how unstable and

16  likely this machine will go into a lateral upset.  So I'm not

17  a warnings expert, per se, but I can tell you there's no

18  warnings on the machine that apprise the operator of how

19  unstable this vehicle is.

20         The seat that Honda chose to use on this vehicle --

21  and they've used this similar seat on their -- most of their

22  ATC's, is, in my opinion, too long, which allows the operator,

23  especially if -- if the machine is in rough terrain, to move

24  involuntarily on the seat in the wrong position to maintain

25  maximum stability for the vehicle.

1          But the two main causes, in my opinion, the two main

2    defects that caused this accident were the lack of rear

3    suspension on this machine.  The machine does not have any

4    rear suspension other than the soft air -- the soft tires.

5    The air in the tires acts as the rear suspension on this

6    vehicle.

7          And the tests have been run, reports, papers been

8    published, have talked about those problems with the early

9    ATC's -- or early three-wheel vehicles.  Not necessarily just

10   Hondas, but other manufactured three-wheel vehicles; that if

11   you have little or no suspension in the vehicle, they will

12   tend to bounce or gallop as you travel, even at speeds in the

13   10- to 15-mile-an-hour category.  And this machine falls into

14   that category because it has no rear suspension.  It has some

15   front suspension, fairly short travel, but there's no rear

16   suspension.

17         And the biggest problem, which was what -- the

18   galloping or the bouncing of the machine precipitated the --

19   the biggest problem, which is the lateral instability of the

20   machine.  Once the machine gets the handlebars voluntarily or

21   involuntary turned in the 10- to 15-mile-an-hour category, the

22   machine will go into a forward pitch roll, is what happened in

23   this accident, and that's what ejected Dylan from the machine

24   and caused his death.

25         Q.   And, Doctor, the methodology that you used in this

1    case, that you described previously in reviewing the various

2    documents and reviewing the data, is that the same methodology

3    that you used in all of the other cases that we spoke

4    previously about?

5         A.   That is correct.  That is the same methodology that

6    I have used in most of the ATV cases I work on.

7              Obviously, if it's a rear flip-over and not a

8    lateral upset, I will use different criteria, but I go through

9    the same basic analysis each time.

10             You study to see what data you have, you study to

11   see what facts you have, you examine the dynamics of the

12   vehicle, and then you carry out the mathematical calculations

13   to determine why the vehicle did or what it would do at

14   various positions or speeds during that accident scenario.

15             And I used -- all of the equations that I used, the

16   methodology and the equations are all published in my paper,

17   which is part of the 1991 transactions in the Society of

18   Automotive Engineers.

19        Q.   I'm sorry, Doctor, could you just state that -- the

20   society again.  I missed it.

21        A.   It is SAE, Society of Automotive Engineers, which is

22   the largest international technical society in the world.

23        Q.   And that that methodology that you've used in past

24   cases, is it true that a Court has never found that to be

25   insufficient?

1      A.    That is correct.  Every -- I've used the same
2  methodology in every one of my analyses.  I go through, you
3  know, whether -- whether -- whatever case it is, I go through
4  basically the same methodology, the same analysis.  And no
5  Court has ever kept me from giving my opinion -- using that
6  methodology to the -- to the jury.
7      Q.    All right.  And, Doctor, as you know from Honda's
8  Motion in Limine, they take issue with the fact that you did
9  not perform a test specifically on this ATV.  Are you aware of
10 that?
11     A.    That is correct.  I'm very aware.
12     Q.    And can you just describe for the Court, is testing
13 on the instant ATV, is that necessary?
14     A.    No, it is not.
15     Q.    Can you explain why not.
16     A.    The reason is, is because I've already examined -- I
17 don't know the number.  At least -- at least a half dozen,
18 probably more of the exact same model, year vehicle as
19 involved in this accident.
20          So there was no need for me to go ahead and -- and
21 re -- quote, reinvent the wheel.  Since I've already done that
22 work on -- on similar ATV's of -- there was no need for me to
23 go ahead and do it again.  There was no need for me to spend
24 the time, nor the Plaintiff's money to go through the same
25 thing that I've already had data on.  And I always check on my

1    data against the AO reports that -- that you were able to get

2    for me from Honda through interrogatories.

3           So I've -- I've looked at the AO documents for this

4    particular make and model and compared it to my measurements

5    that I've made over the years, and then checked that against

6    my calculations and analysis.

7           So there was no need to run tests on -- on this

8    particular machine because I've done it before.  I've run

9    radio control tests on similar Honda ATC's to determine what

10   speeds they go into lateral upset.  I even have copies of

11   videos that we made of those tests.

12          So, again, there was no need to -- to, quote,

13   rediscover the wheel.  No need to spend the time and money to

14   redo what I've already done.

15      Q.   Okay.  Thank you, Doctor.

16          MR. KELLY:  I have no further questions.  Similar to

17   Mr. Kitzes, I would just like to offer the declaration into

18   evidence.

19          THE COURT:  Can we call that exhibit Plaintiff's

20   Exhibit 2, and we'll call the declaration that was for

21   Mr. Kitzes Plaintiff's Exhibit 1?  Is that how we're doing

22   this?

23          (Discussion held off the record.)

24          MR. KELLY:  So, yes, Your Honor, so --

25          THE COURT:  We need to have these marked.  That's my

1    point.  We have stickers up here.  We have to do that at some

2    point so that the record is clear.

3                MR. KELLY:  We can certainly do that, Your Honor.

4                THE COURT:  Okay.

5                MR. KELLY:  The declaration of Dr. Wright is Exhibit

6    4.  And then his expert report is 5.  And then his CV is 6.

7                THE COURT:  Okay.  We'll sticker up our papers.

8                     All right.  Attorney Trischler.

9                MR. TRISCHLER:  Thank you, Your Honor.

10                (Discussion held off the record.)

11                MR. TRISCHLER:  All set, Your Honor?

12                THE COURT:  Yes, we are.  Thank you.  Thank you.

13   Sorry.

14                          CROSS-EXAMINATION

15   BY MR. TRISCHLER:

16       Q.   Dr. Wright, good afternoon.

17       A.   Good afternoon, Mr. Trischler.

18       Q.   I'm looking straight ahead because the camera's

19   there, but I'm seeing you over to your right.  So if I'm

20   looking back and forth while we're talking today, I apologize.

21   Okay?

22       A.   Well, I apologize.  I'm sitting here in my office

23   chair in my office, and so as I lean back, I kind of move --

24   it appears to be getting smaller and bigger, and I apologize

25   for that.  But I'm -- I am paying attention.

1      Q.   Good.  So I'd like to start by making sure I

2  understand your opinions as to what occurred on February 19,

3  2017.  Okay?

4      A.   I'd be happy to answer your questions.

5      Q.   Can we agree that this case involves an unwitnessed

6  accident that occurred sometime between 7:00 p.m. and midnight

7  during the evening of February 19, 2017?

8      A.   I would agree with that constraints [sic].

9      Q.   And can we also agree that Dylan Fehlman was

10  operating a 1984 ATC 200ES along a set of railroad tracks?

11      A.   Either alongside or in the middle of the tracks.

12  But, yes, he was on the railroad property, and he was

13  operating that ATC, correct.

14      Q.   In fact, your opinion is that he -- is that was

15  riding along the railroad tracks, not next to them.

16      A.   No, I -- my opinion was he was riding between the

17  two rails.

18      Q.   Right.  And that's what I mean by along the tracks,

19  is he's -- he's riding between --

20      A.   Oh, okay, I see.  I thought along/beside.  But yes.

21      Q.   Okay.  So just to clarify, make sure we're on the

22  same page, we can agree that Dylan Fehlman was riding between

23  the two rails with his ATC 200ES on the night of this

24  accident.

25      A.   Correct.  I would agree with that.

1      Q.   And --

2      A.   And I --

3      Q.   And perhaps the Court --

4           THE COURT:  Wait.  He's still --

5           THE WITNESS:  I was going to say, I get that

6  information from Officer Hahn.  I mean, he was very specific

7  on that matter.  So that's -- that's why it is my opinion, is

8  because he's the one who investigated the accident, and so

9  that's how I got that information.

10  BY MR. TRISCHLER:

11     Q.   All right.

12     A.   But, yes, I agree with it.

13     Q.   And let me show you -- perhaps I can show you what

14  we'll mark for identification Defendants's Exhibit A and B,

15  which are some photographs of the railroad tracks.  I just

16  want you to take a look at them and confirm for me that you

17  agree that these are fair and accurate depictions of the

18  tracks that Mr. Fehlman was operating on during the evening of

19  this accident.  Okay?

20          Can you see --

21     A.   Yes, that's --

22     Q.   Can you see --

23     A.   I was at the accident -- yes, that's -- that's very

24  familiar with the way it looked when I was there, correct.

25     Q.   All right.  And these -- these tracks run between --

1   run parallel to Route 6, which you can see in this photograph,

2   correct?

3       A.   Yeah, Route 6 is to the left in that photograph,

4   that is correct.

5       Q.   Right.  And they -- and the tracks run between

6   Sheffield and Tiona up in Warren County, Pennsylvania.

7   Correct?

8       A.   I can't remember the exact cities, but, yes, it is

9   definitely in Warren County.

10      Q.   All right.  And the view we're looking at now, which

11  we'll call Exhibit B, is a view looking -- if you're facing

12  the photograph, you're looking toward Sheffield.  Correct?

13      A.   If you say so.  I can't -- that, I can't remember

14  the exact towns.  But, yes, that is the tracks that Dylan was

15  operating his ATC on, and that is definitely Route 6 to our

16  left in that photograph.

17      Q.   All right.  And then if we go back to Exhibit A just

18  for a minute, this would be a photograph looking in the

19  opposite direction toward, I believe, Tiona, which is in the

20  direction of his home.  True?

21      A.   Correct.  That is correct.  And the crossing that

22  you see in the foreground is the road -- service road to

23  Cameron -- Cameron Energy or Cameron Electric or something

24  like that, which is, in this picture, off to our left.

25      Q.   Right.  And at the time this incident occurred, it

1   was -- it was February, it was in the evening, and it was

2   extremely dark.  Correct?

3        A.   You know, February, the days are really short in

4   February.  So anytime after 6:00 or so, it would be dark.

5        Q.   Right.  And we know from the investigation that

6   there was no ambient lighting or street lighting that was

7   available in this area.  Right?

8        A.   Well, there is a light on the building to our left,

9   which is Cameron -- as I said, Cameron Electric or Cameron

10  Energy.  But it -- I mean, I was never there at night, so I do

11  not know how much light it gives.  But there are no street

12  lights, that is correct.

13       Q.   And what you've mentioned a couple of times already

14  today is that you did review the police accident report, and

15  what the police accident report notes is, quote -- under

16  Weather and Lighting Conditions, is quote, "No adverse

17  conditions for weather, and dark, no street lights."  Right?

18       A.   I -- I agree with that, yes, sir.  That was my

19  assumption I made reading that report.

20       Q.   And while the ATC that Dylan was riding on the

21  evening of this accident had a head lamp, we know that the

22  lens of that head lamp was covered in mud.  Correct?

23       A.   When I inspected it, it was -- there was mud on it,

24  correct.

25       Q.   And not only was it very dark; we know that Dylan

 1   was riding in an area that was completely unknown and

 2   unfamiliar to him.  Correct?

 3        A.   That, I cannot answer that question.  I do not know

 4   if Dylan had ever been there before or not.

 5        Q.   You don't have any facts that you uncovered in your

 6   investigation of this incident to establish that Dylan had

 7   ever ridden in this area prior to the evening of this

 8   accident.  Correct?

 9        A.   That is correct.  I do not have any information one

10   way or the other.

11        Q.   And you told us how you were meticulous in reviewing

12   the testimony of all the witnesses in this case.  Do you

13   remember telling us that just a few moments ago?

14        A.   Yes, I do.

15        Q.   And in your meticulous reviewing of the testimony, I

16   assume you would have taken time to review the testimony of

17   Dylan's mom, Jamie Nelson.

18        A.   Yeah.  And she said that to her knowledge Dylan has

19   never ridden on the railroad tracks.

20        Q.   That's right.  And so by all accounts, what we know

21   is that Dylan was riding in a location where it was very dark,

22   unfamiliar to him, and in a location that he had never ridden

23   before.  Correct?

24        A.   I do not know if he's ridden there before.  I know

25   his mom thought that he never had.  And maybe he never had.  I

1    don't know.  We just don't know.

2        Q.   My question was:  By all accounts, he had never

3    ridden in this area before, correct?

4        A.   From any -- any information I could gather, I would

5    agree with that statement.

6        Q.   And we also know that Dylan had just turned 16 when

7    this accident happened and he had yet to receive or obtain a

8    driver's license.  Can we agree on that?

9        A.   That is correct.  Yes, that is correct.

10       Q.   And one other thing that we know for a fact is that

11   it was illegal for a minor such as Dylan to be operating an

12   ATV at night on railroad tracks.  Correct?

13       A.   I do not know the Pennsylvania laws, so I cannot

14   answer that correctly -- I mean, with any certainty.

15       Q.   Well, do you have the transcript of your deposition

16   with you?  Because you seemed to know that when you were

17   deposed.  Do you have your transcript with you?

18       A.   Yeah.  What page?

19       Q.   Let's take a look at Page 199 of your deposition, if

20   we can.

21            (Discussion held off the record.)

22       Q.   At Page 199 of your deposition, Line 15 through 18,

23   we were talking about whether it's legal and proper to be

24   operating an ATV on railroad tracks.  And your answer that you

25   gave under oath when you were deposed in this case was, quote,

1    "The only answer I can give you is that the police report said

2    it was illegal to be on the railroad tracks, but that's the

3    only information that I have."

4            Was that -- was that your testimony --

5       A.   That's correct.

6       Q.   -- previously in this case, sir?

7       A.   Yeah, that is my testimony, sir.  I have not changed

8    it.

9       Q.   And the only information --

10      A.   Said I don't --

11      Q.   -- that you have is that Dylan was illegally

12   operating this ATC on railroad tracks at night in an area that

13   by all accounts he had never ridden in before.  Correct?

14      A.   I -- yeah, that would be correct, yes.

15      Q.   So let's talk about operation of ATV's on railroad

16   tracks, then.  It's something that you've never tried to do.

17   Correct?

18      A.   I would -- yes, I have not tried.

19      Q.   Operating on railroad tracks presents its own set of

20   challenges because the operating space is extremely tight.

21   Would you agree?

22      A.   Yes.  The rails put a side limit on each side.

23      Q.   Right.  So let's take a look at Exhibit C, if we

24   can.

