## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMIE NELSON, individually and as** | ) | |
| **Administratrix of the Estate of** | ) | |
| **DYLAN FEHLMAN,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 1:18-cv-210** |
| | ) | |
| **v.** | ) | |
| | ) | **Re: Daubert hearing** |
| **AMERICAN HONDA MOTOR CO., INC.** | ) | **ECF Nos. 93, 95, and 97** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

### Introduction

This products liability action arises out of an accident in which 17-year-old Dylan Fehlman died. Plaintiff Mrs. Jamie Nelson is the mother of the deceased and is the administratrix of Fehlman's estate. Dylan was driving a three-wheel All Terrain Cycle ("ATC") manufactured and originally sold by Defendant American Honda Motor Company ("Honda") around 1984.

Following a Consent Decree between several industry manufacturers (including Honda) and the Consumer Product Safety Commission in 1988, **new** three wheel All Terrain Cycles were no longer manufactured or sold in the United States. *See* cpsc.gov/Newsroom/News-Releases/1988/CPSC-Approves-Consent-Decrees-for-All-Terrain-Vehicles.[1]

In motions practice, the Court dismissed Plaintiff's claims for failure to warn (premised on time-of-sale warnings and a failure to recall), strict liability manufacturing defect, fraudulent concealment, and negligent misrepresentation. And the parties stipulated to the dismissal of

---

[1] The Court may take judicial notice of the information published on a government website. *See Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. Aug. 22, 2017) *citing Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

several other claims. *See* ECF No. 9; ECF No. 213. At this advanced stage in the litigation, the only claims remaining for trial are strict liability claims[2] based on the failure to warn (based on a post-sale duty) and defective design. ECF No. 1 (Counts I, II, and X).[3]

Although there are 34 motions in limine pending, this Memorandum Opinion addresses three of the four motions that required a *Daubert*[4] hearing. They are:

> • Defendant's Motion to exclude testimony of Robert Wright, Ph.D. [ECF No. 93];
>
> • Defendant's Motion to exclude testimony of John Talbott [ECF No. 95]; and
>
> • Defendant's motion to exclude testimony of William Kitzes [ECF No. 97].

This Court held a *Daubert* hearing which was conducted in a hybrid manner with the Court and attorneys appearing in person and three (of the four) witnesses appearing via video conferencing. *See* ECF No. 214-215 (Transcript).

---

[2] Pennsylvania law recognizes three different types of defects that give rise to a strict liability claim: (1) design defect; (2) manufacturing defect; and (3) warning defect (i.e., failure to warn or inadequate warnings). *Lopez v. Ethicon Inc*., 2020 WL 5569770, at *3 (E.D. Pa. Sept. 17, 2020) *citing Phillips v. A-Best Prods. Co*., 665 A.2d 1167, 1170 (Pa. 1995). This case presents two distinct theories of liability: design defect and warning defect.

[3] Counts I and II of the complaint are pled as survival claims and Count X is pled as a wrongful death claim. "A survival action is brought by the administrator of the decedent's estate in order to recover the loss to the estate of the decedent resulting from the tort. The measure of damages awarded in a survival action include the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of his earning power – less personal maintenance expenses, from the time of death through his estimated working life span." *Kiser v. Schulte*, 648 A.2d 1, 4 (Pa. Supreme 1994) (internal citations omitted). In contrast, "an action for wrongful death may be brought by the personal representative of those persons entitled to receive damages for wrongful death under the statute. Wrongful death damages are established for the purpose of compensating the spouse, children, or parents of a deceased for pecuniary loss they have sustained as a result of the death of the decedent. The damages recoverable in a wrongful death action include the present value of the services the deceased would have rendered to the family, had she lived, as well as funeral and medical expenses." *Id.*

[4] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

### *Daubert* **standard of review**

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony.
Expanding on those Rules, the Supreme Court set out the standard for admissibility of expert
testimony in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In *Daubert*, the
Supreme Court delegated to district courts a "gatekeeping responsibility" under Rule 702. This
responsibility requires that courts determine at the outset whether an expert witness may "testify
to (1) scientific knowledge that (2) will assist the trier of fact." *Id*. at 592.

The gatekeeping function demands an assessment of "whether the reasoning or
methodology underlying the testimony is scientifically valid" as well as "whether that reasoning
or methodology properly can be applied to the facts in issue." *Id*. at 592-93. A district court
"exercises more control over experts than over lay witnesses," since "expert evidence can be
both powerful and quite misleading because of the difficulty in evaluating it." *Id*. at 595.

After *Daubert*, the Third Circuit established three basic requirements for the admissibility
of expert testimony. The party seeking to introduce the expert testimony must demonstrate:

> (1) the expert's qualifications;
>
> (2) the reliability of the proffered testimony; and
>
> (3) the fitness of the testimony (or, in other words, the connection between the opinion and the issues in the case).