25            (Discussion held off the record.)

1    Q.   Can you see the photograph that's now being shown as

2    Exhibit 3, sir?

3    A.   Yes, I can.

4    Q.   And do you recognize the vehicle that appears in

5    that photograph as an ATC 200ES; the same model vehicle that

6    Mr. Fehlman was operating on the evening of this accident?

7    A.   Yes.  Yes, that's --

8    Q.   And do you recognize -- sorry.  I didn't mean to cut

9    you off.  Sometimes --

10   A.   Well, that appears -- that appears to be a Honda

11   200 -- let me look closely.  Yeah, that's a Big Red.  And

12   that's standard gauge railroad tracks, so it's 4'8 1/2" inches

13   wide from inside rail to inside rail.

14   Q.   Right.  So --

15   A.   So you can see -- so you can see there's -- there

16   is -- there is not a lot of room, but enough room on each side

17   so the wheels are not scraping as -- as you travel down the

18   railroad tracks.

19   Q.   So what you're saying is that from rail to rail,

20   you've got about 56 inches of space, correct?

21   A.   Just about 56, correct.

22   Q.   And the width of the ATC that we're looking at from

23   outer wheel to outer wheel is about 42 inches.  Would you

24   agree with that?

25   A.   You know, I've made those measurements before.  I

1   mean, if you want to wait, I can pull out some documentation.

2   But, yes, that's -- that's -- that's pretty close.  I would

3   agree with that.

4        Q.   So if you're threading the needle and splitting it

5   right down the middle as you happen to be riding along these

6   rails, a rider has a maximum of about seven inches of

7   clearance or space between the rear wheel and the rail on

8   either side.  Agreed?

9        A.   I would say approximately.  Yeah, I would agree with

10   that in round-about numbers.

11        Q.   All right.  Now, you suggest at some point that

12   while Dylan was operating his ATC illegally on these railroad

13   tracks, that the vehicle began to bounce or gallop

14   uncontrollably.  Do I have that right?

15        A.   I'm -- I'm basing that on the testimony of Officer

16   Hahn.  He put that in his accident report, and he also stated

17   that in his deposition testimony.

18        Q.   Yeah, thank you.  I didn't ask you what you based it

19   on, sir.  I'm just trying to understand what your opinion is

20   right now, because I'm going to -- I'm going to get into

21   whether I believe -- whether there's a scientific basis for

22   it.  So right now, if you bear with me, I'm just trying to

23   understand what your opinion is.

24             And what you suggest is that at some point as

25   Dylan's riding illegally on these railroad tracks, that this

1   ATV begins to bounce and gallop uncontrollably.  That's your

2   opinion, right?

3        A.   I never said "uncontrollably".  I never used the

4   word "uncontrollably".

5        Q.   Okay.  Well, let's leave out the "uncontrollable"

6   part, because we'll look at your report later and see what it

7   says.  But at least for now you'll agree with me that your

8   opinion is, is that at some point while riding along these

9   railroad tracks, the ATC starts to bounce and gallop.

10       A.   I would agree with that statement, yes.

11       Q.   All right.  And so I can get to the foundation of

12   what your opinion is, we can certainly agree that you were not

13   in Warren County on February 19, 2017, right?

14       A.   I would agree I was not there.

15       Q.   You didn't witness the accident, right?

16       A.   No, I did not.

17       Q.   In fact, nobody witnessed this accident.  Agreed?

18       A.   I would -- at least everyone -- I mean, there was no

19   information of anyone witnessing -- witnessing the accident.

20   So that -- I would agree with that.  At least if someone

21   witnessed it, they've never come forward.

22       Q.   So there are no eyewitness to the accident who will

23   say that they saw Dylan's ATC bouncing or galloping as he was

24   riding along the railroad tracks.  Agreed?

25       A.   I would agree with that statement, yes.

1      Q.   And in addition, you cannot point to anyone who ever

2   used this ATC during the 33 years that it was in service prior

3   to this accident who ever reported experiencing uncontrolled

4   galloping or bouncing, can you?

5      A.   I can't -- I'm trying to answer it so that there's

6   no misconception in my answer.

7           I don't remember anyone being asked specifically if

8   they ever noticed it bouncing or -- no one said it was

9   uncontrollable.  I would agree with that statement.  No one

10  ever said it was uncontrolled; it went into a bouncing or a

11  gallop mode in an uncontrolled manner.  But I don't know of,

12  say, of anyone saying that they never experienced any bouncing

13  or galloping with this machine.

14     Q.   Suffice it to say, sir, that your opinion that this

15  ATC was bouncing or galloping as it went down the railroad

16  tracks is not based on experiential testimony from anyone that

17  actually rode this vehicle.

18     A.   From anyone that rode this specific vehicle, the

19  accident vehicle, I would agree with that statement.  But I

20  have -- I have talked to, I have read papers, I've analyzed

21  these ATC's or other three-wheel ATV's that have no rear

22  suspension do bounce or gallop at various speeds over various

23  terrains.

24     Q.   Okay.  But --

25     A.   But I will agree with you, for this specifically --

1    this specific accident machine, the one that was involved in

2    this accident, I have no testimony to say that this physical

3    accident machine bounced or galloped.  What -- I have no

4    testimony one way or the other.

5        Q.   Okay.  We'll get into that perhaps a little bit more

6    later.  But let's -- let's go with this:  What you just

7    indicated to us is that you believe the galloping and bouncing

8    occurs because the ATC 200ES has no mechanical rear

9    suspension.  Do I have that right?

10       A.   That's correct.  That is a correct statement.

11       Q.   And if you can put up your report that's just been

12   identified as a Plaintiff's Exhibit.

13            MR. TRISCHLER:  Tiffany, can you display Page 8, the

14   top paragraph, please.

15   BY MR. TRISCHLER:

16       Q.   Are you able to see that, sir?

17       A.   Yeah.

18       Q.   Okay.  So I've just highlighted a couple statements

19   that you wrote in your report, and I want to just confirm that

20   this is your testimony and your opinion.

21            You write, quote, "Since this vehicle has little or

22   no suspension (especially in the rear), it will bounce freely

23   or gallop as it is driven and be airborne a good portion of

24   the time."

25            Those are your words, correct?

1      A.   Those are my words, and those are words that have

2   been given to me by various individuals that I have

3   interviewed and talked to and gleaned out of scientific and

4   technical papers.  But, yes, those are my words, and -- and

5   they are reported here correctly.

6      Q.   And you go on to write, and it's highlighted in Page

7   9 of your report, quote, "At speeds less than 20 miles per

8   hour, the ATV can pitch violently fore and aft and can flip

9   over forward due to the lack of proper suspension coupled with

10  inadequate lateral and longitudinal stability."  Those are

11  your words, right?

12     A.   Those are my words, that is correct.

13     Q.   Once this ATC begins to bounce or gallop, if I

14  got -- if I'm following your opinion in your reconstruction

15  analysis, what you suggest is that the handlebars of this ATC

16  can turn all by themselves, leading to an uncommanded yaw of

17  the vehicle.  Right?

18     A.   Well, let's -- let's back up just slightly.  I mean,

19  the answer is -- the correct answer technically is yes.  But

20  so that the answer is not misconstrued, it's -- the handlebars

21  just don't turn on their own.  The handlebars get turned

22  without rider input due to the surface at which the front

23  wheel is running.

24          So in this case, the ATC is -- is going down the

25  middle of the railroad tracks, and obviously there are

1  railroad ties, wooden cross-pieces, and gravel in between the

2  ties as the ATC is moving in a forward direction along the

3  railroad tracks.

4          So the railroad ties, as we saw in your Exhibits A

5  and B, were very -- it's very clear to see that they are not

6  concrete ties, but they're actual physical wooden ties made

7  out of lumber.  And so each of those ties, as time moves on,

8  they become not totally uniform.  They become asymmetric in

9  their shape.  And I think the photographs in A and B that you

10  previously showed were very clear how the ties are not totally

11  uniform.

12          And so if the front tire as it's going fore and aft,

13  as it's bouncing, goes into a tie that is -- a crosstie, a

14  wooden crosstie that is not uniform, the forward or -- force

15  that is applied to the front tire won't be uniform in a

16  forward direction, but will be asymmetric or push it one way

17  or the other.

18          So to answer your question, the handlebars do get

19  turned, as I use the word, involuntarily.  Dylan is not trying

20  to turn the handlebars one way or the other.  Actually, he's

21  probably trying his best to keep them going straight.  But the

22  railroad ties, due to the bouncing or fore and aft motion of

23  the ATC, will get turned one way or the other, and that's what

24  will cause the forward pitch roll.

25          Q.   And that's basically what I said.  According to you,

1    the handlebars turn all by themselves.  No operator input.
2    Right?
3        A.   Well, they're -- they turn because of the -- because
4    it's bouncing and the surface running.  So I wanted to make
5    sure that you didn't think that I -- the way your question was
6    stated made it appear that the handlebars had a mind of its
7    own and just suddenly turned right or left just because they
8    wanted to.
9        Q.   But there's --
10       A.   Due to the physical terrain that the vehicle is
11   riding.
12       Q.   You're right that mechanical objects don't usually
13   turn by themselves.  But in this case what you're telling us
14   is that the operator didn't turn them.
15       A.   That is correct.
16       Q.   But they turned nonetheless.
17       A.   That is correct.
18       Q.   And according to you, if I follow the theory, they
19   turned involuntarily or uncommanded, first to the left and
20   then to the right.
21       A.   It appears that it first went to the left, and then
22   when Dylan realized that it was going in the left -- in a
23   direction he hadn't planned on, he tries his best to correct
24   it.
25            But, yes, it goes left and right.  I would agree

1  with that.

2      Q.   And so to be more specific, what you suggested is

3  that this roll or overturn event can be induced by these steer

4  maneuvers, either voluntarily or involuntarily, in the range

5  of 10 to 15 degrees.  Right?

6      A.   Of handlebar at speeds of 10 to 15 miles an hour,

7  correct.

8      Q.   And just -- we're almost to the end of it, because I

9  do want to make sure I understand the theory before we get

10  into the basis for it.  And then what you claim is that these

11  small yaws, whether voluntarily or involuntarily, that cause

12  the handlebars to turn, induce the overturn of this ATC before

13  the wheels strike the side rails of the track.  Is that -- is

14  that your theory?

15      A.   That is correct, yes.

16      Q.   In other words, what you're claiming, Dr. Wright, is

17  that this was not an impact event of some type.  Right?

18      A.   It does not appear to be an impact -- the only

19  impact it appears, looking at the machine itself and going

20  through the police report from Officer Hahn, is that the

21  damage occurred as the vehicle landed on its -- basically,

22  landed upside-down.  But there was not any impacts before it

23  goes into a lateral upset.

24      Q.   So the wheels don't collide or strike the rails.

25  According to Robert Wright, the yaw or movement of the

1    handlebars involuntarily induces the overturn before the

2    wheels ever get into the rails.  That's what you're telling

3    us.

4         A.   During the accident, as it starts to go over, I

5    would imagine one of the rear tires and one of the front tires

6    brushes up against the rails.  I'm not saying that they never

7    touched the rails.  But I'm saying that the rails were never

8    the precipitator.

9         Q.   All right.  So now that we've defined your opinions,

10   let's walk through them a bit.

11        You have no personal experience operating a 1984 ATC

12   200ES, which is the ATV involved in this accident.  True?

13        A.   That is correct, I do not.

14        Q.   You've never been on an ATC 200ES.  Agreed?

15        A.   That is correct; I have not.

16        Q.   Never operated one on flat, level ground?

17        A.   That is correct, I have not.

18        Q.   Never operated one on bumpy, hilly, or uneven

19   terrain?

20        A.   That is correct, I have not.

21        Q.   The term "ATC" is a trade or brand name that Honda

22   has used for all of its three-wheel ATV's.  You're aware of

23   that, correct?

24        A.   That is correct, I'm very aware.

25        Q.   And so the various model ATV's that Honda produced,

1   three-wheel ATV's that Honda produced from the early 1970's up

2   through 1987, they would all be called ATC's, right?

3       A.   That is correct.

4       Q.   And the fact is you've never operated any Honda ATV.

5   True?

6       A.   That -- that is correct; I have not.

7       Q.   You've never -- Honda wasn't the only manufacturer

8   of three-wheel ATV's.  Kawasaki made them, Suzuki made them,

9   Yamaha made them.  Right?

10      A.   That is correct.

11      Q.   You've never operated -- for what it's worth, you've

12  never operated any three-wheel ATV.  Agreed?

13      A.   That is -- I have not.

14      Q.   Let's expand it a little bit and talk about three-

15  and four-wheelers; ATV's.  And by definition, we've been

16  using -- I guess just to make sure you and I are on the same

17  page, Dr. Wright, we've been using the term "ATV" also, and

18  that's an acronym for all-terrain vehicle.  Correct?

19      A.   That is correct.

20      Q.   And "all-terrain vehicle" is a term that's defined

21  to include a class of vehicles that's generally defined as a

22  rider-only off-road vehicle intended for off-road use with a

23  straddle seat for the operator and handlebars for steering

24  controls.  Right?

25      A.   That is correct.

1     Q.   So if we talk about all three- and four-wheel ATV's

2  ever made in the 50 years that they've been on the

3  marketplace, have you ever operated a single ATV on railroad

4  tracks?

5     A.   Never on railroad tracks.

6     Q.   Is it fair to say that you have no personal riding

7  experience to judge how an ATC handles on any terrain, let

8  alone how an ATC 200ES will handle over railroad tracks?

9     A.   I would agree with that statement.

10    Q.   You would or would not agree with that statement?

11 I'm sorry; I didn't hear you.

12    A.   I said -- you said that I don't have any experience,

13 and I would agree.  Personal experience.

14    Q.   Thank you.  With the connection, I just wasn't sure

15 if I heard you.

16         In addition to never having been behind a wheel, so

17 to speak, you've never tested your theory that operating an

18 ATV without rear suspension on railroad tracks will cause a

19 200ES to bounce or gallop, have you?

20    A.   We've run tests over series of boards in various

21 terrains, and it does gallop or bounce, but I've never done it

22 on railroad tracks per se.

23    Q.   You've never tested the ride, handling, or

24 performance of a Honda ATC on railroad tracks; true?

25    A.   That is correct; I have not.

1    Q.   You've never tested any ATV on railroad tracks;

2  true?

3    A.   Four-wheel.  I don't remember ever testing on a

4  railroad track.

5    Q.   You never tested any three-wheel ATV on railroad

6  tracks.