*Santiago v. Walmart*, 2019 WL 5103106, at *2 (W.D. Pa. 2019) *citing In re Paoli R.R. Yard
PCB Litig*., 35 F.3d 717, 741-43 (3d Cir. 1994) ("*Paoli II*"). The admissibility of expert
testimony "hinges on a 'trilogy of restrictions: qualification, reliability, and fit." *Three Rivers
Hydroponics, LLC v. Florists' Mutual Ins. Co*., 2020 WL 419946, at *1 (W.D. Pa. 2020) *quoting
Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The burden of establishing **each** of these

requirements by a preponderance of the evidence is on the party seeking to present the expert testimony to the jury. *Id. citing In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir. 1999).

The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert. *Paoli II,* 35 F.3d at 741. Qualification "refers to the requirement that the witness possess 'specialized expertise' which requirement the Third Circuit has interpreted liberally, holding that 'a broad range of knowledge, skills, and training qualify an expert.'" *Ellison v. United States*, 753 F.Supp.2d 468, 475 (E.D. Pa. Nov. 10, 2010) *quoting Schneider*, 320 F.3d at 404 (cleaned up).

To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Paoli II,* 35 F.3d at 742, *quoting Daubert*, 509 U.S. at 589. "An expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Id*. In other words, "an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Id*.

As to the fit prong, admissibility "depends … on the proffered connection between the scientific research or test result … and [the] particular disputed factual issues." *Id*. at 743. This third element "goes primarily to relevance." *Daubert*, 509 U.S. at 591. The expert's testimony "must fit under the facts of the case so that 'it will aid the jury in resolving a factual dispute.'" *Meadows v. Anchor Longwall & Rebuild, Inc.,* 306 Fed. App'x 781, 790 (3d Cir. 2009) *quoting Lauria v. National Railroad Passenger Corp.,* 145 F.3d 593, 600 (3d Cir. 1998). "The standard for [this] factor is not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Id*.

Importantly, credibility is not part of the *Daubert* analysis. Instead, the credibility of a witness and the weight of the evidence are for a jury to decide. *Babcock & Wilcox Ebensberg, Power, Inc. v. Zurich American Ins. Co.,* 2005 WL 6068838, at *9 (W.D. Pa. 2005).

**Burden of Proof at *Daubert* Hearing**

The burden of proof for the admissibility of expert testimony falls upon the party who seeks to introduce the evidence. *Oddi v. Ford Motor Co*., 234 F.3d 136, 145 (3d Cir. 2000). However, the Third Circuit has emphasized that "the test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology." *Id*. Moreover,

> "[t]he standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."

*Id. citing Paoli II*, 35 F.3d at 743. District courts must always be cognizant of the fact that "the analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." *Id*.

**Plaintiff's Expert Robert Wright [ECF No. 93]**

Honda seeks to exclude Robert Wright, Ph.D. as a witness in this matter. Dr. Wright's expertise is Force Analysis and Dynamics, a discipline that includes the areas of product and vehicle design, stability of vehicles, and accident reconstruction. Dr. Wright has authored and

co-authored scientific papers related to the design and testing of ATVs and vehicle accident reconstruction.[5] ECF No. 210, Declaration of Robert Wright.

In the preparation of his written report, Dr. Wright met with Dylan's mother and stepfather. He examined and analyzed the accident vehicle and the accident site. He also reviewed copies of photos of the vehicle and the accident site taken by the Pennsylvania State Police the day after the accident; the deposition testimony of Chris Nelson, Edith Ciongoli, Fred Bailey, Jamie Nelson, Robert Hadley, Pennsylvania State Trooper Kenneth J. Hahn, and John Bulick; answers to various discovery requests (numbered 1-5365); the Pennsylvania State Police non-traffic death investigation report; the Warren County Coroner's Report.

Dr. Wright performed numerous tests on Honda and other manufacturer's ATVs including lateral stability tests on a Honda three-wheel ATC; performed calculations and analyzed this accident scenario (including calculating the dynamic characteristics of the ATC with an operator of about the same size and weight of Dylan at the time of the accident); investigated and analyzed hundreds of other off-road accident scenarios; and inspected and analyzed hundreds of off-road vehicles manufactured by Honda and others.