7    A.   That is correct, I have not.

8    Q.   Have you ever tested any ATV with mechanical rear

9  suspension on railroad tracks?

10    A.   No, I have not.

11    Q.   Your theory in this case is that if you install some

12  type of mechanical suspension on the rear of this ATV, that it

13  will be less prone to uncontrollable galloping and bouncing.

14  True?

15    A.   It definitely -- all the reports I have read and

16  scientific and technical papers is that if you put suspension

17  on, especially rear suspension on an ATV, whether it's

18  three-wheel or four-wheel, the bouncing and galloping

19  definitely is significantly diminished.

20    Q.   Have you ever done any testing of an ATC 200ES on

21  railroad tracks to evaluate its response to that type of

22  terrain?

23    A.   The answer is no, I have not.

24    Q.   Have you ever done any testing or engineering

25  evaluation on railroad tracks to evaluate the differences, if

1    any, in the handling between ATV's with and without mechanical
2    suspension?
3        A.   We've done testing on that in the past, and there's
4    been a lot of scientific technical papers written in that
5    regard that -- with and without suspension.
6        Q.   I'm confused.  What papers have been written
7    evaluating how ATV's perform when ridden on railroad tracks?
8        A.   Well, not on railroad tracks.  I'm just talking
9    about suspension in general.
10       Q.   The fact is that as you sit here today, you can't
11   point to any data, testing, or research to show a difference
12   in vehicle response between ATV's with mechanical suspension
13   and those without when operated on railroad tracks, true?
14       A.   I don't know of any papers.  I have not seen any
15   papers that address either question.
16            MR. TRISCHLER:  Can you pull up Page 67 of the
17   deposition transcript.
18   BY MR. TRISCHLER:
19       Q.   Can you take a look at Page 67 of your deposition,
20   sir.
21       A.   Are you going to put it on the screen, or do you
22   want me to hunt for it in my copy here?
23       Q.   I'll put it up on the screen if it's easier for you
24   here.
25       A.   Oh, okay.

1       Q.    Page 67, if you go to Line 10, please.

2       A.    Okay.

3       Q.    So I asked you the question in your deposition, when

4    you were previously testifying under oath in this case, Dr.

5    Wright, "So my question is:  Can you cite me any data, any

6    tests, any research, any measurements to show the difference

7    in vehicle response to operation on railroad tracks between

8    vehicles with mechanical suspension and those without?"  And

9    your answer was at Line 17, "On railroad tracks, I cannot."

10         Was that testimony truthful then and is it still

11   truthful now?

12      A.    The answer is yes and yes.

13      Q.    And so we talked a little bit also about the

14   testimony of witnesses and the experience of people who have

15   operated this ATC.  Do you recall that?

16      A.    Correct.

17      Q.    So while you never operated the ATC 200ES, you did

18   review the testimony of Christopher Nelson, for instance.

19   Right?

20      A.    Right.  Both Mr. and Mrs. Nelson, yes.

21      Q.    Well, I'm just asking you about Mr. Nelson for now.

22   But there were depositions of -- you're right that Mr. and

23   Mrs. Nelson were both deposed.

24         Christopher Nelson was the owner of the ATC 200ES,

25   right?

1          A.   That is correct.

2          Q.   Mr. Nelson had extensive experience with this ATV.

3     Do you agree?

4          A.   I guess you'd have to define what "extensive" is,

5     but, yes, he had -- he'd operated it quite a bit.

6          Q.   Well, isn't it true that he testified that he

7     operated it over 50 times in the six months preceding this

8     accident?

9          A.   That is correct.

10         Q.   Would you consider that extensive experience with

11    the vehicle?

12         A.   Yeah, I guess I would.  Yeah.

13         Q.   So in the dozens and dozens of rides that Mr. Nelson

14    had on this ATC 200ES, the very vehicle involved in this

15    accident, he never once reported any problems with the

16    operation or control of the vehicle, did he?

17         A.   That is correct.  That was his testimony.

18         Q.   He operated it on trails all around his home in

19    Tiona.  True?

20         A.   Right.  That is correct.

21         Q.   And, of course, anyone that's operating an ATV on

22    off-road trails in Western Pennsylvania is going to be

23    confronted with uneven, bumpy, and hilly terrain.  Would you

24    agree with that?

25         A.   That is true.

1     Q.   And according to Christopher Nelson, he never

2     experienced any issues with control, handling,

3     maneuverability, or stability of this ATV.  Agreed?

4     A.   That was his testimony, right.

5     Q.   In fact, we can look -- if could put up -- we'll

6     mark it as Exhibit D.  This is Page 118 of Mr. Nelson's

7     testimony, part of which you read.  Correct?

8     A.   Correct.

9     Q.   And if we look down at the bottom there, at Line 14,

10    Mr. Nelson testified, "And based on the 30 to 50 times that

11    you operated the ATV prior to the accident, did you have any

12    concerns with the safety of this ATV?"  And his answer was

13    "no", correct?

14    A.   Correct.

15    Q.   And if we go down further to Page -- Line 23,

16    Mr. Nelson was asked, "Based on the 30 to 50 times that you

17    operated this ATV prior to Dylan's accident, did you ever have

18    any difficulties with the handling or operation of the ATV,"

19    and his answer was "no".  True?

20    A.   That is what he said, yes.

21    Q.   And you also read -- you told us you also read the

22    deposition of Mrs. Jamie Nelson.  Correct?

23    A.   That is correct, I have.

24    Q.   She's the wife of Christopher and the mother of

25    Dylan Fehlman.  True?

1      A.    That is correct.

2      Q.    Mrs. Nelson told us about her experience riding this

3   ATC 200ES.  Right?

4      A.    She did, in her testimony.

5      Q.    And she told us all about Dylan's riding as well.

6      A.    That -- I remember her talking about Dylan's

7   operation.

8      Q.    Sure.  And one of the things she told us was that

9   Dylan rode this ATC every day, right?

10     A.    He -- he was -- yes, I'd agree with that.

11     Q.    He was on it hundreds of times.

12     A.    I mean, I would say probably in that ballpark, yes.

13     Q.    Well, you would say.  That's what the testimony

14   says, correct?

15     A.    Well, yeah, I agree, yes.

16     Q.    All right.  And Mrs. Nelson told us and testified

17   under oath that she rode this ATC even more than her son.

18     A.    That's what I remember her saying.

19     Q.    And according to Miss Nelson, in the hundreds and

20   hundreds of rides, no one ever reported or observed any

21   stability, handling, or control issues, whether they were

22   riding on bumpy terrain, even terrain, uneven terrain, you

23   name it.  Right?

24     A.    At least that is what the testimony was.

25     Q.    And the bottom line is that Christopher Nelson and

1    Jamie Nelson describe hundreds and hundreds of rides with this

2    ATV, and no one ever reported any control problems.  Right?

3          A.   That is what they testified to.

4          Q.   No one certainly ever reported any bouncing or

5    galloping when they were riding on uneven terrain, did they?

6          A.   I don't know if they were ever asked that question.

7    I don't remember them being asked that question.

8               But, yes, neither one of them made that statement in

9    their deposition testimony.

10         Q.   Well, if a rear suspension of an ATV causes

11   uncontrollable bouncing or galloping, that would be a control

12   problem, would it not?

13         A.   You keep using the word "uncontrolled".  The amount

14   of bouncing or galloping is totally dependent on the speed

15   it's being operated and the terrain it's being operated on.

16              So if you operate on some very rugged terrain, but

17   only going four or five miles an hour, you're not going to

18   notice bouncing or galloping.  So, you know, it's all

19   according to the surface it's being run on and the speed that

20   you're running on that particular surface.

21              So, I mean, I could see where -- that the most --

22   Mr. and Mrs. Nelson never noticed or -- or thought it was a

23   problem, the bouncing or galloping of the machine, in their

24   operation the hundreds of times that they operated it.

25         Q.   That's very interesting, Dr. Wright.  So are you

1    suggesting to this Court and to this jury that in the hundreds

2    and hundreds of times that the Nelson family operated this

3    vehicle, they always operated it four to five miles per hour?

4         A.   I never said that.

5         Q.   All right.

6         A.   That is not what I said.  You've mis -- misconstrued

7    my statement 180 degrees.  I said --

8         Q.   Well, that's why I asked the question.  I want to

9    make sure I understand it.  Because you've testified, and you

10   wrote a report that said this bouncing or galloping surfaces

11   at speeds as low as 10 miles per hour.

12        A.   That is correct.

13        Q.   Certainly the Nelsons operated this vehicle hundreds

14   of times at speeds above 10 miles an hour, right?

15        A.   And you missed part of my statement earlier or my

16   answer; was that it is a -- it is both the speed it's being

17   operated and the surface it's being operated.

18             So if the surface is totally smooth, you could

19   operate it, you know, 15, 20 miles an hour and not notice any

20   bounce or galloping.  If you get some undulations to the

21   surface, then the speed will significantly drop before you get

22   to feel or notice the balancing or galloping.

23             So it is both a speed and terrain phenomena.  And,

24   obviously, the better the suspension, the -- the less problems

25   you will have with the control and balancing and galloping of

128

1   the vehicle.

2       Q.   Well, let's see if we can just agree on this:   No

3   one who ever rode this ATV reported any operational

4   difficulties of any type.  Can we agree on that?

5       A.   What they reported, I would agree, yes.  I would

6   agree with that.  I  mean, I found -- I found no testimony,

7   either from the previous owner or Mr. and Mrs. Nelson, that

8   they -- that they reported any -- any difficulty in control.

9       Q.   In the 33 years that elapsed from 1984, when this

10  ATV was originally sold, until 2017, when this accident

11  occurred, are you aware of any fact to suggest that anyone

12  ever suggested that this ATV bounces or gallops uncontrollably

13  when on uneven terrain?

14      A.   The answer is I have seen no one testify to that

15  regard.

16           But, again, you keep using the word "uncontrolled".

17  The vehicle can start bouncing or galloping and still be in

18  control.  The accident occurs as the front wheel comes into

19  contact with something asymmetric, which will cause the

20  vehicle to then go into a lateral upset, as occurred to Dylan.

21  And if that never occurred in the previous 33 years to any of

22  the operators, then no accident would have occurred, and we

23  knew -- we know from the testimony that no accident did occur

24  with this vehicle until Dylan had his.

25      Q.   Dr. Wright, can we agree that this opinion that an

1    ATV without mechanical rear suspension will bounce or gallop

2    is an opinion that's not supported by any eyewitness

3    observations in this case?

4         A.   It's supported in numerous scientific and technical

5    papers.  It is reported to me numerous times from tests that

6    we've done.  But I will agree with you that in this particular

7    case, I have not seen anyone testify in that regard.

8         Q.   Cite to the Court, please, all the numerous

9    scientific papers saying an ATV 200ES will bounce or gallop

10   when operated on railroad tracks.  Please give us the cite to

11   all of those papers that you just referenced.  I'm going to

12   write them down.

13        A.   Okay.  If you want to refer to SAE paper 860227.

14   This is not -- this is for three-wheel ATV's.  It doesn't say

15   that we're talking about Honda ACV 200ES.  But a Honda ATC

16   200ES falls into the category of a three-wheel ATV.  So SAE

17   paper 860227.

18        Q.   What's the title of that paper, sir?

19        A.   "Full Suspension on Three-Wheel ATV's," by Tan and

20   Huston.

21             THE COURT REPORTER:  I'm sorry; can you repeat that

22   one more time.  "Full Suspension --"

23             THE WITNESS:  Okay.  860227.  Then SAE paper -- this

24   is another paper, different paper.  SAE 860228.  Both of those

25   papers were authored by Tan and Huston.  And Huston is spelled

1    H-U-S-T-O-N.  Tan is T-A-N.

2    BY MR. TRISCHLER:

3        Q.   So when you -- when you just told the Court that

4    there were papers published establishing that an ATV operated

5    on railroad tracks with -- that does not have rear suspension

6    will bounce or gallop, the Tan and Huston papers that you just

7    cited are the ones you're relying on.  Correct?

8        A.   Well, I relied on those two papers, I relied on --

9    there's -- on testing that we've done in the Gosewich case,

10   that involved a --

11           THE COURT REPORTER:  I'm sorry; in the what case?

12           THE WITNESS:  G-O-S-E-W-I-C-H.  Gosewich.  That was

13   Gosewich v. Honda, and that involved a Honda ATC -- it was a

14   185, if I remember correctly.  And we did testing on that.

15   And actually videos of those tests were shown on CBS's 60

16   Minutes.

17   BY MR. TRISCHLER:

18       Q.   Try to stay with me, Dr. Wright.  I'm talking

19   about --

20       A.   I'm trying to give you -- I'm trying to answer your

21   question.

22       Q.   Hold on.  Hold on.  I asked you about papers.  We'll

23   get to the things you want to talk about.  I asked you about

24   papers, and you cited two.  Are there other papers?

25       A.   Yes, there's some other papers.  I don't have them

1    written down, no.  There -- there's papers on the tires, SAE

2    891106 by Holloway, Wilson, and Drach.  But that -- that's

3    talking about the tires and how the tires are used as

4    suspension.  How they will grab, let go, grab, let go, which

5    is a form of galloping.

6          There -- there are some other papers.  I don't

7    have -- I don't have them on my fingertips right now.

8          Q.   The Tan and Huston papers that you mentioned, none

9    of those papers involved actual vehicle testing.  Wouldn't you

10   agree?

11         A.   The Tan and -- yes, those are all showing the

12   difference between suspension and non-suspension from a --

13   a -- an engineering -- engineering analyses, right.

14         Q.   The Tan and Huston papers -- let's be honest, sir.

15   The Tan and Huston papers were nothing more than theoretical

16   modeling.  Correct?

17         A.   That's correct, yeah.  That's --

18         Q.   And no testing was ever done to validate that

19   theoretical model.  Correct?

20         A.   I think in Paper 2, if I remember correctly -- now,

21   I could be wrong.  It's been a while since I read those

22   papers.  But I think in Paper 2 -- both papers had the same

23   title.  One was Part 1 and one was Part -- I think Part 2 they

24   did do some physical testing, if I remember correctly.

25         Q.   And the vehicles that were being modeled in that

1    case were not the ATC 200ES, correct?

2         A.   That is correct.  He --

3         Q.   And the modeling that was done did not involve

4    operation over railroad tracks in either one of the Tan and

5    Huston papers, correct?

6         A.   That is correct.  I would agree with that.

7         Q.   And the Gosewich case that you referred to and, I

8    guess, the testing that you want to talk about that was done

9    supposedly in connection with some case 30 plus years ago,

10   there was no testing on railroad tracks that was done in that

11   case.