In his written report, Dr. Wright opined that the accident was caused by the defects inherent in the 1984 Honda ATC 200ES "Big Red" Three-Wheel vehicle, explaining:

> "As he was travelling east bound on the roadbed at approximately 10 mph to 15 mph (no more than approximately 20 mph) and due to the extremely unstable characteristics of his vehicle (1984 Honda ATC 200ES "Big Red"), the Honda ATC went into a forward pitch roll (flipping over both in a forward and side-wise manner). As noted by State Trooper Kenneth J. Hahn, the Honda ATC 200ES appeared to have been bouncing or galloping prior to the accident occurring. This vehicle (1984 ATC 200ES "Big Red") has its rear axle mounted rigidly to the frame. This design will cause control or steering problems which are brought

---

[5] In its papers, Honda does not challenge Dr. Wright's qualification as an expert. *See* ECF No. 214, page 93. However, Honda makes much of the fact that Dr. Wright has testified frequently to the instability of ATVs. Honda's argument in this regard is of no moment: whether, and to what extent, Dr. Wright has testified in other cases is not part of this Court's inquiry under *Daubert*.

about by the fact that the rear of this vehicle has no suspension other than the soft balloon tires on which it rides. Lack of adequate rear suspension will cause the ATC to bounce up and down or gallop at speeds of less than 10 mph. Due to this bouncing or galloping of the vehicle, the handlebars can get turned or rotated involuntarily. Tests performed and analyses done by the present author have shown, that if the handlebars get turned (either voluntarily or involuntarily) 10 to 15 [degrees] with no significant movements of the rider, the ATV will go into a forward pitch roll (the ATV will flip over). Due to the defects inherent in the 1984 Honda ATC 200ES "Big Red," it flipped over (forward pitch roll) causing Dylan to impact the railroad ties on the ground which resulted in his death. The damage done to the 1984 Honda 200ES "Big Red" in this accident scenario (or lack of major damage) shows that this accident did not occur at speeds over approximately 20 mph.

Thus, it is my opinion that the 1984 Honda ATC 200ES "Big Red" Three-Wheel ATV is the cause of this accident and the death of Dylan Fehlman. This product has defects which are inherent in its design and these defects caused this accident. Honda knew or should have known that its design of this vehicle was defective in that it was inherently unstable."

ECF No. 131-1, pages 5, 6-7.[6]

---

[6] Plaintiff summarizes Dr. Wright's report as highlighting five particular defects in the ATV which led to Dylan's accident:

1) The weight distribution and location of the center of gravity for the vehicle was inappropriate, making the vehicle laterally unstable and prone to forward pitch rolls.

2) The rear end of the ATV has no suspension, which causes control or steering problems.

3) Due to the inherent instability of the ATV, Dr. Wright recommends there be an occupant protection system.

4) The seat of the ATV is defective because it is too long, which allows the operator to inadvertently move because of the unexpected events or unanticipated changes in the terrain.

5) There are insufficient warnings on the machine to address the inherent instability of the ATV.

ECF No. 131, page 4. Following summary judgment, four of these five are no longer relevant to (or "fit") this case. *See* ECF No. 82, Report and Recommendation; ECF No. 87, Final Order adopting Report and Recommendation. The only remaining theory of defective design advanced by Dr. Wright is that the vehicle was laterally and longitudinally unstable.

At its core, Dr. Wright's theory of defective design is that the subject ATC was both laterally and longitudinally unstable and the lack of independent rear suspension contributed to that instability. Honda challenges Dr. Wright's testimony because it "falls short of the methodology and reliability components of *Daubert*." ECF No. 214, page 93. Honda argues that Dr. Wright employed no reliable methodology in reaching his conclusions that the lack of an independent rear suspension and resulting lack of stability (both lateral and longitudinal) caused this accident. ECF No. 94, page 7.

Honda challenges the reliability of Dr. Wright's proffered testimony in several ways. First, Honda takes issue with Dr. Wright's claims that the ATC galloped or bounced. Honda characterizes Dr. Wright's opinion in this regard as "pure fantasy." ECF No. 94, page 12. However, Dr. Wright specifically relies on the notes of State Trooper Kenneth Hahn that the vehicle was bouncing or galloping and Dr. Wright says as much in the report itself. ECF No. 131-1, page 6. *See also* ECF No. 214, Transcript of Dr. Wright's hearing testimony, page 110 ("I'm basing that on the testimony of Officer Hahn. He put that in his accident report, and he also stated that in his deposition testimony."). Additionally, the pre-incident testimony of John Bulick indicates he witnessed the bouncing of an ATC. *See* ECF No. 107-1, page 24. The bouncing or galloping of similar ATCs is also supported in other scientific and technical papers, as discussed by Dr. Wright at the *Daubert* hearing. *See* ECF No. 214, page 130. So then, Dr. Wright's supposition in this regard is not fantastical or outlandish; it is based on the Accident Report authored by a State Trooper with more than twenty years of experience,[7] the testimony of Mr. Bulick, and, more generally, by technical papers of the Society of Automotive Engineers.[8]

---

[7] ECF No. 94-6, Deposition of State Trooper Kenneth Hahn, pages 6-7.

[8] The Court recognizes that there are pending motions in limine to exclude certain subject areas of testimony by Trooper Hahn and Mr. Bulick. Those motions will be addressed separately.