12        A.   I wasn't talking about railroad tracks.  I was

13   talking about no suspension and how the vehicle will gallop

14   or -- or bounce.

15        Q.   Well, let's see if you can --

16        A.   But, yes, as I said earlier -- as I said earlier, I

17   don't know of any tests run on railroad tracks.

18        Q.   So let's see if you can follow my question, then,

19   please.  We can agree that this notion that an ATV without

20   mechanical suspension will bounce or gallop on railroad tracks

21   is not supported by eyewitness testimony, correct?

22        A.   Since I'm not seeing any testing on a railroad

23   track --

24             THE COURT:  I'm sorry; hold on.

25             MR. FRIDAY:  Objection.  Asked and answered.  At

1    least several times.

2              THE COURT:  It's hard to tell, because the questions

3    and the answers are not exactly on point with each other.  But

4    I think I understand what he's answering, and I think I

5    understand where you're trying to get him to go.

6              There hasn't been testing on railroad tracks

7    that he knows of, and he's giving you an answer as to testing

8    on different types of terrain.

9              Is that correct, sir?

10             THE WITNESS:  That is correct.

11             THE COURT:  So I think it's time to move on.

12             (Discussion held off the record.)

13             THE COURT:  We're going to take a ten-minute break.

14   We'll be back at 3:00.  Does that work for you, Dr. Wright?

15             THE WITNESS:  That's great.  That's fine.

16             THE COURT:  Okay.  We'll be back at 3:00.  Thank

17   you.

18             (Recess held from 2:49 till 3:05 p.m.)

19             THE COURT:  There is some sense of what's going on

20   here that seems like a cross-examination at trial, and there's

21   a fine line between whether or not the methodology is

22   appropriate and reliable and whether or not it has holes in it

23   to be cross-examined in front of a jury.  So I understand

24   that.  But I'm not sure why we would have a competing expert

25   testify unless it's well-known in the scientific community

1    that everything Dr. Wright did was done incorrectly.  So, I

2    mean -- or that the methodology used was totally incorrect.

3              So is that where you're going?  I mean, he's

4    been an expert in a number of cases, so it's hard for me to

5    believe that we'll have that kind of testimony.  So I'm just

6    concerned that it's not going to be the sort of

7    cross-examination or the sort of competing expert that you

8    would have in front of a jury, which is not what we're doing

9    here.

10         MR. TRISCHLER:  Well, Your Honor, I think that the

11   fundamental issue that a Court has to wrestle with under Rule

12   702 is whether the science has reliably --

13         THE COURT:  Exactly.

14         MR. TRISCHLER:  -- been applied to the facts of this

15   case.

16         THE COURT:  Exactly.

17         MR. TRISCHLER:  So the fact that this witness -- you

18   know, and I don't mean this pejoratively, but the fact that

19   this witness has been making a living testifying in court for

20   50 years is really not relevant, because what's been -- what's

21   happened in the past really isn't what's relevant.  What's

22   relevant is whether the science has reliably been applied to

23   the facts of this case.

24              What I'm attempting to establish -- I think I

25   have so far, but the Court will be the ultimate judge of that.

1    But what I'm trying to establish --

2              THE COURT:  That the railroad tracks are different.

3              MR. TRISCHLER:  Well, they're certainly different.

4    And that the conclusions that the expert has drawn are not

5    supported by science, they're not supported by physical

6    evidence, they're not supported by facts.  And there is a

7    methodology that could have been employed to evaluate the core

8    opinions that this expert's offering, and that's what I would

9    intend to offer Dr. Fowler to testify about.  I don't want to

10   preview the rest of my cross-examination, but if the Court

11   wants me to, I will.

12             Essentially, what -- what this boils down to is

13   fundamentally there's some core opinions that Dr. Wright has

14   offered.  And he's listening to me now, so, again, I'd prefer

15   not to spell it out now --

16             THE COURT:  Okay.  But, I mean, you have

17   cross-examined him in deposition.  He is on the record in this

18   case.

19             MR. TRISCHLER:  Right.  Well, and he's offered three

20   core opinions; that ATV's without rear suspension bounce and

21   gallop --

22             THE COURT:  Weight distribution and location --

23             MR. TRISCHLER:  No. 2, that when they bounce and

24   gallop, they cause uncommanded steering inputs.

25             No. 3, that when those uncommanded steering

1    inputs occur, this vehicle flips over on railroad tracks

2    without any impact to the rails.

3              And what we're going to show is that there's a

4    way that you can test and evaluate scientifically whether

5    those things can happen.  He didn't do any of them.  He's

6    opined that they have, but he didn't do -- he didn't follow

7    any recognized methodology to answer those questions.

8    Dr. Fowler has.  And I think that's entirely relevant and

9    appropriate at the Daubert inquiry.

10             THE COURT:  He has followed methodologies for the

11   lack of rear suspension and its effect on this vehicle, the

12   length of the seat, is my understanding, and when it is on

13   unsteady terrain.  I've heard that from him today.

14             MR. TRISCHLER:  Well, if he's articulated a

15   methodology other than "it's my opinion", I haven't heard

16   that.  But he's certainly offered the opinion that he believes

17   that ATV's need rear suspension.  He's not offered a

18   scientific methodology, whether based in literature, testing,

19   engineering evaluation -- he's not even an engineer.  We

20   haven't even gotten into that yet.  But he's not offered a

21   valid methodology to reach those opinions.

22             Certainly he's opined in his report, in his

23   deposition, that ATV's need rear suspension.  Certainly he's

24   opined that you should have a bigger seat.  By the way, he

25   testified in deposition that wasn't the cause of the accident.

1    We'll get into that.  But he's offered that opinion because

2    he's offered that opinion for 50 years, and he'll keep

3    offering as long as someone pays him.

4                    But the reality of it is, that there's no

5    methodology for it, Your Honor, other than this gentleman

6    saying that's his belief, and that's -- and that's the ipse

7    dixit that Daubert and its progeny say is not reliable expert

8    testimony.  There has to be -- there has to be science behind

9    it.  He's offered nothing.  You know, so what's -- the idea

10   that it gallops, where would you look for for that?  People

11   that have actually ridden it?  People that have witnessed it,

12   tests that have been done to prove it?

13           THE COURT:  Or his --

14           MR. TRISCHLER:  He hasn't done any of that.

15           THE COURT:  Or his expertise in -- well, I don't

16   know about that.  I mean -- but his expertise in -- I have it

17   right here -- force analysis and dynamics.

18           MR. TRISCHLER:  Well, that's one of the areas --

19           THE COURT:  So you have to get to those questions.

20           MR. TRISCHLER:  That's one of the areas to get to.

21           THE COURT:  Because up till this point, honestly, it

22   sounds like a cross-examination of an expert witness who has

23   been -- who has been okayed for testimony.

24           MR. TRISCHLER:  I'm not suggesting -- well, I

25   understand.  I'm disappointed to hear that's the Court's view.

1  But, you know, these are certainly questions that -- there's

2  definitely overlap between trial cross-examination and

3  Daubert --

4          THE COURT:  But he's also testified to this major

5  paper that he wrote.  And I understood it to mean was based in

6  testing a number of years ago that he's still relying on.  Is

7  that correct?

8          MR. TRISCHLER:  He wrote a paper several decades --

9          THE COURT:  That won the award, yeah.

10         MR. TRISCHLER:  So he says.  Several decades ago.

11 It has nothing to do with this ATV or this environment.

12         Every vehicle is a function -- especially an

13 off-road vehicle -- is a function of its environment, a

14 function of its user, a function of its design.  You can't

15 separate those elements from it.  Try as they might, you

16 can't -- you can't evaluate how a vehicle would perform

17 without looking at the operator, without looking at the

18 environment.

19         That's what they want to do.  And so he wants

20 to say -- and I'll show you, if time permits, Your Honor, I'll

21 show you some of the testing he keeps referring to that's

22 totally unrelated and not helpful to the trier to the issues

23 in front of this jury.  So he just wants to throw up that,

24 yeah, there's papers out there --

25         THE COURT:  The vehicle was -- was totaled; is that

1   correct?

2          MR. TRISCHLER:  Well, not -- no, it wasn't totaled.

3          THE COURT:  Okay.  I'll let you continue.

4   Obviously.  We'll go forward.

5          MR. TRISCHLER:  Now, Your Honor?

6          THE COURT:  Well, I was just -- let me think for a

7   second.  I will take argument from Plaintiff's counsel

8   regarding the testimony of your expert in the morning for the

9   sole purpose -- if I allow it, for the sole purpose of

10  critiquing the reliability of, of course, Dr. Wright.  So

11  we'll talk about that at the end of his questioning.  I'm not

12  going to rule on that.

13              There was a -- there was, however, a -- an

14  objection at the time that we took a break, and it hasn't been

15  ruled on.  Would you mind -- do you recall what that was?  Can

16  you read that back.

17         MR. TRISCHLER:  I can probably help, Your Honor, I

18  think it was an objection that a question was asked and

19  answered, and Your Honor --

20         THE COURT:  Yes, and I said let's move on.

21  Basically that was sustained, so let's move on.

22         MR. TRISCHLER:  Understood.

23         (Discussion held off the record.)

24  BY MR. TRISCHLER:

25     Q.   Doctor, we've been talking a little bit about your

1    opinion concerning rear suspension.  Would you agree with me

2    that there is no data to suggest that mechanical rear

3    suspension will reduce accidents on ATV's?

4        A.   No, I've not seen any studies -- with that specific

5    question, I've not seen any studies one way or another.

6        Q.   And you recall that as far as back as 1990, the CPSC

7    and the Specialty Vehicle Institute of America commented on

8    that issue, correct?

9        A.   I know that the -- I know that the standards that

10   they put forth for four-wheel ATV's require full mechanical

11   suspension fore and aft.

12       Q.   Right.

13       A.   But, obviously, there were never any standards put

14   for three-wheel vehicles, because the CPSC, through the --

15   through the lawsuit -- and Honda was one of the companies to

16   agree not to manufacture any more three-wheel ATV's.

17       Q.   Well, thanks for the gratuitous comments, but none

18   of it was really responsive to my question.

19            What I was asking you about was comments by CPSC and

20   the Specialty Vehicle Institute of America concerning whether

21   or not the presence or absence of mechanical suspension has

22   any correlation to accidents.  There was public comments that

23   CPSC and SVIA published on that back in 1990.  Do you remember

24   that?

25       A.   I mean, I don't remember that question specifically.

1    I do know, as I just stated, that mechanical suspension was

2    important enough for the CPSC to make sure that it was

3    included in the four-wheel vehicle standards.

4         Q.   Well, let's look at exhibit -- I think maybe E.

5              MR. TRISCHLER:  Can you put that up for me, Tiffany,

6    please.

7    BY MR. TRISCHLER:

8         Q.   And what you're looking at now, Dr. Wright, is a

9    page from Exhibit E that is the ANSI SVIA 1990 standard that

10   you've been referencing.  And there was a forward to the

11   standard in which the CPSC and SVIA discussed mechanical

12   suspension.

13             MR. TRISCHLER:  I think if you scroll down to the

14   next page, Tiffany, you'll be able to see that part that I'm

15   referring to.  There we go.

16   BY MR. TRISCHLER:

17        Q.   Do you see that paragraph that has the highlight in

18   it, Dr. Wright?

19        A.   I -- yes.

20        Q.   All right.  And here, in the forward to the 1990

21   standard, there's discussion about mechanical suspension and

22   whether it makes a difference.  Do you see that?

23        A.   Correct.

24        Q.   And what the CPSC staff noted in conjunction with

25   SVIA, the Specialty Vehicle Institute of America, was that

1    there was an absence of accident data and analysis correlating

2    accidents and injuries to the presence or absence of

3    mechanical suspension.  Do you see where I read that?

4        A.   Correct, I see that.

5        Q.   And the fact is that you do not have any scientific

6    basis to dispute CPSC's and SVIA's conclusion that accidents

7    on ATV's cannot be reasonably tied to the presence or absence

8    of mechanic suspension.  Agreed?

9        A.   I would agree.  And as I said earlier, in my opinion

10   in this accident scenario, is that the lack of rear suspension

11   I didn't think was the total cause.  I said it was like a

12   symbiontic relationship.  It was -- it was precipitor to the

13   handlebars getting firm.

14           The vehicle went into a forward pitch roll and

15   ejected Dylan to the ground.  And that forward pitch roll

16   was -- was due to the defect in the machine.  But what caused

17   that to precipitate itself, in my opinion, was the lack of

18   rear suspension causing the machine to -- to bounce or gallop,

19   making it difficult for Dylan to control the handlebars as the

20   machine gallops or bounces, as I said before.

21       Q.   Right, I understand your opinions.  That's why I

22   took the time to go over them at the beginning.  So I

23   understand your opinions.  That wasn't my question.

24           My question was:  There is absolutely a derth and

25   absence of data to suggest that there's a difference in

1    accident rates between ATV's with mechanical suspension and

2    ATV's without.  CPSC acknowledged that, SVIA acknowledged

3    that, and you acknowledged that.  Right?

4         A.   I would agree with that statement, yes.

5         Q.   Sure you would.  And in the 30 years since this

6    announcement was made, have you seen any peer-reviewed studies

7    analyzing or comparing accident rates or injuries on ATV's

8    with or without mechanical suspension?

9         A.   No, I have not seen any -- any -- any reports or

10   papers written in -- with that specific question.

11        Q.   Let's take a look at Page 77 of your deposition,

12   sir.  Are you able to see that, Dr. Wright?

13        A.   Now, I can.  Well, that's 263.  There it is.

14        Q.   Okay.  Take a look at Line 13.  We were talking --

15   this is in your deposition.  I was asking you about the issue

16   of whether suspension makes a difference.  And at Line 13, you

17   were asked the question, "So the answer is you're not aware of

18   any peer-reviewed studies that would correlate or compare

19   accident data between vehicles with and without mechanical

20   suspension," and your answer was, "That is correct.  If there

21   are any, I have not seen them."

22             Is that statement still --

23        A.   That was my -- yeah, that was my answer just a few

24   minutes ago.  Yes.

25        Q.   Sure.  And is that statement still true today?

1    A.   Now, yes.

2    Q.   Then I asked you, "Have you personally done any

3  testing to establish or support the claim that mechanical

4  suspension will reduce the number or severity of ATV accidents

5  or injuries," and your answer was, "No."  Correct?

6    A.   Yes.  And I went on to say that we've done

7  suspension testing in the past, but my answer is no then and

8  it still is no now.