Next, Honda argues that Dr. Wright's actual methodology is not reliable. When faced with a challenge to reliability based on methodology, a district court considers eight non-exclusive factors: whether a method consists of a testable hypothesis; whether the methodology has been subject to peer review; the known or potential rate of error; the existence and maintenance of standards controlling the technique's operation; whether the methodology is generally accepted; the relationship of the technique to methods which have been established to be reliable; the qualifications of the expert witness to testify based on the methodology; and the non-judicial uses to which the method has been put. *Paoli II*, 35 F.3d at 742 n.8. These factors "are neither exhaustive nor applicable in every case … and the inquiry envisioned by Rule 702 is a flexible one." *Strictly F/X L.L.C. v. Pyrotecnicco F/X, L.L.C.*, 2022 WL 2343309, *4 (W.D. Pa. June 29, 2022) *quoting Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008). Because "the evidentiary requirement of reliability is lower than the merits standard of correctness," the standard for determining scientific reliability "is not that high." *Oddi*, 234 F.3d at 155-56, *quoting Paoli II*, 35 F.3d at 744-45.

Dr. Wright conducted numerous tests on ATVs manufactured by Honda as well as others. These tests included lateral stability tests, mathematical calculations, and analysis of the present accident scenario. ECF No. 210, Declaration of Dr. Wright, ¶ ¶ 9-11. In his hearing testimony, Dr. Wright described his methodology: he applies the facts and data examining the dynamics of the subject vehicle, then uses "mathematical calculations to determine why the vehicle did or what it would do at various positions or speeds during that accident scenario." ECF No. 214, page 98. Dr. Wright's written report indicates that he established a criterion to determine whether

---

While these pending motions may impact Dr. Wright's testimony at trial, they do not factor into the current analysis under *Paoli II.*

an ATV was designed to avoid forward pitch rolls or lateral instability. When questioned about

this criterion at the evidentiary hearing, Dr. Wright explained:

> "That criterion is a number. It has no – it's called a value that will predict
> dynamically what the machine will do. And that is if the vehicle's attempted turn
> maneuver at various speeds, it will go into lateral upset instead of following a
> curve path or – or skidding and spinning out if it's trying to – if you put a turn
> input into the handlebars,  instead of following that curved path, it will go into
> upset and flip over. … So that is my criterion of a vehicle being stable and
> unstable. And Kp is longitudinal, Kst is for lateral."

*Id*. at 191.[9] Dr. Wright further clarified that all of the methodology and equations he uses are

published in his paper "Stability and Maneuverability Problems of ATVs" which was presented

to the Society of Automotive Engineers in 1991. *Id*. at 98. Numerous courts around the country

have allowed Dr. Wright to testify to a jury using this same methodology and criterion. *Id*. at 99,

192.

In regard to the purported unreliability of Dr. Wright's testimony, Honda points out that:

• Wright has never operated or conducted any tests of an ATV on railroad tracks;

• Wright has never done comparative testing to show that an ATC "gallops"
across railroad ties;

• Wright provides no analysis, test data, or research to explain how a "galloping"
ATC can cause the handlebars to move without operator input.

ECF No. 94, page 21. Moreover, to combat Dr. Wright's opinion, Honda has introduced a

competing expert witness, Graeme F. Fowler, who holds a Ph.D. in Applied Mechanics[10]. Honda

maintains that Dr. Fowler has "done the exact analysis Wright should have done." ECF No. 94,

page 23. Driving an exemplar ATC on eighteen feet of railroad ties and heavy gravel ballast at a

---

[9] Judge Lanzillo's Report and Recommendation further detailed the calculations in Dr. Wright's
report. ECF No. 82, page 19-20.

[10] Applied Mechanics relates to the "informations and movement of bodies when applied under
forces or displacements" and "covers things like stress analysis, also fluid mechanics in that it's
more a … mathematical theoretical side of engineering." ECF No. 215, pages 3-4.

testing facility, Dr. Fowler conducted video-taped test runs which revealed no galloping. ECF No. 215, Testimony of Dr. Graeme Fowler, pages 12, 19-23; Hearing Exhibits H – L.

Honda uses Dr. Graeme's experiential testing to disparage Dr. Wright's mathematical methodology. Dr. Graeme's methodology does not make Dr. Wright's methodology unreliable. "There are no bright-line rules requiring that an expert undertake a specific type of testing in a particular case." *See Trask v. Olin*, 2016 WL 1181428, at *11 (W.D. Pa. 2016).

In considering several factors in the flexible reliability analysis, most notably whether the methods are generally accepted, whether the methodology has been subject to peer review, and the qualifications of the witness to testify based on the methodology, Dr. Wright's opinions are reliable and will not be excluded. Honda's challenges are grounds for cross-examination of Dr. Wright, not a valid basis to exclude him altogether. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Oddi,* 234 F.3d at 155–56  ("The test is not '[w]hether the ... expert might have done a better job.'") (internal citation omitted). Accordingly, Honda's motion to exclude the testimony of Robert Wright [ECF No. 93] will be denied.