9    Q.   Right.  And what you say at the end -- we go on to

10  Page 78, if you want to talk about what else you said beside

11  "no".  The second paragraph, quote, "But I've not done any

12  study to say that suspension -- I've not done any studies to

13  say what the rate of change in accident scenarios would be one

14  way or the other."

15    That was your sworn testimony, correct?

16    A.   That is correct.  It was the same then as it is now.

17  That's correct.

18    Q.   So so far we've talked about your opinion that the

19  lack of suspension causes ATC's to bounce or gallop.  Let me

20  ask you about the second opinion that you've outlined for us,

21  and that is this -- the idea that as -- once it bounces or

22  gallops, it will -- that eventually leads to uncommanded yaws

23  or turns.  Do you remember telling us about that?

24    A.   Correct, I do.

25    Q.   And you said that at some point after the ATV starts

1   to bounce or gallop, the handlebars turn involuntarily.

2   That's at Page 6 --

3        A.   Well --

4        Q.   That's at Page 6 of your report.

5        A.   That is correct.

6        Q.   And I think in your deposition, that involuntary

7   turn of handlebars, you called it an uncommanded yaw.

8        A.   That's another way of saying the same thing, right.

9        Q.   Okay.  So whether we call it an involuntary turn or

10  an uncommanded yaw, what we know, though, is that there's

11  absolutely no physical evidence to document or confirm that

12  the handlebars turned by themselves when Dylan Fehlman was

13  riding on the tracks in February of 2017.  True?

14       A.   Well, that's kind of misleading in the way you've

15  asked the question, and so I want to make sure that when I

16  answer it, I'm answering it so that there's no confusion, in

17  that the handlebars, because the machine is -- is galloping,

18  bouncing -- and I don't mean that it's like on a trampoline.

19  I mean that the machine, because it has no rear suspension, it

20  bounces more than it would with suspension.  And there is a

21  fore and aft motion of the vehicle as it's moving down the

22  railroad tracks.

23            So as the front tire runs into the railroad ties,

24  which are asymmetric in shape, basically due to weather -- and

25  your pictures in A and B show that very clearly -- that the

1   handlebars will -- will get pushed -- maybe that's the best
2   way of saying it -- pushed by the ties against the front tire
3   one way or another.  And as they get pushed, to turn the
4   handlebars in an asymmetric manner, then Dylan, who is holding
5   onto the handlebars, will try his best to correct it.
6           And I think what Dylan did in this accident -- and I
7   stated that earlier, and it's still my opinion, the same now,
8   is that as the handlebars got turned, or as you called it,
9   yaw -- you can use whatever terminology, it's all the same --
10  then as he corrects that or attempts to correct that, then
11  it -- it is a -- a function of him correcting it, and the
12  vehicle then goes into a forward pitch with the handlebars
13  being turned in the opposite direction.
14          And, again, we're not talking, you know, lock to
15  lock.  We're talking about a few degrees off center one way or
16  the other.
17      Q.   You said a lot there, Doctor, and I'm not sure that
18  any of it was in answer to my question.
19          My question was:  What physical evidence do we have
20  to verify that as Dylan Fehlman was riding along these
21  railroad tracks, that the handlebars move on their own, move
22  involuntarily, or are pushed by someone or something other
23  than him?
24          MR. FRIDAY:  Objection.  This has been asked and
25  answered.

1           THE COURT:  I'm going to let him answer this.
2    Overruled.
3           THE WITNESS:  The answer to that question is:  We
4    know that the action occurred.  We know that Dylan ended up in
5    a forward pitch roll.  You can see the position of the ATV,
6    you can see the position of Dylan after the accident.  So we
7    know this accident occurred.
8                And the way it occurred is -- is -- is that the
9    vehicle went into a forward pitch roll.  The only way it can
10   go into a forward pitch roll is for the handlebars to get
11   turned.
12               Now, those railroad tracks are totally straight
13   in this area, so I don't think -- it is my opinion that Dylan
14   was not trying to turn the handlebars aggressively one way or
15   another because the railroad track is totally straight here.
16   So he's not trying to negotiate any type of curve or any type
17   of surface feature.  But the machine, because of the defective
18   condition, is dictating to Dylan how the vehicle will operate,
19   and he's doing his best to -- to maintain physical control.
20   So those are my opinions.  That is the physical evidence.
21               Now, was anyone running a videotape at that time?
22   No.  Did anyone observe it?  No.  Is that the best explanation
23   of how this accident occurs?  Yes.  That answers the question
24   the best I can.
25   BY MR. TRISCHLER:

1    Q.   Can you go to Page 195 of your deposition, please.
2    Take a look at Line 19.

3    A.   19?

4    Q.   Yes, sir.

5    A.   Okay.

6    Q.   "Question:  What physical evidence do we have that
7    the vehicle yawed counterclockwise?  Answer:  We have none."

8         That was your answer, correct?

9    A.   That is correct.

10   Q.   Take a look at Page 196, Line 11.  "What physical
11   evidence do we have that there was a right steer input
12   followed by a counterclockwise yaw?  Answer:  There is none."
13   Is that your testimony?

14   A.   That is my testimony.

15   Q.   And you say -- and when we -- and the steer input
16   that you claim occurred, whether voluntary or involuntary,
17   whether caused by someone or something other than the
18   operator, we don't know what that steer input to the left was,
19   do we; whether it was 5 degrees, 10 degrees, 15 degrees?

20   A.   We don't.  I mean, we do not know how the front
21   flair is interacting with the --

22        THE COURT REPORTER:  I'm sorry.  Can you repeat your
23   answer.  We don't know how the front --

24        THE WITNESS:  I'm sorry; say that again.

25        THE COURT:  The court reporter didn't catch that,

1  Dr. Wright.  She said, could you repeat the last answer.

2            THE WITNESS:  We do not know how much the handlebars

3  got turned.  I can -- I can testify with absolute certainty

4  the handlebars got turned.  How much, we do not know.  We do

5  not know exactly what position the vehicle is when it was

6  doing its fore and fish as it was galloping along or bouncing

7  along.  We do not know the exact tie that the front tire hit

8  to cause the asymmetric force to cause the handlebars to get

9  rotated.  We do not know how much the handlebars got rotated.

10           Again, we -- there's no way for anyone to ever

11  come up with an answer to that, because we weren't there at

12  the time of the accident, and there was no video camera

13  running to record that accident.

14           So the answer is we do not know.  And so my

15  answers back when I was being deposed and my answer now is the

16  same, that the amount of turn of the handlebars, we -- there's

17  no way to put any numeric value to that at this point in time.

18      Q.   And we also know that you've not done any

19  operational testing to prove that the lack of rear mechanical

20  suspension can cause control problems to arise by inducing the

21  handlebars to turn involuntarily.  Correct?

22      A.   We've done testing on -- on the bouncing or the lack

23  of rear suspension.  I've not done any specific test.

24  Obviously, each surface feature in the direction that the

25  tires making contact with the surface feature will determine

1    what force and what angles the front handlebars will get

2    turned.  But to answer your question as accurately as I'm

3    trying to do, as I possibly can, the -- we have not done any

4    specific test to that, because, again, if we did a specific

5    test, it would be meaningless because we do not know the exact

6    path that the vehicle was at this time in the accident.

7         Q.   Well, forget specific tests.  Cite me a study or

8    cite to the Court a study that says if a vehicle without

9    independent rear suspension will have control problems, that

10   will cause the handlebars to turn all by themselves or to turn

11   involuntarily.  Cite me a study where I can find that finding

12   in the scientific literature.

13        A.   I do not know of any studies done to that.  I can

14   tell you that I've talked to numerous individuals who have

15   operated machines both with and without suspension.  And

16   discussions with them and the tests we've run with Randy

17   Nelson, I can tell you that the vehicle does get involuntary

18   inputs to the handlebars.  Now --

19             MR. TRISCHLER:  Objection.  Move to strike, Your

20   Honor.  Randy Nelson is not a witness in this case.  You know,

21   to just give an answer --

22             THE COURT:  Overruled.

23                  Dr. Wright, what testing, if any, and what in

24   the literature, if any, explains to you that asymmetrical

25   force was applied in this situation that would have caused the

1    outcome that you saw in the pictures?

2         THE WITNESS:  The first thing is, as I mentioned to

3    Mr. Trischler so far, is that we've done numerous tests, both

4    on lateral stability tests and on lack of suspension tests.

5         Being at the accident site -- and I thought the

6    pictures that Mr. Trischler showed as A and B, which shows the

7    accident site in this case and the railroad tracks he's

8    operating, you can see in the picture that the ties, the

9    railroad ties are very asymmetric.  I mean, obviously, when

10   they laid them, they were probably very symmetric.  But over

11   age, they've become rugged, maybe is the right word to use.

12   And so when the machine is -- is doing a fore and aft; you

13   know, bouncing or galloping, whatever terminology -- and it

14   doesn't have to be -- we're not talking about it's jumping

15   five feet into the air.  We're not talking anything along

16   those lines, which sometimes it appears that Mr. Trischler is

17   trying to make it sound like -- that the machine is a bucking

18   Bronco, which it is not.

19        But due to the fore and aft motion, due to the

20   lack of rear suspension, the front tire will put -- load and

21   unload as more and less force is being applied to it.

22        Now, as it loads up, as it pitches slightly

23   forward due to the gallop motion, you can see the railroad

24   ties, as I pointed out, are very asymmetric.  They're not

25   uniform, both up and down and across.  And so if the front

1    tire pushes down on an asymmetric tie -- tie, a railroad tie,

2    then the handlebars and the front tire are going to be shoved

3    back as a way --

4            THE COURT:  And you know that from testing that you

5    have done.

6            THE WITNESS:  We -- well, I -- yes, we -- well,

7    I've -- I've worked with Mr. Nelson.  Mr. Nelson and I have

8    done a lot of testing.  And Mr. Nelson is a co-author on the

9    paper I just -- I just referenced, the paper that was a part

10   of the 1991 transactions of SAE.  He's one of the co-authors

11   there.  Mr. Nelson and I have worked on testing on probably

12   more than -- testing itself, more than a hundred different

13   types of various scenarios.

14             Now, as I told Mr. Trischler, I have not done

15   any specific tests on railroad ties, but, again, railroad ties

16   will give a different answer each time unless the railroad

17   ties are totally uniform.  And as you can see in Picture A and

18   B, the railroad ties are not totally uniform.  They are

19   very -- due to their age, they are very asymmetric.

20             But, yes, Your Honor, we have -- we have

21   tested, and the handlebars do load up when the machine

22   does a -- goes into a forward pitch.

23           THE COURT:  Go ahead.

24   BY MR. TRISCHLER:

25       Q.   We've asked -- I've asked you a lot of questions

1   about your deposition that you gave in this case, Dr. Wright.

2   And one of the things that I asked you in your deposition was

3   to provide me with any testing from prior cases that you were

4   relying upon.  Do you remember that?

5        A.   I -- I kind of remember that, yes.

6        Q.   All right.  And you were --

7        A.   I thought --

8        Q.   You were kind enough to bring a thumb drive to your

9   deposition that had that testing, and the testing that you

10   were relying upon, you said, was from a case called Laing,

11   L-A-I-N-G.  Do you remember that?

12       A.   That's correct.  That's a case that occurred in

13   Louisiana.

14       Q.   Right.  And you produced two -- and the Laing test

15   was testing that you did on a different ATC.  It was not the

16   1984 ATC 200ES, but it was a different ATC, right?

17       A.   It was -- I think it was a 250 -- I think it was --

18   here.  Here, I've got the date here.  Hold on a second,

19   please.

20       Q.   It's probably on your list of 62.  We can find that.

21       A.   It was a 250SX, is what it was.

22       Q.   So that was my point.  It was a different ATC.  And

23   you did some testing out at an airport in Louisiana.  Right?

24       A.   That is correct.  That's where we were doing the

25   testing.

1      Q.   And the testing that you did was without any

2   operator on the vehicle.

3      A.   That is correct.  It was radio-controlled.

4      Q.   And the testing that you -- what you produced was

5   testing in Laing where you operated a vehicle at speeds

6   between 19 and 28 miles an hour through a remote control

7   device.  Correct?

8      A.   We actually ran seven tests that day, and the video

9   I provided to you were only two of -- two of the seven.  And

10   we ran it from, I think, seven miles an hour up to 20

11   some miles an hour, if I remember.

12      Q.   All I have is the two video runs, like you

13   mentioned.  One was at 19 miles an hour, and I think the other

14   one was at 28 miles an hour.  Right?

15      A.   Correct.  That is correct.

16      Q.   And what you did was not evaluate the issue we're

17   talking about now, which is suspension and uncommanded

18   steering, because what you did in that case was to steer the

19   vehicle remotely.  Correct?  To induce --

20      A.   That is correct.  That's correct.

21      Q.   Let's take a look at the two videos.  And we'll mark

22   them as Exhibit F.  I'm not going to ask you any questions,

23   I'm just going to play them right now.

24      A.   Okay.

25           (Videos played.)

1      Q.   So those video that we just watched, those are the
2  ones from the Laing case that you provided to me in response
3  to my query that you provide us with testing that you were
4  relying on from other cases.  Right?

5      A.   That's part of -- yes, that's one of the tests that
6  we did that I do rely on, that is correct.

7      Q.   And you -- and in that Laing case, the vehicles, the
8  steering was handled -- was being controlled by a cord,
9  correct?

10     A.   Correct.  There was a shock cord that is -- was
11 attached to the handlebars, that was attached to a solenoid
12 pin.  And when the solenoid pin is pulled, the handlebars get
13 turned, and we had stops on there to turn it to whatever
14 degrees that we had preset.

15     Q.   So there was no uncommanded steer inputs that you
16 were evaluating in Laing.  You were inducing steer inputs at
17 various speed to evaluate, I guess, the dynamics of a vehicle
18 with no operator.  Correct?

19     A.   What we were trying -- what I was trying to show on
20 those tests were that my analyses -- the analysis that I had
21 come up with on stability, longitudinal stability, forward
22 pitch rolls, were borne out in the real world.

23          So that when I said that the vehicle will go into a
24 forward pitch roll at a certain speed, we then ran a physical
25 test to show that it physically would.

1          Now, I -- you could make calculations both of the

2     machine without an operator, which I've done, and we ran those

3     tests, and you can then make a -- calculations of what it

4     would be with an operator of someone of Dylan's size and

5     weight, which I've done, and can show that the speed at

6     19 miles an hour, as shown in the videotape, is the same as

7     17 miles an hour if someone was on a 2 -- 250ES of Dylan's

8     size and weight.  They're mathematically equivalent.  The case

9     of st or the b/h ratio is the same in those two scenarios.