**Plaintiff's Expert William Kitzes [ECF No. 97]**

Honda has also moved to exclude the testimony of William F. Kitzes, another of Plaintiff's proposed expert witnesses. Plaintiff proposes to offer Mr. Kitzes as an expert in support of the post-sale failure to warn claim.

Honda moves to exclude Mr. Kitzes' testimony challenging each of the three parts of the *Paoli II* test for admissibility, arguing that Kitzes is not qualified to express the opinion that he

offers; that his opinion is not reliable because the "method" he used to arrive at his opinion is not

scientific, and that his generic views about warnings would not be helpful to the jury.  *See* ECF

No. 98, pages 7-22.

*Qualifications*

Honda first attacks Mr. Kitzes' qualifications as an expert in this case. The Court

interprets this requirement "liberally," considering that "a broad range of knowledge, skills, and

training qualify an expert as such." *Paoli II*, 35 F.3d at 741. The basis of an expert's "specialized

knowledge" can include "practical experience as well as academic training and credentials."

*Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998).

Mr. Kitzes' educational background, as noted in his Curriculum Vitae, is uncontested.

He received a bachelor's degree in history, with a minor in political science from the University

of Wisconsin as well as a law degree from the American University – Washington College of

Law. *See* ECF No. 98-8, page 2. Upon completion of his law degree, Kitzes worked as an

attorney for the Federal Consumer Products Safety Commission ("CPSC") for six years. *Id*. at

page 3. He then left the CPSC and joined the Institute for Safety Analysis, working as that

organization's Vice President and General Manager for two years. *Id*. Then, in 1983, Kitzes

started his own consulting company, Consumer Safety Associates. *Id*. He has been a presenter

and speaker at numerous workshops and conferences on safety-related issues and has authored

numerous articles on consumer products safety issues. *Id*. at pages 4-8. His firm has been

retained as a safety consultant to provide advice and guidance on safety issues for many

manufacturing companies. *Id*. at page 8. His work with these companies included consultations

on product safety issues, warning labels and safety bulletins, and point-of-purchase recall

displays. *Id*. Mr. Kitzes also authored an article for the Journal of Law, Medicine, and Healthcare

in 1989 for the World Health Organization outlining the issues involved with ATV safety. ECF No. 214, page 7.

But despite this experience, Mr. Kitzes is not a registered engineer nor is he a member of any professional engineering societies or organizations, as Honda points out. ECF No. 98, page 17. Honda also notes that Mr. Kitzes has no experience in the "design, engineering, development, or testing of industrial machinery, helmets, golf-karts, or go karts, automobiles, or automotive restraint systems." *Id*. Additionally, Honda argues that Kitzes is unqualified because he has "never conducted, supervised, or organized any field testing of any ATV …." *Id*. Nor has Mr. Kitzes "conducted any comparative analysis of ATV operations in difference environments …." *Id*. Finally, Honda argues that because Mr. Kitzes "has not tested the subject ATV or any similar models for fitness and safety … has never ridden a three-wheeled ATV … has never conducted any testing on alternative and supplemental warning labels … [and] has never formulated any post-sale warning labels or implemented a campaign to inform users of safety concerns after the purchase of a product," he is not qualified under Rule 702 to offer expert testimony in this case. *Id*. at pages 17-18.

Plaintiff argues that Mr. Kitzes is qualified as an expert on product safety and "hazard control." ECF No. 129, at page 5. She points to Mr. Kitzes' "thirty years of experience as Board-Certified Public Safety Manager and Hazard Control Manager," and his concomitant "knowledge with regard to how companies should handle matters of product safety" as support for his expert qualifications. *Id*. at page 6. Plaintiff also notes that Mr. Kitzes has "been qualified as a product safety expert in numerous other cases involving ATVs and motorcycles." *Id*. Indeed, many federal courts, including some within the Third Circuit, have also qualified Mr. Kitzes as an expert on a wide range of consumer product safety issues. *See, e.g., Schmidt v. Conagra Foods,*

*Inc.,* 2020 WL 7027445 (D. Conn. Nov. 30, 2020); *Schall v. Suzuki Motor Am.*, 2020 WL

1225047 (W.D. Ky. Jan. 12, 2020); *Ruggiero v. Yamaha Motor Corp., USA*, 2017 WL 1197755

(D.N.J. Mar. 31, 2017).

After careful review, the Court concludes that Mr. Kitzes is qualified to give expert

testimony in this case. Despite his lack of a formal engineering education, he presents the

minimum education, training, and experience to testify about warning labels in general. *Accord,*

*Ruggiero*, 2017 WL 1197755, at *5. The Court concludes that despite some of the deficiencies in

his educational background—as pointed out by Honda—the designation of an expert as

unqualified "simply because [he or she] does not have the most appropriate degree of training" is

improper. *Yarchak v. Trek Bicycle Corp.,* 208 F. Supp.3d 470, 495 (D.N.J. 2002); *see also Rullo*

*v. Univ. of Pittsburgh*, 2021 WL 640063, at *3 (W.D. Pa. Feb. 18, 2021) (holding that "a broad

range of skills and training can qualify a witness as an expert."). Further, the fact that Mr. Kitzes

is not a product designer or engineer does not mean that he lacks "specialized knowledge" which

he can provide to inform Plaintiff's allegations that the warnings at issue were inadequate. *See,*

*e.g., Ruggiero*, 2017 1197755, at *5; *see also Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 782

(3d Cir. 1996) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court

does not deem the proposed expert to be the best qualified or because the proposed expert does

not have the specialization that the court considers most appropriate.").