10          So, basically, those tests that were done is totally

11     applicable in this particular matter because it shows what a

12     three-wheel ATV will do under various circumstances.

13          Yes, I will agree with you that the steering was

14     induced by us, the radio control operator in this case, but it

15     doesn't matter who is controlling the steer input if the

16     handlebars get turned, whether voluntarily or involuntary.  In

17     our tests they were voluntary.  In accident scenarios, many

18     times they're involuntary.  But if the handlebars get turned

19     due to the dynamics and the instability of the Honda ATC, the

20     machine will go into a forward pitch roll, as demonstrated on

21     those two tests that I provided to you for the tests that we

22     did back in Louisiana.

23     Q.   But to the Court's question of whether or not you

24     have testing to show that galloping or bouncing from an ATV

25     without rear suspension will lead to uncommanded steer input,

1    this Laing testing has nothing to do with that.

2        A.    No, the Laing testing has a lot to do with this

3    accident scenario.

4        Q.    That wasn't my question --

5             THE COURT:  But that wasn't my question either.  I

6    suggested in my scenario that asymmetrical force hit the front

7    wheel.

8             THE WITNESS:  Correct, Your Honor.

9             THE COURT:  So that wasn't quite a description of

10   mine either.

11   BY MR. TRISCHLER:

12       Q.    So the question is, that I have, is what testing can

13   you present to validate this notion that a bouncing ATV will

14   experience uncommanded steer inputs?

15       A.    I mean, I guess I'm relying on individuals I talked

16   to, which you called hearsay.  I rely very much on my

17   co-author on two of the papers I've written, and that is Randy

18   Nelson, who has run tests numerous times with -- with my

19   input.  And he has indicated to me that -- he was the test

20   writer, and I was the provider or instigator of the testing --

21   that the machine does -- you can feel the handlebars get

22   turned right and left as the machine gallops or bounces.  And

23   the more asymmetric the front tire is in contact with the

24   surface, the greater the input to the handlebars.

25             So -- and I think it's pretty obvious, we -- to

1    anyone, if you're riding a bicycle, whatever vehicle you're

2    on, if -- if you were to feel the bicycle doing -- it doesn't

3    have to be significantly bouncing up and down, but some fore

4    and aft motion because of the surface you're riding on, you

5    literally are moving the handlebars slightly back and forth.

6    And the reason you're moving the handlebars slightly back and

7    forth is because the vehicle, as it is doing this slight

8    bouncing or undulation, is -- is receiving asymmetric forces

9    to the handlebars.  It's pretty obvious.

10        Q.   Pretty obvious even though you've never been on one.

11        A.   I've been on numerous motorcycles.  I've been on

12   four-wheel ATV's, I've been --

13        Q.   I didn't ask you about any other vehicle other than

14   the ATC.

15        A.   I know.

16        Q.   You haven't been on one.

17        A.   And I've answered that question many times.  I've

18   never been an operator on a three-wheel ATV.

19        Q.   By the way, Dr. Wright, is it true that you're not a

20   registered engineer, professional engineer in any state?

21        A.    The answer is correct.  When I taught at Ohio State,

22   and I was in the college of engineering on the faculty, the --

23   Ohio has a rule that you can only become a PE, a professional

24   engineer, registered professional engineer, if you graduate

25   from an institution that offers an accredited engineering

1  program.  My undergraduate degree, Butler University, does not

2  offer engineering.  I think they offer it now.  But when I was

3  in school, they didn't.  So I -- even though I taught students

4  and taught even the refresher course for the students to take

5  the PE exam, I was not allowed to take it because my

6  undergraduate school was not an engineering school.  At least

7  at that point in time.

8       Q.   So I think what we just confirmed is you're not a

9  registered professional engineer, and you were -- you're not

10  even qualified to sit for the exam.  Correct?

11      A.   Well, at least in the State of Ohio.  I have not

12  checked other states.

13      Q.   And as you mentioned, your undergraduate degree was

14  in the field of mathematics.  Correct?

15      A.   Mathematics, with a minor in physics and chemistry.

16      Q.   And while you were attending Butler, or at the time

17  you were attending Butler University in Indiana, they did not

18  even have an engineering program.  Correct?

19      A.   That is correct.

20      Q.   And you eventually matriculated to Ohio State and

21  obtained a Master's Degree.  And I think your Master's Degree

22  is in astronomy.  Correct?

23      A.   That is -- that is correct.

24      Q.   Your Master's thesis was entitled, "Rotational

25  Velocities of A-Type Stars Brighter than Magnitude 9.5 in High

1   Galactic Latitudes."

2           Did I get that right?

3       A.   Well, actually, it rotational velocities and radio

4   velocities of A-type stars brighter than --

5       Q.   Suffice it to say, vehicle dynamics and automotive

6   engineering were not a focus of your Master's work.

7       A.   Well, there's a lot of crossover.  I mean, to study

8   the velocities of rotation of stars both fore and aft and in a

9   rotation, you're studying the same basic laws of physics.  But

10  we did not talk about any -- at least my Master's thesis did

11  not talk about any automobiles.  That is true.

12      Q.   And, in fact, you did not take a single course in

13  mechanical engineering during your Master's program at Ohio

14  State, right?

15      A.   During my Master's program, that is correct.

16      Q.   And you continued with your education, and you

17  eventually obtained a Ph.D. in education.  Right?

18      A.   Well, my Ph.D. was a joint program.  The College of

19  Education coordinated the degree, but my degree was so I was

20  qualified to teach at the collegiate level in math, science,

21  and engineering, which I've done.

22      Q.   Your Ph.D. is not in engineering.

23      A.   My Ph.D. was a pedagogical degree that I -- my

24  dissertation allowed me to -- to best teach students majoring

25  in math, science, and engineering.  And, obviously, I was on a

1    faculty at the College of Engineering, and I taught

2    engineering mechanics, engineering graphics, statics, strength

3    in materials, dynamics.

4        Q.   The bottom line is you don't have any formal

5    training as a design engineer.  Correct?

6        A.   That is correct.  I wouldn't -- I -- my area is --

7    is, as I said, force analysis and dynamics, which talks about

8    how vehicles will behave under various circumstances.  But I

9    don't consider myself a design engineer.

10       Q.   And you have no formal training in vehicle

11   engineering?

12       A.   That's a good question.  I never took a course

13   called vehicle engineering, so I guess -- I guess if you use

14   the word "formal", I would concur with that statement.

15       Q.   You have no formal training in vehicle design?

16       A.   If you're talking about a course in vehicle

17   design -- I've -- I'm definitely qualified to talk about the

18   design of a vehicle when it comes to its -- its motions.  But

19   I don't know if I -- I never did take a course in vehicle

20   design, per se.

21       Q.   Do you hold any patents?

22       A.   I've had a patent application, but I do not hold a

23   patent myself.

24       Q.   Is it true that you've never designed an ATV that

25   was commercially marketed by any company or entity?

1        A.    Mr. Nelson and I worked on -- I guess the word
2    "ATV", I would have to agree.  I -- ours was a UTV, not an
3    ATV.
4        Q.    My question was:  You've designed an ATV that was
5    commercially marketed.  That's a true statement; is it not?
6        A.    That is a true statement, yes.
7        Q.    You've never produced any piece of power sports
8    equipment that was commercially marketed and produced, true?
9        A.    That is true.
10       Q.    You've never designed any component for an ATV
11   that's been put into commercial production.
12       A.    That's been put into commercial production, the
13   answer is correct, I have not.
14       Q.    We touched on the ANSI SVIA standards that are, I
15   think, Exhibit E.  You understand that when those were
16   established, they were a set of design and performance and
17   safety standards that were applicable to all-terrain vehicles?
18       A.    The four-wheel ATV vehicles, yes.
19       Q.    And these design, safety, and performance standards
20   have been reviewed and approved by the CPSC?
21       A.    That is correct.  I -- I think that the standards
22   are subpar, and I've even written letters to -- to the SVIA
23   indicating that I had some concerns.  I think they were a step
24   in the right direction, but I still have some concerns of
25   adequacy.

1      Q.   I'm sure you do.  But the reality of it is, is that

2   those standards are now the law in the United States, right?

3   Every ATV sold in America has to meet those SVIA standards.

4   Right?

5              THE COURT:  You said four-wheel; is that correct?

6              MR. TRISCHLER:  Yes.  I don't know if --

7              THE WITNESS:  Only four-wheel.  Right, Your Honor.

8              MR. TRISCHLER:  I don't know if I said that, but

9   that's what I meant.

10  BY MR. TRISCHLER:

11     Q.   My question to you is this:  Have you ever served on

12  the subcommittee responsible for developing those standards?

13     A.   I attended numerous meetings and hearings that the

14  CPSC had and invited me to attend, but I never was a member of

15  any of the subcommittees.

16     Q.   Have you performed any SVIA compliance testing on

17  any ATV?

18     A.   The answer is no, I have not.

19     Q.   And for at least the past 25 years, you've made your

20  living solely as a litigation consultant.  Correct?

21     A.   Yeah.  I've done a lot of other work besides ATV's,

22  but, yes, ATV litigation has been a part of my workday.

23     Q.   Sure.  I mean, ATV litigation has been part of your

24  workday for the better part of five decades.  Correct?

25     A.   I think my first ATV case was at the end of the

1    1980's.  So I would say four decades.

2         Q.   Well, I was counting decades.  '80s, '90s, 2000's,

3    2010.  Here we are in 2022.  Five decades.

4         A.   Okay.  You're right.  I was talking about the total

5    number of years.  But you're right.

6         Q.   And you have -- in your career, I think you said

7    earlier on direct examination, you couldn't remember the

8    number.  But I think you told me that over the course of your

9    career you've had a chance to look at 500 to 1,000 ATV cases

10   since you began your litigation work --

11        A.   Oh, total -- total litigation.  I would say it's

12   more than 500 ATV cases.  But the total number of ATV cases, I

13   don't think it's reached a thousand.  I've done lots of --

14   I've done trucking accidents, I've done industrial accidents.

15   I've done a lot of accident scenarios besides ATV's.  I know

16   I've done more than a thousand total assignments, litigated

17   assignments.  But ATV's, I would -- it's definitely more than

18   500.  But I don't think total ATV cases are more than a

19   thousand.

20        Q.   Okay.  I was just -- I said 500 to a thousand, so --

21        A.   Okay.  In that range, I would agree with that.

22        Q.   And since you've been looking at these ATV cases,

23   you've testified that Yamaha ATV's are defective.  Correct?

24        A.   Well, they're all very similar.  So if one is

25   defective, usually they all are because they've all kind of

1    copied each other.  So the dynamic characteristics from Yamaha

2    to Honda to Kawasaki to Polaris, they're pretty much very

3    close being the same b/h ratio or Kst from one vehicle to

4    another.

5            So if one is defective because it's laterally

6    unstable, and the other is very similar, it's going to be

7    defective also.

8        Q.   I'm sure the patent lawyers at those companies would

9    be happy to hear you say that they're all the same.  But try

10   to just stick to answering my questions, if you can.

11           You've testified time and time again since the

12   1980's that Yamaha ATV's are defective, both three- and

13   four-wheel.  Correct?

14       A.   I've not looked at every model.  I look at each

15   model specifically and go through my analysis.  I never make a

16   sweeping statement.

17           But, obviously, if I testify on behalf of a

18   Plaintiff, then my analysis in that accident scenario is that

19   it was defective, or I wouldn't be testifying.

20       Q.   Perhaps you didn't hear my question.  I didn't ask

21   you about every model.  I just said you've testified more than

22   once that Yamaha ATV's are defective.  Correct?

23       A.   That is correct.

24       Q.   And you've testified multiple times that Kawasaki,

25   Suzuki, Polaris, Arctic Cat, Can-Am ATV's are defective.

1    A.    That is correct, I have.

2    Q.    In fact, every time you've testified in a court

3  proceeding involving an ATV, you've found a defect in the ATV,

4  right?

5    A.    If it's an ATV as defined with the operator

6  straddling the seat controlled with the handlebars, then that

7  is a correct statement.

8    Q.    So we talked about the suspension issue.  Let me

9  turn to your opinions on stability, if I might.  Okay?

10   A.    Please do.

11   Q.    In your report -- I think it's at Page 8 -- you

12  suggest that the ATC 200ES is unstable and prone to

13  pitch-overs or side rollovers.  Correct?

14   A.    To forward pitch rolls or side rollovers, correct.

15  That is a correct statement.

16   Q.    And the foundation for your stability evaluation and

17  your reference to measurements of lateral and longitudinal

18  stability.  Correct?

19   A.    That is correct, yes.

20   Q.    And those measurements are referred to sometimes by

21  the designations kp, k/p, Kp, and Kst being the other.

22   A.    Correct.  They are the mathematical equivalent to

23  a/h and b/h.  So Kp is equal to a/h, and Kst is equal to b/h.

24   Q.    And when we refer to Kp, that's a measurement of

25  longitudinal stability.  Correct?

1      A.    That is correct.  And I go into detail in that 1991

2   paper that's part of the transactions of SAE.

3      Q.    Well, we're going to get into it.  Kst, on the other

4   hand, is measure of lateral or side stability.  Right?

5      A.    That is correct.

6      Q.    Both Kst and Kp are what are known as static

7   measurements.  True?

8      A.    I don't use them as static measurements.  I know

9   that the industry likes to use the word "static".  It shows

10  dynamic -- they are measured statically.  But it shows what

11  the dynamics of the machine will be under various operating

12  conditions.  So they are a dynamic criterion, but they are

13  showing -- but they are measured statically.  They are

14  measured from sitting still.

15     Q.    Perhaps there's a better way of putting it.  I

16  apologize if I was inartful.  You're suggesting that Kp and

17  Kst can be predictors of a vehicle's dynamic performance.

18  Correct?

19     A.    That is correct.

20     Q.    But they are measured statically.  By that, you've

21  got an ATV sitting on the ground.  Correct?

22     A.    Correct.

23     Q.    And you can measure Kp and Kst either with a rider

24  or without a rider, and you take various measurements and do a

25  mathematical calculation with that stationary ATV sitting on

1   the ground.

2       A.   Correct.

3       Q.   All right.  And --

4       A.   Most of those -- most of those measurements are best

5   made using a --

6            THE COURT REPORTER:  Are best made using -- I'm

7   sorry.  Are best made using what?

8            THE WITNESS:  Most of those measurements are best

9   made using a tilt table.  T-I-L-T.  Tilt table.