Thus, giving Mr. Kitzes' education and experiences the liberal construction required

under *Daubert* and *Paoli II,* the Court finds that they satisfy the "generalized qualifications"

requirements for designation as expert for purposes of this case.

*Reliability*

Reviewing the reliability of Kitzes' methods requires the Court to focus on the legal claim to which Kitzes' conclusions relate: the post-sale duty to warn claim.[11] Honda maintains that Kitzes' conclusions, as they relate to that claim, are wholly unreliable.  Honda argues first that much of Mr. Kitzes' report correlates to claims that have already been dismissed. *See* ECF No. 98, page 15. That argument is more appropriately reviewed in connection to relevance, which the Court will discuss, *infra*. Second, Honda maintains that Kitzes' report lacks any "true analysis, tests or engineering theory," and instead "relies primarily on injury statistics, and CPSC guidelines." *Id*. Finally, to the extent anything in Kitzes' report implicates the post-sale failure to warn claim, Honda contends that the report "is utterly devoid of any credible methodology or testable hypothesis."  *Id*. at page 22.

Mr. Kitzes opines that despite what he considers the "known risks" of its ATCs, Honda failed to apply the accepted principles of product safety management to take corrective actions to eliminate, guard, or warn consumers of the danger and motivate them to avoid injury. ECF No. 129-1, pages 11-12. Plaintiff argues the methodology used in reaching this opinion is reliable because Kitzes relied on his "extensive industry practice, experience, and knowledge relating to product safety" in reaching his conclusions. ECF No. 129, page 8. Honda counters that Kitzes' experience and knowledge do not present "a testable hypothesis" and lack any "discernable scientific approach that can be subject to peer review or error rate." ECF No. 98, page 24.

But, as one court recently noted, "… experts need not be scientists or mathematicians. The Rules of Evidence permit experts with 'scientific, technical, *or other specialized knowledge.*'" *Ke v. Liberty Mutual Ins. Co*., 2021 WL 5203150, at *2 (E.D. Pa. Nov. 9, 2021)

---

[11] Mr. Kitzes acknowledged that his testimony as an expert would pertain to this claim. ECF No. 214, page 11 (*Daubert* Hearing Transcript).

(emphasis in original) *quoting* F.R.E. 702(a). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]here are many different kinds of experts, and many different kinds of expertise."). Thus, for experts like Mr. Kitzes, "whose expertise is based purely on experience," as opposed to experiments or tests, "courts focus on two factors: (1) Is the methodology commonly used? (2) Is the opinion based on sufficient 'professional studies or personal experiences?'" *Ke,* 2021 WL 5203150, at *2, *quoting Kumho Tire Co*., 526 U.S. at 151-52.

At the *Daubert* hearing, Kitzes testified that "I'm going to present notice, only notice of what the engineers said and what Honda understood." ECF No. 214, page 45. Based on his experience and background, Kitzes stated that he would testify to Honda's post-sale duty to warn stemming from the 1988 Consent Decree. *Id*. at pages 80-82. For example, Kitzes indicated that while he had not created a warning label in this case, he had "presented the warnings that Honda agreed to post-sale." *Id*. at page 80. He acknowledged that he was not asked to create a warning label for this case, but that he "believe[d] that the warnings that came out of the Consent Decree are reasonable … I say that I can rely on those to provide the information necessary in this case." *Id*. The labeling outlined in the Consent Decree serves as a baseline for Honda's duty to warn. *Id*. at page 82.

Kitzes' methodology aligns "with how experts typically testify about industry customs and practices." *Ke*, 2021 WL 5203150, at *2, *citing Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217-18 (3d Cir. 2006). That is, drawing on his "specialized observations," Kitzes is comparing industry practices to the facts before him. *See Kumho Tires*, 526 U.S. at 149. Thus, the Court finds his methodology reliable.

*Relevance*

Finally, Mr. Kitzes 'testimony must be relevant and must "fit" the case. *Daubert*, 509

U.S. at 597. Relevant evidence is that which has "any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable that it

would be without the evidence." *Id. citing* F.R.E. 401. Put another way, Kitzes' testimony must

be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."

*Repa v. Napierkowski*, 2022 WL 1522360, at *3 (W.D. Pa. May 13, 2022) *quoting United States*

*v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985). The standard for determining relevance is a

liberal one. *Hausknecht v. John Hancock Life Ins. Co., of New York*, 2022 WL 1664362, at *4

(E.D. Pa. May 25, 2022) *citing Daubert*, 509 U.S. at 587.