10  BY MR. TRISCHLER:

11      Q.   And what you were suggesting in response to one of

12  my earlier questions is while this is a static measurement,

13  you believe it can be a predictor of a vehicle's dynamic

14  performance, such that the higher the Kp number, the greater

15  the vehicle's resistance to pitch or longitudinal rollover.

16      A.   That is a very -- you said that very well.

17      Q.   And, conversely, the higher the Kst is measured, the

18  greater the vehicle's resistance to sideways or lateral

19  rollover.

20      A.   That is correct.

21      Q.   And what you've suggested in this case, if I read

22  your report accurately and followed your testimony during the

23  deposition that we had, is that you believe that every ATV

24  should be designed in such a way to ensure that its Kp, when

25  measured with a rider in a seated position, is greater than

1    1.0.  True?

2         A.    That is true.

3         Q.    In 1984, when Honda produced the ATC 200ES, did any

4    ATV manufactured by any company meet your recommended standard

5    for Kp?

6         A.    I -- I have no idea one way or another.

7         Q.    Well, take a look at Page 92 of your deposition.

8    And particularly Line 12, if you can see that, Doctor.

9         A.    Yeah.

10        Q.    In your deposition I asked you, "In 1984, when the

11   ATC 200ES was produced, did any ATV manufactured by any

12   company meet your recommended standard for Kp," and your

13   answer was, "I don't know of any that did.  That is correct."

14   Is that testimony truthful?

15        A.    I didn't know of any that did.  But -- but maybe

16   there were some.  I don't know.

17        Q.    Since 1984, the CPSC has developed standards that

18   manufacturers have to satisfy in order to sell ATV's in the

19   US.  We've talked about that, right?

20        A.    Correct.

21        Q.    And to this very day, nearly four decades after

22   Honda made this three-wheeler, the standards and the law in

23   the United States does not require any ATV to have a Kp of 1.0

24   when measured with a rider.  True?

25        A.    With a -- they don't -- they don't measure it with a

1    rider or calculate what it should be with a rider.  All they

2    said is it has to exceed one as -- with no rider.

3        Q.   Right.  And to this day, your standard for

4    longitudinal stability that you believe Honda should have met

5    in 1984 is not -- is a standard that's not required of any

6    vehicle manufacturer selling a product in the United States.

7    Correct?

8        A.   That's what I said earlier; is the standard, even

9    though it's a step in the right direction, is still subpar.

10   You still can get an accident occurring with a rider on the

11   machine, even though it meets the standards without a rider.

12            And, again, I -- as I kept saying, there are ways of

13   doing the standards.  The lawnmower industry has standards

14   with weight simulated on the seat, and I've even said -- and I

15   even sent a letter to Mr. Delaney, who was head of the SVIA at

16   the time, that the standards should be with a weight on the

17   seat approximating a 150- or a 175-pound rider, because,

18   obviously, the machine, unless you radio-control it, as we

19   have done in tests, the machine is going to have a rider on

20   the machine, so you need to have the stability quotient, the

21   stability criterion for a vehicle as it is being used with a

22   rider.  So measuring it without a rider, I think, is -- is not

23   appropriate.

24       Q.   Well, I appreciate your desire to explain, but the

25   question is this:  In the 50 years that ATV's have been

1    around, no company has ever produced one that meets the Kp

2    standard that you're looking to impose on Honda for a vehicle

3    produced back in 1984.  Agreed?

4         A.   The standard has not changed.  There's some of the

5    four-wheel ATV's now that have a Kp without a rider; 1.5, 1.6.

6    When you put a rider on it, it -- many of those machines will

7    still exceed 1 with a rider.  But -- but the standard has not

8    changed.

9              So to answer your question, the standard is still

10   the same at 1.0 with no rider.

11        Q.   Well, but --

12        A.   But as I said, there are some machines out there now

13   that have a Kp high enough that when you put a rider on, it's

14   still exceeding 1.

15        Q.   Name for me a -- according to Bob Wright, name for

16   me a non-defective ATV that has adequate longitudinal

17   stability.  A rider-only ATV that from a longitudinal

18   stability perspective, according to Dr. Wright, is not

19   defective.  Tell me which one that is.  Please.

20        A.   I -- I cannot remember.  I've measured so many.

21   As -- as I've indicated, I've probably done 6-, 700 ATV cases.

22   Obviously, I calculate each one that I work on, but I can't

23   remember which one.  All I can tell you is that they've gotten

24   more stable over the years.  The Kp has increased over the

25   years.  I cannot tell you which one --

1       Q.    Okay.

2       A.    -- falls into that category.

3       Q.    And you certainly can't tell the Court any ATV

4  that's ever been made that meets your standard for pitch

5  stability.  True?

6       A.    Well, since -- since pitch stability, as the SVIA

7  standard exists today, is measured without an operator, so as

8  I've mentioned, there's some -- and I can't remember -- I was

9  not asked to do this, so I can't remember it, and I haven't

10 gone back over my files.  But I know that some of the newer

11 ones have a higher Kp than 1.0 without an operator.

12          So you put an operator on there, 150, 160 pounds, it

13 will meet the Kp of 1.0 with an operator.  I cannot tell you

14 or the Court at this time which specific vehicles they are.  I

15 wasn't asked to do that.  But I know that there are some that

16 do meet that standard now.

17          THE COURT:  All right.  Move on.  Move on.

18 BY MR. TRISCHLER:

19      Q.    According to your report, or based on your report

20 you have -- you describe this as a pitch roll event, so the

21 more relevant measure, anyway, would be longitudinal

22 stability.  Right?

23      A.    Lateral.

24      Q.    Or lateral stability.  I'm sorry.

25      A.    That's correct.  It would be the Kst or the b/h

1   ratio.

2        Q.   And according to you, ATV's need to have a Kst

3   greater than 1.0, but preferably 1.2 as measured with a rider.

4   Right?

5        A.   That is correct.

6        Q.   In 1984 --

7        A.   Correct.

8        Q.   -- was there any ATV ever made or sold in America

9   that with a Kst with a rider greater than 1.2?

10       A.   The answer is no.

11       Q.   In 1984, was there any ATV made or sold in the world

12   that had a Kst greater than 1.2?

13       A.   If there were, I didn't know about it.  So the

14   answer I would -- the best answer I can give you is no.

15       Q.   This theoretical benchmark for static stability that

16   you have targeted is one that's never been reached by any ATV

17   manufacturer even to this day.  Correct?

18       A.   As I said, I haven't measured old or newer ones, but

19   to the best of my knowledge, it has not -- with a rider, it's

20   not reached that --

21       Q.   And no company has ever seen fit to produce a

22   rider-only ATV with a Kst of 1.2 or greater as measured with a

23   rider.  You're not aware of any such vehicle.  Correct?

24       A.   Of an ATV -- some of the UTV's, but the ATV, the

25   answer is no.

1      Q.   Right.  And no standards organization has ever

2   adopted your benchmarks for Kst.  Correct?

3      A.   Not that -- I mean, I guess -- the answer is no.

4      Q.   And let me ask you about your work a little bit in

5   this -- in this field.  You've told me that you've been

6   looking at ATV cases for the better parts of five decades, and

7   you've been critical of the design of every major

8   manufacturer.  Right?

9      A.   Only when -- and you keep saying "critical".

10  There's some that have very good -- very good aspects.  I'm

11  critical of its dynamic stability.  I mean, that's my area of

12  expertise, is when a vehicle flips over fore, aft, or to the

13  side or pitch roll.  Then it gives me great concern, because

14  usually those accidents, especially since there's very little

15  rollover protection for the operator and/or passenger, usually

16  those accident scenarios turn out to be very injurious to the

17  operator.

18           So to be critical, the ATV, I would say that -- that

19  I am critical of its dynamic capabilities of those vehicles,

20  as you mentioned.

21     Q.   Right.  And you used these static stability

22  measurements as your benchmarks for evaluating the dynamic

23  performance of these vehicles.

24     A.   Well, my -- my benchmark is we don't want the

25  vehicle to get upside-down.  On its side or upside-down.  We

1   want to keep it on its wheels.

2          And so my benchmark is a benchmark that will

3   indicate whether the vehicle stays on its wheels, like it's

4   supposed to, and everyone is -- is enjoying themselves and

5   having a good time or performing their job, whatever they are

6   using the ATV for, versus with a machine that is on its side

7   or upside-down and the occupant is -- is now being injured

8   because he's made contact with the ground.  Obviously, that

9   is -- my criteria is I want the vehicle to stay on its wheels.

10          So my analysis, my stability criterion is the value

11   that keeps the vehicles on its wheels versus being

12   upside-down.

13      Q.   Well, I guess here is my question, Dr. Wright:  Have

14   you ever put pen to paper and designed a rider-only ATV that

15   meets your theoretical standards for Kst and Kp?

16      A.   The answer is we did some testing -- the paper

17   entitled, "A Safer ATV," we used -- we used a four-wheel

18   ATV -- well, actually, we ended up bringing three vehicles in

19   that paper.  There was two -- two three-wheel ATV's and a

20   four-wheel ATV that we used in that paper.  And it was very

21   difficult -- I'm not saying it's not -- it's not impossible,

22   because, obviously, if you sit down from -- from scratch and

23   start working, the answer is, yes, you could make a

24   three-wheel ATV that is laterally and longitudinally stable.

25   It's more difficult than using a four-wheel ATV.  And we did

1   have a four-wheel ATV in that paper that we also published.

2   It was an SAE paper we published in 1991 that showed that a

3   four-wheel ATV could be made much more both laterally and

4   longitudinally stable if we did, and we did put, on that

5   particular ATV, we put rollover protection.

6           So we started out with a Honda four-wheel ATV and

7   made quite a few modifications to it.

8           So to answer your question, have I sat down with pen

9   and paper, the answer is yes, we did that.  Now, the answer is

10  partly yes because we started with a vehicle that was already

11  being manufactured.  We've never started from ground zero,

12  which would have been -- which would have been much better,

13  but, obviously, didn't have the financial capabilities as

14  Honda or Kawasaki to do such a project.

15  Q.   You referenced -- you referenced your 1991 paper

16  entitled "A Safer ATV".  I think at some point in time it was

17  a cover page that was up on the screen.

18          The vehicles that you modified and that you referred

19  to as a quote/unquote "safer ATV" did not meet your benchmarks

20  for Kp, did they?

21  A.   For Kp, it did.  Kst, it did not.

22  Q.   With a rider?

23  A.   With a rider, it did, yeah.

24  Q.   Okay.

25  A.   If I remember correctly.  Do you have a copy of it?

1          Q.   Well, that's not what you said in your deposition,
2     but we can go there, if you'd like.
3          A.   I think Kp, it did -- here, let me find a copy of
4     that paper.  If you look on Page 9 of that paper, the Kst with
5     an operator is 1.24.
6          Q.   Can I refer you to Page 106 of your deposition,
7     please.
8          A.   Well, then bring it up.
9          Q.   I'm trying, sir.  If you look at Line 17 of your
10    deposition, I asked you, "What I'm trying to get at is that
11    modified vehicle did not achieve the benchmarks or targets for
12    Kp and Kst that you've set out for us here today."  And your
13    answer was, "That is correct, they did not." [As read.]
14         A.   The Kp did.  The Kp did, but the Kst did not.
15    That's what I said earlier.
16         Q.   And so to this day, have you ever designed a vehicle
17    that met the bench --
18              THE COURT:  Okay.  You've asked that four times.  I
19    really don't want to hear that question again, please.  Move
20    on.  He wasn't asked to design a vehicle.
21              MR. TRISCHLER:  Well, Your Honor, since alternative
22    feasible design is part of the burden of proof, I'd suggest he
23    should have been.  But I'll move on.
24              THE COURT:  Let me ask you this, Dr. Wright.
25              THE WITNESS:  Sure.

1          THE COURT:  In your testing and in your work on this
2     case, is your training in physics, in engineering, or other
3     science more important to your results?
4          THE WITNESS:  I think the most important -- for this
5     particular assignment, I think the most important aspect of my
6     educational background and my knowledge is my knowledge of --
7     of engineering mechanics; statics and strength in material --
8     statics and dynamics, along with my physics background using
9     and applying the laws of physics.  That is, to me, the most
10    important in this, because that is predicting -- since this
11    vehicle accident was unobserved -- no one saw it -- then we
12    have to figure out using the laws of physics -- obviously, the
13    laws of physics are the same in Pennsylvania as they are in
14    Louisiana, as they are anyplace else.  So my laws -- the laws
15    of physics and the laws of engineering mechanics are what is
16    the most important in my analysis of this accident scenario.
17         THE COURT:  Thank you.  I'm sorry to have
18    interrupted you, Attorney Trischler.
19         MR. TRISCHLER:  No problem, Your Honor.
20         THE COURT:  Go ahead.
21    BY MR. TRISCHLER:
22    Q.   Let me just ask you a few questions about your
23    reconstruction of this accident, Dr. Wright.  All right?
24         You have opined that this accident occurred when
25    Dylan Fehlman was driving on the railroad tracks at speeds of

1    approximately 10 miles per hour.  Correct?

2        A.   I would say in the neighborhood of 10 to 15.

3    It's -- obviously, they don't have speedometer -- no one knows

4    what he was really running.  But at 10 to 15 miles an hour,

5    you're going to get some pretty good undulation, or as we use

6    the word bouncing or galloping at that speed.  And it's more

7    than enough speed to cause the lateral instability to

8    precipitate a forward pitch roll.

9             So looking at the vehicle where Dylan ended up,

10   where the vehicle ended up and the accident scenario, it

11   appears that the best speed is in the 10- to 15-mile-an-hour

12   category.

13            When you do enough of these accident reconstructions

14   and study the laws of physics and look at your -- the testing

15   that you've done and look at all the accidents you've looked

16   at, you get a pretty good feel when you go through the

17   analysis of what the speed is for a specific vehicle as I've

18   done in this particular case.

19       Q.   Did you indicate --

20       A.   So to answer your question -- to answer your

21   question, 10 to 15 is the most likely speed that this accident

22   unfolded.

23       Q.   Did you indicate in your report that he could have

24   been going as fast as 20 miles per hour?