Honda argues that Kitzes' expert opinions are irrelevant to the remaining portion of

Plaintiff's post-sale failure to warn claim. *See* ECF No. 98, pages 19-22. This Court disagrees.

While Pennsylvania recognizes the post-sale failure to warn theory of strict liability, the precise

contours of such a claim, and indeed strict liability in general, remain a bit unsettled.[12] However,

part of the analysis requires juries in Pennsylvania courts (and in federal courts applying state

law in diversity cases) to examine the "peculiarities of the industry" "to support the imposition of

---

[12] *See generally Commonwealth v. Monsanto Co*., 269 A.3d 623, 657 (Pa. Commw. Ct. Dec. 30, 2021) ("[I]nconsistent application has led to what the Pennsylvania Supreme Court has recognized as the continuing state of disrepair in the arena of Pennsylvania strict-liability design defect law."); *Sullivan v. Werner Co*., 253 A.3d 730, 745 (Pa. Super. Apr. 15, 2021) (in discussing unsettled state of strict liability, "we note that federal district court decisions, as well as those by federal Courts of Appeal, are not binding on Pennsylvania courts."). *Cf. Oberdorf v. Amazon.com Inc*., 818 Fed. App'x 138 (3d Cir. June 2, 2020) (certifying questions to Pennsylvania Supreme Court as to whether § 402A of Restatement (Second) of Torts would apply to e-commerce business because it was unable to predict how the Pennsylvania Supreme Court would rule.); *Tincher v. Omega Flex, Inc.,* 104 A.3d 328 (Pa. Supreme 2014) (overruling *Azzarello v. Black Bros. Co.,* 391 A.2d 1020 (Pa. Supreme 1978) and declining to adopt Restatement (Third) of Torts: Products Liability).

liability." *Padilla v. Black & Decker Corp.*, 2005 WL 697479, at *6 (E.D. Pa. 2005). In

summarizing Pennsylvania law, the *Padilla* court explained:

> "[W]hether a plaintiff will be able to proceed on such a theory [of post-sale failure
> to warn] is a highly fact-intensive question. Potential material questions of fact on
> this matter will include, but perhaps not be limited to, whether the product was
> defective at the time it left the hands of the manufacturer, whether the
> manufacturer subsequently became aware of that defect, whether the goods are
> sold in a 'small or distinct market,' and whether the establishments that service
> the product are 'convenient and logical points of contact.'"

*Id. See also Trask*, 2016 WL 1255302, at *9 ("[A] fact-intensive analysis is necessary to

determine whether Defendant had a duty to warn" in a case involving strict liability of a firearm

manufacturer).

Kitzes' written report provides, inter alia, detailed background on consumer product

safety management principles and the ATV industry generally. He explains that Honda knew its

ATCs were dangerous and continued to convey a message to the purchasing public that its

vehicles were reasonably safe. ECF No. 129-1, page 20. Moreover, Kitzes describes Honda's

obligations under the 1988 Consent Decree with regard to warnings required on the subject

vehicle and opines that Honda failed to "adequately provide safety data and warnings required by

1988 final consent decree." *Id.* at ¶ 4.  This information is directly relevant to the jury's

determination of liability on the post-sale failure to warn claim.

Accordingly, the motion to exclude the testimony of Mr. Kitzes [ECF No. 97] will be

denied.


**Plaintiff's Expert John Talbott [ECF No. 95]**

Finally, Honda seeks to exclude the testimony of Dr. John Talbott at trial. At the

evidentiary hearing, Plaintiff produced evidence that John Talbott is a board-certified neurologist

with forty years' experience evaluating head injuries. ECF No. 215, pages 57-59. In the preparation of his written report, Dr. Talbott explained that he reviewed the coroner's report, death certificate, police report, and photographs from the accident scene, as well as the complaint. ECF No. 96-7.

In his report, Dr. Talbott observed that the left side of Dylan's head was struck by a railroad tie causing him to suffer an indentation to his left temple. Dr. Talbott concluded that Dylan's cause of death was blunt force trauma to the head with depressed skull fracture resulting in intracranial hematoma and subsequently trans-tentorial herniation with neurogenic respiratory failure and cardiovascular collapse. Dr. Talbott found that the mechanism of injury was blunt cranial trauma with a depressed left temporal bone skull fracture. The fracture resulted in an intracranial hematoma which in itself would not have caused instantaneous death but there was the rapid development of secondary trans-tentorial herniation associated with the hematoma which a brief interval would have resulted in respiratory compromise and cardiovascular collapse with death. Dr. Talbott opined that Dylan did not die immediately and he was cognizant of pain, anxiety, and stress for a brief time before his death. Additionally, Dr. Talbott deduced that even if Dylan had been wearing a helmet, he would have experienced at minimum, a traumatic brain injury and permanent cognitive impairment.