25       A.   I don't think he was going that fast, because,

1   again, as you increase the speed, you increase the kinetic
2   energy.  And you increase the kinetic energy by the square.
3   So you double the speed, you get four times the energy.  You
4   get four times the energy, he's going to move farther -- the
5   difference between the vehicle and where Dylan ends up is
6   going to be greater.
7           As you can see in the photographs that were taken at
8   the accident site by the police after the accident occurred,
9   Dylan is pretty darn close to the vehicle, which would
10  indicate that the speed is not -- is not greater than 15 miles
11  an hour.
12          But, I mean, you never know.  I mean, you could get
13  as high as 20.  I would say it could be as high as 20, but 20
14  would be unlikely that high, because of the kinetic energy
15  involved.
16      Q.   Respectfully, I'm not sure you answered my question.
17  My question was:  Did you say in your report that he could
18  have been going as high as 20 miles per hour?
19      A.   I can't remember what I put in my report.  I looked
20  at it the other day, but I can't remember what the upper limit
21  was.  If that's what I said in my report, then that is true.
22      Q.   Well, I'm looking at Page 6 of your report.  You
23  tell me if this is a true statement.  Quote, "As he was
24  traveling eastbound on the roadbed at approximately 10 to
25  15 miles per hour (no more than approximately 20 miles per

1    hour) --"

2         A.   That's what I said.  It could be as high as 20, but

3    I don't think it's that high.

4         Q.   Now, your reconstruction that you say you performed

5    in this case, do you agree it was not -- the reconstruction is

6    not based on any published methodology?

7         A.   I would disagree.  I mean, all accident

8    reconstruction -- I've written several papers on accident -- I

9    wrote a paper on ATV accident reconstruction.  I don't know if

10   you have a copy of it, but it's -- it was published by the --

11   published by the American Society of Mechanical Engineers.

12        So an ATV accident reconstruction follows accident

13   reconstruction -- the category, you do the same thing in each

14   case.  Now, obviously each case is different, and there's

15   different constraints that you have to work on and satisfy.

16        But ATV accident reconstruction is a little

17   different than automobile accident reconstruction because of

18   the various constraints and the various dynamics of the

19   vehicles.

20        But -- but, yes, I think my methodology I used in

21   this case is exactly the same that I used in every case,

22   whether it's an automobile accident, whether it's an

23   industrial accident, whether it's an ATV accident.  Obviously,

24   you have to apply the correct laws of physics and the correct

25   equations or dynamics for the various vehicles.  And so the

1  methodology I used here is the same as the methodology that

2  most accident reconstructionists use and that I used in

3  basically all thousand cases that I've investigated, analyzed,

4  and given opinions.

5       Q.   Well, tell me what mathematical equations you used

6  to come up with the speed of between 10 and 15, but no more

7  than 20.  What was the mathematical equation --

8       A.   What I'm doing -- I don't use -- in that

9  particular -- what I do -- I do use -- first of all, I know

10 that with Dylan on the machine, what is the minimum speed he's

11 going to go into a forward pitch roll.  And it's got to go

12 into a forward pitch roll at a great enough speed --

13      Q.   Excuse me, sir.  That wasn't my question.  Tell

14 us -- I want to know the mathematical formula you used.  You

15 said your reconstruction was based on mathematical formulas.

16 What was the formula?

17      A.    If you refer to Paper 911944, which is the paper

18 that is part of the --

19           THE COURT REPORTER:  I'm sorry.  I'm sorry.  91 --

20           THE WITNESS:  It's 911944.  And the title of the

21 paper is, "Stability and Maneuverability Problems of ATV's"

22 and it is a paper that I was the lead author, and it's part of

23 the 1991 transactions of SAE.  And I'm going to tell you which

24 page to go to.

25           Go to Page 7 and follow down.  There's a whole

1    bunch of equations there, and those are the equations I used
2    to determine speeds of lateral upset.  And I used the same
3    equations in this analysis that I did in all the other
4    analyses --
5    BY MR. TRISCHLER:
6         Q.   Do you have a worksheet that you can show me for
7    this case of the equations and inputs that you used?
8         A.   I don't have those anymore.
9         Q.   Well, you have produced your file for me in
10   discovery, and they weren't in there.
11             THE COURT:  He just testified -- said he doesn't
12   have them anymore.
13             MR. TRISCHLER:  Well, I'm trying to find out, Your
14   Honor, if he ever had them.  Because I don't think they were
15   done.
16             THE WITNESS:  It's just a calculation.  Mr.
17   Trischler, are you trying to indicate to the Court that I just
18   made up these numbers?  The answer is no, I did not make them
19   up.
20   BY MR. TRISCHLER:
21        Q.   I'm asking you, sir, did you ever have the
22   calculations, and where are they?
23        A.   I do the calculations because most of the time when
24   you do an accident reconstruction, you have to do an iterate
25   process --

1          THE COURT REPORTER:  You have to do a what process?

2          THE WITNESS:  Iterate.  It means -- an iteration is

3   a mathematical term which means you do a calculation and then

4   see what the results are, and then you do another calculation,

5   changing some of the variables, and you kind of hone in on the

6   correct answer.  It's solving differential equations.  That's

7   the way all computers do it, is by iteration.  And, obviously,

8   a computer can do a million calculations in a very short time.

9   But if you're doing them by hand, usually you take small --

10  bigger steps in and out.

11          But, yes, I -- those are the equations I used.

12  Anyone can put those numbers in.  You can put the --

13          THE COURT:  Dr. Wright, he was asking you if you had

14  the worksheets.  So if you did them by hand, do you have the

15  worksheets where you used those -- those formulas?  And if you

16  did them on the computer, could you tell us that.

17          THE WITNESS:  The answer is I did them by hand, and

18  I do not have those sheets of paper anymore.

19          MR. TRISCHLER:  Thank you.

20  BY MR. TRISCHLER:

21      Q.   When you did your reconstruction, did you use any

22  computer program or computer modeling?

23      A.   No, I did not.

24      Q.   Did you perform any momentum analysis to support the

25  reconstruction?

1          A.    No, I did not use any momentum in this case.

2          Q.    Your opinion as to speed and your efforts at

3     reconstruction, were they based on any published force

4     displacement data?

5          A.    They were based on the equations I gave you just a

6     few minutes ago in our 1991 paper, and they are based on

7     numerous analyses of various accidents I've looked at over the

8     years by -- as I mentioned to you, the speed is a

9     determination of the kinetic energy that the vehicle and the

10    rider have at any point in time.  And the positions of the

11    vehicle and the rider when they go into a lateral upset, you

12    get a very good feel.

13          So since I've done so many accidents, in this

14    particular case I -- I did the calculations to determine what

15    the upset velocity is going to be.  And as you can see, we've

16    run tests up to 28 miles an hour on a Honda ATC.

17          So, obviously, this accident scenario was not as

18    violent as the test you saw in the video.  That -- that

19    vehicle flipped over three or four times.  This one was only a

20    partial -- I mean, a -- this didn't even go one time over.  It

21    just went over onto its side.  But it was enough to eject

22    Dylan.

23          So we know the speed has to be definitely 20 miles

24    an hour; more likely 10 to 15.  And, again, it's the

25    experience doing one test after another, doing the

1  calculations to determine what speeds it's going to take to go

2  into lateral upset, those -- that is the best explanation I

3  can tell you of the methodology I used and how I came up with

4  these numbers.

5       Q.   Yeah, I appreciate that, but that wasn't my

6  question.  All I asked you was:  As part of your

7  reconstruction, did you rely on any published force

8  displacement data?

9       A.   I don't know what you mean by "force displacement".

10  Do you mean bending --

11       Q.   Crash data.

12       A.   No.  I've used crash data because I've had some

13  crash data in the past, but in this case, no, I did not.

14       Q.   A couple more questions, because I know the Court

15  wanted to finish at 4:30.  So I'll just ask you four more

16  questions, hopefully.

17            Number one, remember we were talking about the

18  limited space between the rails and the tires as the ATC sits

19  on the tracks?

20       A.   Correct.

21       Q.   And you've told us about the uncommanded or

22  involuntary yaw might have been on the order of 10 degrees or

23  15 degrees.  We don't know for sure.  Do you remember that?

24       A.   The un -- the unattended -- the first shove is

25  probably much smaller than that.  The asymmetric -- because of

1    the bouncing or galloping of the machine hitting the

2    asymmetric ties probably caused a two-, three-, four-degree

3    turn.  And as Dylan felt that turn, he's trying to correct or

4    keep the machine going in the straight direction, so he puts

5    counterforce in the opposite direction.

6              Counterforce in the opposite direction, especially

7    if the vehicle then moves to the next tie, could be enough to

8    get it into, as I said, 10 to 15 degrees, and that's what

9    causes the precipitation -- or, I mean, the rollover --

10   Q.   I wasn't asking you when 10 to 15 degrees comes in.

11   I'm just trying -- I was just trying to establish a predicate

12   for my question that you have a -- you mentioned a 10- to

13   15-degree turn or steer input or yaw.

14             Have you done any testing with an ATC 200ES to

15   evaluate how long it will take for the rear wheel to move

16   seven inches in response to a 10-degree steer input?

17   A.   No, we have not done any testing of that.

18   Q.   Would you agree that within a matter of

19   milliseconds, if the steering wheel is turned 10 degrees, that

20   the rear wheel will move outboard seven inches?

21   A.   When you say "millisecond", I mean, obviously,

22   everything can be measured in milliseconds.  I have not done

23   any testing.

24             And as I said early on, I -- I think the tires made

25   contact with the rails, but in the -- in the turning-over

1    maneuver, I don't think the rails caused it, but I think the

2    tires did make contact with the rail -- one or more of the

3    side rails --

4        Q.    Have you done -- I didn't mean to cut you off.  I'm

5    just trying to cover these last couple things.  Sorry.

6        A.    Sure.

7        Q.    Have you done any modeling or simulations with an

8    ATC 200ES to evaluate how much movement of the rear wheel is

9    seen in response to a 10-degree steering plate?

10       A.    The answer is no, I have not.

11       Q.    You mentioned -- you outlined during direct

12   examination your opinions.  We've talked a lot about

13   suspension.  I think we talked a lot about stability.

14           You mentioned two things, two opinions that you have

15   about the ATC.  One relates to warnings.  You understand that

16   the Court has already granted summary judgment to Honda, and

17   that there is no claim in this case that the warnings that

18   were provided with the vehicle at the time of sale are

19   defective?  You understand that claim is out?

20       A.    I have been informed of that, and I do not plan to

21   testify at the time of trial anything about that.

22       Q.    All right.  I'm just trying to clarify these last

23   two things for the record.

24           And then you also talked about the seat and because

25   it's a rider-active vehicle, like the motorcycle is, the seat

1   for an ATC is long.  And you've been critical of the design of

2   the seat.

3          Isn't it true that in your deposition you testified

4   that while you believed the seat is defective, you do not have

5   any opinion that enables you to link the alleged defect in the

6   seat to the cause of this accident?  Didn't you testify to

7   that in deposition?

8      A.   That is correct.  And that's still my opinion.

9      Q.   All right.  So you won't be testifying at trial that

10  the seat had anything to do with the cause of Dylan Fehlman's

11  accident.  Right?

12     A.   The answer is correct, I will not be testifying to

13  the defective nature of the seat.

14          MR. TRISCHLER:  Your Honor, in the interest of time,

15  I'll stop.

16          THE COURT:  Thank you.  Thank you, sir.

17          Attorney Kelly, do you want to ask your

18  questions now, if you don't have many, or we can ask Dr.

19  Wright to join us in the morning.

20          MR. KELLY:  Your Honor, I think I can do it in five

21  minutes or less.

22          THE COURT:  You're on the clock, sir.

23                      REDIRECT EXAMINATION

24  BY MR. KELLY:

25     Q.   All right, good afternoon, Dr. Wright.  So much was

1  made about this discussion of stability.  I just want to talk

2  about your report; specifically on Page 7.  And I'll just read

3  this to you, as opposed to putting it up.

4        But you write, "I established a criterion to

5  determine whether an ATV was designed so as to avoid forward

6  pitch rolls," and in parentheses, "Lateral instability."  And

7  then you say, "The lateral stability criterion is explained in

8  detail in the papers, 'Lateral and Longitudinal Stability of

9  ATV's and Instability and Maneuverability Problems of ATV's'."

10  And my question to you, Dr. Wright, can you please explain

11  this criterion.

12        A.    That criterion is -- is a number.  It has no -- it's

13  called a value that will predict dynamically what the machine

14  will do.  And that is if the vehicle's attempted turn maneuver

15  at various speeds, it will go into lateral upset instead of

16  following a curve path or -- or skidding and spinning out if

17  it's trying to -- if you put a turn input into the handlebars,

18  instead of following that curved path, it will go into upset

19  and flip over.  And, obviously, that's not what you want to

20  happen on a vehicle where you have no protection whatsoever

21  where the operator can be ejected off.

22        So that is my criterion of a vehicle being stable

23  and unstable.  And Kp is longitudinal, Kst is for lateral.

24        Q.    Did you use the same criterion in the previous cases

25  that you were an expert witness in?

1          A.    Virtually every case that I've worked on, if there

2     is a -- a longitudinal stability problem or a lateral

3     stability problem, I definitely have always used Kp or a/h and

4     Kst or b/h as the criterion.

5               And in the equations that I just pointed out that

6     are on Paper 911944, which is part of the 1991 transactions of

7     SAE, I have those equations.  I use them every time I am asked

8     to evaluate and analyze an accident scenario involving a

9     three- or four-wheel ATV.

10         Q.    And in using that criterion, Doctor, have you ever

11    been disqualified as a witness?

12         A.    Never.

13              MR. KELLY:  I have no more questions.  Thank you.

14              THE COURT:  Thank you.  We appreciate your time and

15    your testimony, Dr. Wright.  You are excused.

16              THE WITNESS:  Well, thank you.  Thank you.

17              THE COURT:  I'm going to allow Defendant's witness

18    over objection to testify in the morning.  We will begin at

19    10:00.  And I have a Board of Judges meeting at 12:30, so I

20    would like to get some lunch, so I'd say we'll be done at

21    noon.  Is that doable?

22              (Discussion held off the record.)

23              (Hearing adjourned at 4:40 p.m.)

24

25

1                    C E R T I F I C A T E

2        I, JANIS L. FERGUSON, RPR, CRR, certify that the
   foregoing is a correct transcript from the record of
3   proceedings in the above-entitled case.

4

5   \S\  Janis L. Ferguson         5/20/2022
   JANIS L. FERGUSON, RPR, CRR     Date of Certification
6   Official Court Reporter

7

8

9

10                      I N D E X

11

12   WITNESSES:                              PAGE

13   WILLIAM F. KITZES

14        Direct examination by Mr. Friday        2
         Cross-examination by Mr. Auther         18
15

16   ROBERT R. WRIGHT

17        Direct examination by Mr. Kelly         87
         Cross-examination by Mr. Trischler      101
18        Redirect examination by Mr. Kelly      190

19

20

21

22

23

24

25