Honda's challenge to Dr. Talbott's testimony is two-fold: 1) Dr. Talbott's testimony about the timing of Dylan's death and his awareness/consciousness (after the accident but before his death) should be excluded and 2) Dr. Talbott's testimony speculating about potential injury if Dylan had been wearing a helmet should be excluded.[13]

---

[13] Honda does not argue that Dr. Talbott should be precluded from offering expert opinion as to the cause of Dylan's death.

*Levels of Consciousness*

Dr. Talbott testified that based on Dylan's injuries his death was "inevitable" but it was "not instantaneous." Instead, "there would have been a brief period of cognizance" following the injury. ECF No. 215, page 60. Dr. Talbott went on to explain that consciousness is "difficult to define." *Id.* Based on his experience, Talbott detailed three levels of consciousness (or, in his words, "being") and opined that

> "Once [Dylan] hit his head, then he would no longer have any knowledge or understanding, but he would have primitive feeling; pain, anxiety, things of that nature. … I would say maybe a minute, maybe two or three minutes. And then he would do down to "be," loss of consciousness, which would just simply be heart rate, pulse, breathing, things of that nature. And then following that, it would be total loss of blood pressure, control and there would be death."

*Id.* at page 61.

Honda argues that Dr. Talbott's opinion regarding pain and suffering is not relevant and does not "fit" this case. Honda points out that, under Pennsylvania law, damages for pain and suffering can only be awarded in cases where a plaintiff was conscious. Honda's point is well taken and is an accurate statement of the law. *See Tong-Summerford v. Abington Memorial Hosp.*, 190 A.3d 631, 652 (Pa. Super. 2013) *citing Kiser v. Schulte*, 648 A.2d 1, 4 (Pa. Supreme 1994) ("The measure of damages awarded in a survival action includes the decedent's *conscious* pain and suffering.") (emphasis added).[14]

However, there is sufficient connection between Dr. Talbott's scientific opinion and the disputed factual issues. Throughout his forty-year career as a hospital neurologist, Dr. Talbott

---

[14] "The determination of the amount to be awarded for pain and suffering is primarily a jury question." *Tong-Summerford v. Abington Mem'l Hosp.,* 190 A.3d 631, 653 (2018) *quoting Gunn v. Grossman,* 748 A.2d 1235, 1241 (Pa. Super. 2000).

has examined hundreds, if not thousands, of patients while they are unresponsive to higher levels of mental functioning and further has examined unresponsive patients to advise on organ harvesting. ECF No. 215, page 76. Dr. Talbott's decades of experience with patients in the field informs his testimony, which is relevant to how long Dylan lived after the trauma, his level of brain function and whether he experienced pain during that time. These subjects are not within the common knowledge of jurors. In this case, pain and suffering goes to the available damages in this action. Dr. Talbott's testimony in this regard is a strong fit. *See Three Rivers*, 2020 WL 419946, at *2, *citing In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 745 ("The standard for fit is 'not that high,' although it is 'higher than bare relevance.'").

*Helmet Scenario*

In his written report, Dr. Talbott also opined that even if Dylan had been wearing a helmet, he would have experienced an axonal shearing injury with resultant traumatic brain injury and permanent cognitive impairment. ECF No. 130-1.

As to the helmet scenario, Dr. Talbott's testimony will be excluded. Plaintiff offered no evidence to support that Dr. Talbott is an expert or has any specialized knowledge in this area. Honda elicited testimony from Dr. Talbott that he is not a helmet expert, has never worked for a helmet manufacturer, has never been involved in the testing of helmets, and is not familiar with governmental standards that apply to helmets. ECF No. 215, pages 84-85. Accordingly, Dr. Talbott is not qualified to offer testimony in this regard and his testimony will be excluded.

To summarize, Honda's motion to preclude the testimony of Dr. Talbott [ECF No. 95] will be granted in part and denied in part. Dr. Talbott will be permitted to testify as to cause of death and Dylan's level of awareness/pain in the moments between the accident and his death,

but he will not be allowed to testify as to any opinion about possible injuries if Dylan had been wearing a helmet.

# O R D E R

AND NOW, this 6th day of July 2022;

IT IS HEREBY ORDERED that Honda's Motion to exclude testimony of Robert Wright, Ph.D. [ECF No. 93] is denied.

IT IS FURTHER ORDERED that Honda's Motion to exclude testimony of William Kitzes [ECF No. 97] is denied.

IT IS FURTHER ORDERED that Honda's Motion to exclude testimony of Dr. John Talbott [ECF No. 95] is granted in part and denied in part. Dr. Talbott will be permitted to testify as to cause of death and Dylan's level of awareness/pain in the moments between the accident and his death, but he will not be allowed to testify as to any opinion about possible injuries if Dylan had been wearing a helmet.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States District Judge